**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Avenue, 34th Floor
New York, New York 10016
T: 212-686-1060
F: 212-202-3827
Email: lrosen@rosenlegal.com
pkim@rosenlegal.com

***Lead Counsel for Lead Plaintiff Wyche***

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTOPHER WYCHE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ADVANCED DRAINAGE SYSTEMS, INC., JOSEPH A. CHLAPATY, and MARK B. STURGEON,<br><br>Defendants. | Case No. 1:15-cv-05955 (KPF)<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Christopher Wyche ("Plaintiff") by and through his undersigned attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (1) a review and analysis of regulatory filings made by Advanced Drainage Systems, Inc. ("ADS" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (2) a review and analysis of press releases and media reports issued by and disseminated by ADS; (3) a review

of other publicly available information concerning ADS; and (4) conversations with former employees of ADS.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired ADS securities between July 25, 2014 and March 29, 2016, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities law and to pursue remedies under asserting claims under Sections 10(b) and 20(a) the Securities Exchange Act of 1934 (the "Exchange Act").

2. Throughout the Class Period, Defendants ADS, Joseph A. Chlapaty ("Chlapaty"), its Chairman and CEO, and Mark B. Sturgeon ("Sturgeon"), its CFO, knowingly or recklessly disseminated materially false and misleading ADS financial statements – financial statements they ultimately restated. Former employees describe a corporate culture and accounting function that blatantly disregarded generally accepted accounting principles ("GAAP") in favor of what accounting personnel commonly referred to as "SAAP," or "Sturgeon approved accounting principles," named for Defendant Sturgeon. ADS's corporate accounting function told accounting personnel assigned to the Company's manufacturing facilities simply to get used to it. Compounding the Company's knowing rejection of GAAP, former employees describe internal controls – on which Defendants had been intensely focused from at least late 2013 as they began the process of going public – that were materially inadequate for a public company.

3. Defendants were focused on ADS's internal controls because, by late 2013, it had become evident that the Company was going public. By means of a Registration Statement on Form S-1 and a Prospectus ("Offering Documents") that Defendant ADS filed with the Securities Exchange Commission ("SEC") and which became effective on July 24, 2014, ADS issued stock

in its initial public offering ("IPO") for the first time. The IPO and a follow-on offering in December, 2014, enabled certain controlling shareholders to sell hundreds of millions of dollars in ADS stock to the public and for the Company, itself, to reap over $100 million for the Company to pay down certain debt.

4. The Offering Documents, themselves, included financial statements for fiscal years 2010-2014.[1] In addition, the Offering Documents projected that the Company's internal controls were adequate to meet the requirements of a public company, including the requirements of the Sarbanes-Oxley Act of 2002 ("SOX"), and that the Company was compliant with the Foreign Corrupt Practices Act and similar anti-corruption laws. Last, the Offering Documents described that ADS was compliant with all of its debt covenants.

5. Once public, ADS performed well, and the stock rose from an IPO price of $16 per common share to nearly $30 per share in mid-May, 2015. In the interim, the Company disclosed earnings for the first three quarters of fiscal 2015, ending June 30, 2014, September 30, 2014 and December 31, 2014. Early on the morning of May 12, 2015, the Company issued a press release, disclosing its results for the fourth quarter and year ended March 31, 2015. On this news, the Company's stock price jumped 8.4% on robust volume.

6. On June 30, 2015, however, the Company announced a delay in filing its 2015 Annual Report on Form 10-K ("2015 10-K"). It would not file that document with the SEC until March 29, 2016. The Company announced that "it was in the process of finalizing its inventory costing analysis, which will require additional time to complete." In addition, according to the Company, "the Audit Committee of the Company's Board of Directors has undertaken a review

[1] ADS's fiscal year ends March 31.

of the Company's journal entry control processes, which review is ongoing and will require additional time to complete."

7. On the morning of July 15, 2015, the Company issued a further delay in filing the 2015 10-K. In the press release, Defendants stated that it was reviewing inventory values and determining whether transportation and equipment leases it had recorded as operating leases were really capital leases. On this news, ADS's stock price fell $0.56 or 2%.

8. After the close of the market on August 17, 2015, the Company announced that, in fact, it had misclassified leases and would have to reclassify them as capital leases. In addition, the Company confirmed that its review of inventory costing would necessitate adjustments to inventory accounting. According to the Company, it found other, unspecified errors that it would reflect in its restated. Even though the Company issued a press release on that same day, announcing that it would pay a $0.05 per share dividend, the next trading day, August 18, 2015, the price of ADS common stock fell $1.14 or 4%.

9. The Company omitted from this disclosure that its internal controls were wholly inadequate, that its Mexican operations were plagued with potential accounting and control errors and that the SEC had transmitted a request for information, concerning these accounting problems.

10. On November 9, 2015, before the opening of trading, the Company issued a press release, announcing the departure of Defendant Sturgeon after 33 years with ADS. On that news the Company's stock price fell $1.83 or 6%.

11. The Company did not file the 2015 10-K until after the close of trading on March 29, 2016. In it, the described problems well beyond those Defendants had cursorily described in previous disclosures. As Defendants had disclosed, the restatement related to the inventory costing problems and the lease misclassification, in part. The GAAP Defendants failed to adopt in

preparing its financial statements was simple and prescriptive, requiring little if any estimates or judgment on Defendants' part. But the Company also disclosed that its internal controls were ineffective, that accounting personnel had been asked to adjust journal entries "without proper authorization or support . . ., with which they were uncomfortable" or which were inappropriate. In other words, Defendants had wholly misrepresented both ADS's financial condition and its internal controls. At the same time, insiders sold millions of dollars of ADS common stock at inflated prices. The SEC's informal investigation, became a formal investigation with its service of a subpoena on ADS.

12. On this news, the price of ADS common stock fell $1.50 or 6% on March 30, 2016. By virtue of their Class Period purchases of ADS common stock, Lead Plaintiff and the members of the Class have been damaged.

## JURISDICTION AND VENUE

13. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

14. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), and Section 27(c) of the Exchange Act (15 U.S.C. §78aa(c)) as a significant portion of the defendants' actions, and the subsequent damages, took place within this District.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

16. Lead Plaintiff Christopher Wyche, as set forth in the accompanying certification (see Exhibit A), incorporated by reference herein, purchased ADS common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17. Defendant ADS is a Delaware corporation with its principal executive offices situated at 4640 Trueman Boulevard, Hilliard, Ohio 43026. ADS common stock trades on the New York Stock Exchange ("NYSE") under the symbol "WMS."

18. Defendant Joseph A. Chlapaty ("Chlapaty") has served as the Company's President and Chief Executive Officer at all relevant times. Defendant Chlapaty joined ADS in 1980. He has served as Chairman of the ADS board of directors since 2008, a director since 1988, President since 1994 and Chief Executive Officer since 2004. Prior to serving as CEO, Defendants Chlapaty served as ADS vice president and Chief Financial Officer. Prior to his employment with ADS, Defendants Chlapaty served as corporate accounting manager, assistant treasurer, and treasurer for Lindberg Corporation. He began his career with Arthur Andersen LLP. During the Class Period, he signed all relevant filings with the Securities Exchange Commission ("SEC"), certifying the Company's post-IPO financial statements and the material accuracy of its financial condition and results of operations as ADS's principal executive officer.

19. Defendant Mark B. Sturgeon ("Sturgeon") has served as the Company's Executive Vice President, Chief Financial Officer, Secretary and Treasurer at all relevant times. Defendants Sturgeon joined ADS in March, 1981, serving as executive vice president and Chief Financial Officer since February, 1994. Prior to that, Defendant Sturgeon served ADS as Corporate Cost and Budget Manager and Market Planning Manager. ADS named him corporate controller in

October, 1988. Prior to joining ADS, Defendant Sturgeon was a Budget & Financial Analyst for Borden Company after spending a year with accounting firm Touche Ross & Company. Defendant Sturgeon claims to hold both a bachelor's and master's degree in accounting from Penn State University. During the Class Period, he signed all relevant filings with the Securities Exchange Commission ("SEC"), certifying the Company's post-IPO financial statements and the material accuracy of its financial condition and results of operations as ADS's principal financial officer.

20. Defendants Chlapaty and Sturgeon are referred to herein as the "Individual Defendants."

21. ADS and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### *Background*

22. ADS bills itself as a "leading manufacturer of high performance thermoplastic corrugated pipe, providing a comprehensive suite of water management products and superior drainage solutions for use in the construction and infrastructure marketplace." ADS's "product line includes corrugated high density polyethylene (or HDPE) pipe, polypropylene (or PP) pipe and related water management products." In addition to its drainage businesses, it claims to "have aggressively pursued attractive ancillary product categories such as storm and septic chambers, PVC drainage structures, fittings and filters, and water quality filters and separators."

23. The Company claims that its products are "lighter, more durable, more cost-effective and easier to install than comparable alternatives made with traditional materials." According to the Company, its "innovative products" have "non-residential, residential, agriculture and infrastructure applications." Boasting a national sales distribution platform, a wide

breadth and scale of products and "manufacturing excellence," ADS boasts that its "national footprint combined with our strong local presence and broad product offering makes us the leader in an otherwise highly fragmented sector comprised of many smaller competitors." The market in which it competes, ADS claims, consists of an approximately $10 billion in annual revenue opportunity. With the "the increasing acceptance of thermoplastic pipe products in international markets represents," the Company projected international markets as an opportunity for.

24. The Company entered the market for corrugated polyethylene pipe in the late 1980s, and claimed "to consistently gain share and achieve above market growth throughout economic cycles." It continued that it expected "to continue to drive conversion to our products from traditional products as contractors, civil design engineers and municipal agencies increasingly acknowledge the superior physical attributes and compelling value proposition of our thermoplastic products." To supply product, the Company described "an extensive domestic network of 48 manufacturing plants and 19 distribution centers allowing us to effectively serve all major markets in the United States, which we define as the largest 100 metropolitan statistical areas based on population."

25. The Company's fiscal year ends on March 31. For the fiscal year ended March 31, 2014, the Company reported net sales of $1,069.0 million, net income of $12.9 million, Adjusted EBITDA of $147.0 million and $454.0 million of total outstanding debt.

***The Initial Public Offering***

26. Prior to July 24, 2014, ADS was a private company with equity ownership divided among management (24.17%), and several investors including ASP ADS Investco, LLC ("ASP") (57.42%) and the University of Notre Dame du Lac ("Notre Dame") (10.10%). On July 24, 2014, however, the Company through an initial public offering ("IPO"), enabled ASP and Notre Dame

to sell millions of shares of the stock they owned. The Company filed a final Registration Statement and Prospectus with the SEC ("Offering Documents"), detailing, among other things, ADS's business, financial statements and operations. Defendants Chlapaty and Sturgeon signed the effective Registration Statement. In the IPO, ASP sold 7,894,737 shares while Notre Dame sold 1,315,789 shares and the Company sold 5,289,474 shares for proceeds of $118,105,266, $19,684,203 and $79,130,531 respectively, after underwriting discounts and commissions.

27. ASP, a Delaware limited liability company, is 99% owned by American Securities Partners V, L.P., a $2.3 billion fund raised and sponsored by American Securities, a private equity investment firm. American Securities that purports to focus "on partnership with great companies and their existing management teams, using conservative capital structures to enable stability, growth and flexibility." Outside investors contributed $2.3 billion to the ASP V Funds, providing the capital ASP used to invest in ADS.

28. At the time of the IPO, by virtue of its September, 2010, investment in ADS, ASP appointed three members to the ADS board of directors, including David L. Horing ("Horing"), managing director of American Securities, Mark A. Lovett ("Lovett"), a vice president of American Securities, and Scott M. Wolff ("Wolf"), another managing director of American Securities. Lovett holds a B.A. in Economics from Yale and an M.B.A. from the University of Pennsylvania's Wharton School. Horing holds a B.S in economics and engineering from the University of Pennsylvania and an M.B.A. from Harvard. Wolff holds a B.S. in finance from Indiana University and an M.B.A. from the University of Pennsylvania's Wharton School.

29. In "partnering" with companies such as ADS, American Securities purports to have a fund life of 25 years, allowing it "to focus on the long-term best interest of companies." American Securities claims that its "investment team serves as thought partner to management

teams," providing assistance with strategic initiatives, acquisition evaluation, financing and "continuous improvement." In addition, American Securities makes available to companies its resource group, "a team of functional experts who are American Securities employees and are available upon a CEO's request." The resource group offers "expertise" in strategy, operations, human capital and information technology. American Securities claims that "the combination of our Investment Team and the Resource Group helps management drive value creation."

30. With respect to ASP's investment in ADS, the Offering Documents state:

> In connection with the investment in our common stock by ASP ADS Investco, LLC, an affiliate of American Securities, in 2010, certain of our stockholders, including ASP ADS Investco, LLC, entered into an amended and restated stockholders' agreement that provides, among other things, that ASP ADS Investco, LLC is currently entitled to elect (or cause to be elected) four out of 11 of our directors. Currently, such directors include Messrs. Horing, Lovett and Wolff and Ms. Fratto. The stockholders' agreement will be terminated contingent upon, and effective at the time of, consummation of this offering and it will be replaced by a registration rights agreement with certain of our stockholders, including ASP ADS Investco, LLC.

31. According to the Offering Documents, at the time of the IPO and beyond, the Audit Committee was responsible for selecting independent auditors and approving both audit and non-audit services those auditors perform. The Audit Committee is charged with "monitoring the integrity of [ADS's] financial statements and its compliance with legal and regulatory requirements as they relate to financial statements or accounting matters." In addition, the Audit Committee is charged with "reviewing the adequacy and effectiveness of [ADS's] internal control policies and procedures." The Audit Committee interacted with auditors and management to discuss audit scope and results and reviewing interim and annual financial results.

32. ASP's Lovett served on the Company's Audit Committee, notwithstanding, the Offering Documents state, that:

> Our board of directors has determined that Mr. Lovett is not independent for the purposes of audit committee membership, due to his employment with American Securities. American Securities is a significant stockholder through its affiliate, ASP ADS Investco, LLC. Accordingly, solely for the purpose of Rule 10A-3 of the Securities Exchange Act of 1934, as amended, our board of directors has concluded that Mr. Lovett is an affiliated person by virtue of his relationship with American Securities and thus not considered independent for purposes of Exchange Act Rule 10A-3, although he is considered to be independent for purposes of the rules of the NYSE.

33. With all the thought capital American Securities purported to bring ADS, its professionals – including Lovett whom, the board of directors found qualified to serve on the Audit Committee – failed to discern that ADS's internal controls were materially inadequate and its financial statements materially inaccurate.

34. Notwithstanding its purported focus on long-term investing and long-term success, after only three years, ASP determined to begin cashing out of ADS. After reaping over $118 million through its IPO sale, ASP still owned over 19.5 million shares of ADS or 36.84%. Then again, on December 4, 2014, ADS issued a secondary offering, this time allowing ASP, and ASP alone, to sell ten (10) million more shares at $20.35 per shares for proceeds of $203,468,750.

***The Company Assures the Market that it is Compliant with its Debt Covenants***

35. According to the Company in the Offering Documents, during fiscal 2014, the Company's financing, included a credit agreement with PNC bank that consisted of a $325 million revolving credit facility and bank term loans in an aggregate original principal amount of $100 million. In addition the Company had issued Senior Notes through a private shelf offering with Prudential Investment Management, Inc., enabling the Company to issue to Prudential notes in the aggregate principal amount of $100 million. As of the IPO date, the Company had issued all $100

million in Senior Notes, having "no further amount available for issuance of senior notes under the private shelf agreement."

36. About its liquidity, the Company stated:

> As of March 31, 2014, we had $84.3 million in liquidity, including $3.9 million of cash and cash equivalents and $80.4 million in borrowings available under our Revolving Credit Facility, described below. We believe that our cash on hand, together with the availability of borrowings under our Revolving Credit Facility and other financing arrangements and cash generated from operations, will be sufficient to meet our working capital requirements, anticipated capital expenditures, scheduled interest payments on our indebtedness and dividend payment requirement for our convertible preferred stock for at least the next twelve months. We are not dependent on this offering to meet our liquidity needs during that period.

37. In addition, ADS noted that its debt agreements and instruments imposed "restrictive covenants" on it, including certain financial ratios. The Company described its Leverage Ratio and the Fixed Charge Ratio, stating:

> For any relevant period of determination, the Leverage Ratio is calculated by dividing Total Consolidated Indebtedness (funded debt plus guarantees) by Consolidated EBITDA. The current upper limit is 4.0 times. The Fixed Charge Ratio is calculated by dividing the sum of Consolidated EBITDA minus Capital Expenditures minus cash Income Taxes paid, by the sum of Fixed Charges. Fixed Charges include cash Interest expense, scheduled principal payments on Indebtedness, and ESOP Capital Distributions in excess of $10 million in a given fiscal year. The current minimum ratio is 1.25 times.

38. According to the Company, it intended to use the net proceeds from the IPO "to repay borrowings under the revolving portion of our credit facility." The Company continued that "[b]ecause an affiliate of Fifth Third Securities, Inc. and PNC Capital Markets LLC are lenders under our revolving credit facility and each will receive 5% or more of the net proceeds of this offering, Fifth Third Securities, Inc. and PNC Capital Markets LLC are each deemed to have a

"conflict of interest" under Rule 5121 of the Financial Industry Regulatory Authority, Inc., or FINRA." The Company further stated:

> We intend to use the net proceeds from this offering to repay at least $72.8 million of outstanding indebtedness under the revolving portion of our credit facility. We intend to use the remaining proceeds (if any) for general corporate purposes, including working capital. The revolving portion of our credit facility consists of a $325.0 million secured revolving credit facility, with an interest rate based on a fluctuating rate of interest, currently at approximately 2.3%, which matures on June 12, 2018. Our revolving credit facility and other indebtedness is described below under "Description of Certain Indebtedness — Senior Loan Facilities." In the last 12 months, we borrowed under our revolving credit facility to pay a $108.1 million special dividend and to fund working capital.

39. Whether the Company was in compliance with its debt covenants, however, is in serious dispute. After the close of the Class Period, the Company stated in its 2015 10-K:

> On August 21, 2015, the Company entered into amended agreements related to the Bank Term Loans and Senior Notes in connection with the Company's determination that a substantial portion of its transportation and equipment leases should be treated as capital leases rather than as operating leases, as discussed in "Note 2, Restatement of Previously Issued Financial Statements". The material terms of each amended agreement modify certain definitions applicable to the Company's affirmative and negative financial covenants, including the negative covenant on indebtedness, to accommodate the Company's treatment of its transportation and equipment leases as capital leases rather than operating leases, along with corresponding changes to the provisions outlining the application of generally accepted accounting principles in the definition of accounting terms used in various financial covenants. The amendments also waive any potential event of default that may exist under any of the respective agreements as a result of the Company's change in lease accounting treatment, and do not require the Company to deliver financial statements or compliance certificates for any annual or quarterly period prior to the fiscal year ended March 31, 2015.
>
> In addition, from July 2015 through February 2016, the Company obtained various consents from the lenders and further amended the Bank Term Loans and Senior Notes. These consents and the additional amendments had the effect of: i) extending the time for

> delivery of our fiscal 2015 audited financial statements and the first, second and third quarter fiscal 2016 quarterly financial statements to April 1, 2016, whereby an event of default was waived as long as those financial statements were delivered by that date, ii) further modified certain definitions applicable to the Company's affirmative and negative financial covenants, including with respect to the treatment of the costs related to the Company's restatement for purposes of the calculation of the minimum fixed charge coverage ratio and the maximum leverage ratio, and iii) permitted the Company's payment of quarterly dividends on common shares in June, August and December 2015, as well as an annual dividend for preferred shares in March 2016.

40. Thus, the Company tied its improper accounting for leases directly to satisfying its debt covenants for the term loans and the Senior Notes, $200 million of debt. If the Company had accounted properly for its lease obligations, the August 21, 2015 amendments indicate that it would have violated debt covenants in fiscal 2014, thereby putting its IPO in doubt. Yet, at the time of the IPO, the Company stated, without reservation, that "[w]e were in compliance with our debt covenants as of March 31, 2014."

***The Company Assures the Market that its Internal Controls are Adequate***

41. Against this background, in the IPO Registration Statement and Prospectus, filed with the SEC and effective on July 24, 2104, Defendants included a risk disclosure about ADS's internal controls stating:

> ***Our failure to maintain effective disclosure controls and internal control over financial reporting could adversely affect our business, financial position and results of operations***.
>
> Upon completion of this offering, we will be required to evaluate the effectiveness of our disclosure controls and internal control over financial reporting on a periodic basis and publicly disclose the results of these evaluations and related matters, in accordance with the requirements of Section 404 of the Sarbanes-Oxley Act of 2002. These reporting and other obligations place significant additional demands on our management and administrative and operational resources, including our accounting resources, which could

> adversely affect our operations among other things. To comply with these requirements, we have upgraded, and are continuing to upgrade our systems, including information technology, implemented additional financial and management controls, reporting systems and procedures. We cannot be certain that we will be successful in maintaining adequate control over our financial reporting and financial processes. Furthermore, as we grow our business, our disclosure controls and internal controls will become more complex, and we may require significantly more resources to ensure that these controls remain effective. If we are unable to continue upgrading our financial and management controls, reporting systems, information technology and procedures in a timely and effective fashion, additional management and other resources may need to be devoted to assist in compliance with the disclosure and financial reporting requirements and other rules that apply to reporting companies, which could adversely affect our business, financial position and results of operations.
>
> We have not been required to have and have not had our independent registered public accounting firm perform an evaluation of our internal control over financial reporting as of the end of our last fiscal year in accordance with the provisions of the Sarbanes-Oxley Act of 2002. Had our independent registered public accounting firm performed an evaluation of our internal control over financial reporting in accordance with the provisions of the Sarbanes-Oxley Act of 2002, additional control deficiencies may have been identified by our independent registered public accounting firm and those control deficiencies could have also represented one or more material weaknesses.

42. But nowhere in the Registration Statement and Prospectus did the Company disclose that, in fact, its internal controls were materially inadequate. Indeed, in the shadow of that risk disclosure, in the Company's Quarterly Reports on Form 10-Q during the Class Period, ADS included Sarbanes Oxley certifications concerning the information in those Forms 10-Q and the Company's internal controls. Defendants Chlapaty and Strugeon stated that the Forms 10-Q contained no "untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report." In addition, they attested, "the

financial statements, and other financial information included in this Report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this Report."

43. In addition, Defendants Chlapaty and Sturgeon acknowledge that it was they who were "responsible for establishing and maintaining disclosure controls and procedures" for ADS. They acknowledged that they designed or supervised the design of disclosure controls and procedures "to ensure that material information relating to the registrant, including consolidated subsidiaries, is made known to us by others within those entities." They claimed that they "evaluated the effectiveness of [ADS]'s disclosure controls and procedures. . . ." And they acknowledged that they disclosed in the Forms 10-Q "any change in [ADS]'s internal controls over financial reporting that occurred during [its] most recent fiscal quarter . . . that has materially affected, or is reasonably likely to materially affect, [ADS]'s internal control over financial reporting."

44. The Forms 10-Q, themselves, stated that "[n]o change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act) occurred during the period covered by this Quarterly Report on Form 10-Q that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting."

***The Company is not GAAP or SOX Compliant***

45. As described below, however, not only were ADS's internal controls materially inadequate, but instances of purposeful or reckless accounting manipulations caused the Company to issue materially false financial statements for 2010 through 2014 and for the first three quarters of 2015.

46. Former employees confirm that internal controls and financial accounting at ADS, Company-wide, was knowingly and materially inadequate and not in compliance with GAAP or SOX either before or during the Class Period. Former Employee 1 ("FE1")[2] recalled that the Ennis, Texas plant had approximately 25 18-wheeler trucks to deliver product, at least half of which were leased. FE1 handled the accounting for these leases, recalling that ADS required the plant accountants to classify the leases as operational leases. FE1 believed that the notwithstanding that classification, the leases met the requirements for capitalization. FE1's accounting experience informed that large, long-term leases for items like 18-wheeler trucks were capital leases. Indeed, FE1 knew that "operating leases," as ADS categorized them, typically involve no implied ownership by the lessee. Rather, the lessor maintains the responsibility for the item, repairing it and replacing it. In general, FE1 knew, that if ADS had implied ownership or will purchase the truck at lease's end, it was a capital lease. According to FE1, ADS maintained and took full responsibility for the trucks, necessitating that ADS record them as capital leases. Indeed, Former Employee 2 ("FE2")[3] confirms that ADS routinely purchased trucks it had leased. FE2 participated in meetings with fleet managers at other ADS plants and learned that ADS purchased many of the trucks it had leased.

47. Indeed, according to FE1, while employed at ADS, corporate accounting expected to classify as many expenses as possible as operating expenses, notwithstanding that many were obviously capital expenses. Corporate accounting recorded capital expenditures as operating

---

[2] FE1 was a plant accountant at ADS's Ennis, Texas plant from April, 2009 through January, 2014, reporting to Plant manager Jordan Latham.

[3] FE2 was the fleet manager at ADS's Olympia, Washington plant from 2006 through December 31, 2013, reporting directly to plant managers, the last of who was Graham Wilkins, who, in turn, reported to Scott Kohlmeyer, Regional Manufacturing Manager.

expenses. For example, during her tenure, ADS made capital improvements to the Ennis, Texas plant, including expanding office space and installing new floor tiles. ADS directed FE1 to record those improvements as operating expenses. FE1 believes that Defendants Sturgeon and Chlapaty were aware of these instructions. FE1 interacted with Chlapaty, who was, FE1 recalled fairly involved in accounting treatment and financial statements.

48. But, according to FE1, ADS did not follow GAAP closely. When FE1 began employment at the Ennis, Texas plant, it was apparent that GAAP was not the Company's strong suit. FE1 pointed out to superiors at ADS corporate headquarters that the Company required accounting treatment that was improper. FE1's superiors in ADS's corporate accounting function told FE1 to get used to it. FE1 found the corporate accounting staff to be unaccepting of comments or criticism about appropriate accounting treatment. FE1 recalls that corporate accounting personnel often joked that ADS did not follow GAAP, but rather "SAAP," or "Sturgeon approved accounting principles," named for Defendant CFO Sturgeon.

49. From the beginning of FE1's employment at ADS in 2009, FE1 recalls speaking with senior ADS accounting personnel, including controller Rich Martoran and his personnel, including Chad Green about the Company's initiative to become Sarbanes Oxley ("SOX") compliant. FE1 understood that this meant it was likely that the Company intended to go public, but no one in senior management ever expressed that direction openly. According to FE1, Defendants Chlapaty and Sturgeon were well-aware of the SOX compliance efforts, praising accounting personnel directly when they made progress. By the time FE1 departed from ADS, the Company was still not SOX compliant.

50. Former Employee 3 ("FE3")[4] confirms the Company's efforts to become SOX compliant and its failure to be compliant at the time of its IPO. As Plant Manager, FE3 was submitted month-end accounting documents to ADS's corporate accounting function. The monthly report included information concerning labor costs, electricity costs, raw material usage, inventory, finished good production costs as well as fixed and variable budget numbers. During his tenure, the monthly financial packets were never SOX compliant as ADS, as a whole, never became SOX compliant. In essence, FE3 recalls, ADS lacked any means of ensuring accuracy of financial statements. For example, FE3 recalls that the Brazil plant Production Manager input inventory counts into the Company's Oracle accounting software. It was the Production Manager who ran the report, submitting it to FE3 and the Plant Accountant without verification. According to FE3, Production Managers had production goals and reject limits ADS required them to meet that was ripe for understatement or overstatement to give ADS corporate accounting the numbers on which it insisted.

51. According to FE3, even though he became aware of the Company's initiative to become GAAP and SOX compliant shortly after he began working at ADS in April, 2014, it was not until January, 2015, that the Company began to roll out new requirements to become GAAP and SOX compliant. ADS's corporate accounting function announced to all of the plants that it was determining what it needed to do to become compliant and that the Company would train the accounting staff during the first quarter of 2015. Prior to that, ADS's corporate accounting function failed to require the individual operating units like the Brazil, Indiana plant to prove that they had implemented the systems for monitoring and understanding their financial statements and

[4] FE3 was the Plant Manager for ADS's Brazil, Indiana plant from April, 2014 through June, 2015, reporting directly to Gary Ashley, Regional Manager of ADS Midwest.

operations. In the months prior to January, 2015, according to FE3, the Company knew that it was not SOX or GAAP compliant but was trying to determine what it needed to do to become compliant. FE3 stated that ADS's corporate accounting staff seemed always a step behind but knew that the accounting function both corporate and at the plants was "lean," including many in the accounting staff that did not have accounting degrees.

52. According to FE3, beginning in January, 2015, and continuing throughout the remainder of his tenure at ADS, the ADS accounting function held conference calls during which corporate accounting managers relayed the new requirements to plant managers and accountants. The goals of the conference calls was to convey the requirements to bring the Company into compliance with GAAP and SOX. Among those who participated in the calls was Tom Fussner, at that time, ADS's vice president of operations. Given the company-wide thrust and communications concerning SOX and GAAP compliance, FE3 understood that the initiative came from top management, including Defendants Chlapaty and Sturgeon. According to FE3, prior to the Company's initiative to become GAAP and SOX compliant, its accounting was sloppy, lacking the checks and balances he had experienced at other companies at which FE3 previously worked.

53. In addition, former employees agree that with respect to the cost of raw materials in inventory, the ADS corporate accounting function – and not the individual plants – input the cost to the accounting software. According to FE2, from 2009, ADS employed Oracle accounting software, switching from the business planning and control system it had employed until the switch. Former Employee 4 ("FE4")[5] and Former Employee 5 ("FE5")[6] confirm the use of the

[5] FE4 was the Production Manager at ADS's Brazil, Indiana plant from 2007 through June, 2015. He reported directly to Mike Kelly.

[6] FE5 was a Plant Manager at ADS's Ennis, Texas plant from April, 2014 through January, 2015. She reported to the plant manager, Mark, and the Regional Manager, Ken Sutton. In addition,

Oracle software to convey accounting information from the plants to the ADS corporate accounting function.

54. At ADS's Olympia, Washington facility, for example, FE2 assisted the plant's inventory service coordinator, Ted Fisch, with inventory counts, with partial counts being conducted monthly and a more comprehensive count being done quarterly and annually. Plant accounting personnel input only inventory quantities into the Oracle software. The Oracle software, as programed by ADS's corporate accounting function, then calculated the inventory value automatically. That is, ADS corporate controlled inventory values and not ADS's manufacturing plants. According to FE2, senior ADS executives had access to inventory reports through the Oracle software at all times and certainly could have run the reports themselves. FE1 confirmed that at the Ennis, Texas manufacturing plant, after completing the inventory count, the Ennis accounting personnel entered the quantities into the Oracle software. The system, FE1 recalls automatically calculated inventory costs based on numbers ADS corporate accounting function input.

55. FE4 confirmed that when calculating the value of raw materials in inventory, the Oracles software did the math automatically based on a cost per pound that ADS corporate accounting function set. FE4 understood that the Company set one number monthly for raw materials inventory, regardless of the actual cost. To FE4's knowledge, if ADS purchased raw materials at three different prices during the month, corporate input only one number into the Oracle system on which it based the cost of raw materials in inventory. Similarly, FE5 who prepared and transmitted to Matt Robb at ADS's corporate accounting function month-end reports,

---

Matt Robb, a lead accountant at ADS's corporate accounting function, served as FE5's liaison to corporate.

detailing, among other things, raw materials and finished goods inventories, plant production numbers and expenses. The Ennis, Texas plant personnel were responsible for calculating and inputting raw materials inventory into the Oracle system. The system then automatically calculated inventory dollar values.

56. Thus, former ADS employees confirm that they knew and ADS's corporate accounting function knew or recklessly disregarded that ADS was not GAAP and SOX compliant prior to, at or after the IPO. Each confirms that with respect to inventory, while the manufacturing plants reported quantities, it was the corporate accounting function that determined cost and, in turn, value of the inventory. In addition, recording capital expenditures as operating costs was standard, purposeful practice at ADS, notwithstanding plant accountants, such as FE1, who complained to the ADS corporate accounting function that such treatment was improper. Throughout the Class Period, therefore, Defendants knew or recklessly disregarded that ADS's financial statements for fiscal 2010-2014, the first three quarters of 2015 and the unaudited financial statements for fourth quarter and fiscal year ended March 31, 2015 were materially false.

## **FALSE AND MISLEADING STATEMENTS**

### ***July 24, 2014 Registration Statement***

57. On April 2, 2014, ADS filed a Registration Statement on Form S-1 with the SEC. The Company amended the April 2, 2014 Registration Statement several times, with the fifth and final amendment filed on Form S-1/A with the SEC on July 14, 2014.[7] On July 24, 2014, the SEC declared the Company's Registration Statement, as amended (the "July 24, 2014 Registration Statement"), effective.

---

[7] Defendants Chlapaty and Sturgeon signed the July 24, 2014 Registration Statement.

58. In a section of the July 24, 2014 Registration Statement, beginning on page 19, entitled "Risk Factors," the Company details the "Risks Relating to Our Business." The Company's discussion of the risks related to its business includes the following statements:

> ***Our failure to maintain effective disclosure controls and internal control over financial reporting could adversely affect our business, financial position and results of operations.***
>
> Upon completion of this offering, we will be required to evaluate the effectiveness of our disclosure controls and internal control over financial reporting on a periodic basis and publicly disclose the results of these evaluations and related matters, in accordance with the requirements of Section 404 of the Sarbanes-Oxley Act of 2002. These reporting and other obligations place significant additional demands on our management and administrative and operational resources, including our accounting resources, which could adversely affect our operations among other things. ***To comply with these requirements, we have upgraded, and are continuing to upgrade our systems, including information technology, implemented additional financial and management controls, reporting systems and procedures. We cannot be certain that we will be successful in maintaining adequate control over our financial reporting and financial processes***. Furthermore, as we grow our business, our disclosure controls and internal controls will become more complex, and we may require significantly more resources to ensure that these controls remain effective. If we are unable to continue upgrading our financial and management controls, reporting systems, information technology and procedures in a timely and effective fashion, additional management and other resources may need to be devoted to assist in compliance with the disclosure and financial reporting requirements and other rules that apply to reporting companies, which could adversely affect our business, financial position and results of operations.
>
> We have not been required to have and have not had our independent registered public accounting firm perform an evaluation of our internal control over financial reporting as of the end of our last fiscal year in accordance with the provisions of the Sarbanes-Oxley Act of 2002. Had our independent registered public accounting firm performed an evaluation of our internal control over financial reporting in accordance with the provisions of the Sarbanes-Oxley Act of 2002, additional control deficiencies may have been identified by our independent registered public accounting firm and

> those control deficiencies could have also represented one or more material weaknesses.[8] (Emphasis added).

59. Through this disclosure, the Company projected to investors that, at the time of the IPO, it had adequate internal controls, including information technology, financial and management controls, reporting systems and procedures.

60. In addition, the Offering Documents included a statement disclosing risk of fraud at foreign operations, but projecting that the Company had adequate controls, that "[p]rovided for compliance with all applicable anti-corruption laws. . . ." the Company stated.

> The U.S. Foreign Corrupt Practices Act, or the FCPA, and similar foreign anti-corruption laws generally prohibit companies and their intermediaries from making improper payments or providing anything of value to influence foreign government officials for the purpose of obtaining or retaining business or obtaining an unfair advantage. Recent years have seen a substantial increase in the global enforcement of anti-corruption laws, with more frequent voluntary self-disclosures by companies, aggressive investigations and enforcement proceedings by both the U.S. Department of Justice and the U.S. Securities and Exchange Commission, or SEC, resulting in record fines and penalties, increased enforcement activity by non-U.S. regulators, and increases in criminal and civil proceedings brought against companies and individuals.
>
> We have operations in Canada as well as existing joint ventures in Mexico, Central America and South America. Our internal policies provide for compliance with all applicable anti-corruption laws for both us and for our joint venture operations. Our continued operation and expansion outside the United States, including in developing countries, could increase the risk of such violations in the future. Despite our training and compliance programs, we cannot assure you that our internal control policies and procedures always will protect us from unauthorized reckless or criminal acts committed by our employees, agents or joint venture partners. In the event that we believe or have reason to believe that our employees, agents or joint venture partners have or may have violated applicable anti-corruption laws, including the FCPA, we may be required to investigate or have outside counsel investigate the relevant facts and circumstances, which can be expensive and require significant time and attention from senior management. Violations of these laws may

[8] July 24, 2014 Registration Statement at 31.

> result in severe criminal or civil sanctions, which could disrupt our business and result in a material adverse effect on our reputation, financial condition, results of operations and cash flows.

61. The foregoing disclosures concerning risks relating to the Company's business, results of operations, and financial condition were false and misleading because Defendants knew or recklessly disregarded that the disclosed general risk of an ineffective control environment was no longer merely hypothetical. Rather, Defendants knew or were reckless in not knowing that they had created and/or maintained an ineffective control environment, including FCPA and other anti-corruption compliance, in which the risk of errors in the accounting treatment of these areas had materialized, as evidenced by: (i) an insufficient number of personnel appropriately qualified to perform control design, execution, and monitoring activities, (ii) an insufficient number of personnel with an appropriate level of GAAP knowledge, experience, and ongoing training in the application of GAAP commensurate with our external financial reporting requirements, which resulted in erroneous judgments regarding the proper application of GAAP, (iii) insufficient documentation or basis to support account balances and accounting estimates, (iv) the lack of appropriate independent review and approval over certain key accounting personnel who had the ability to both prepare and post manual journal entries, and (v) the failure to communicate effectively management's expectations regarding the level of documentation necessary to support account balances, journal entries, accrual calculations and cutoff processes and management estimates. The omission of these deficiencies in the control environment rendered the Company's general risk disclosure meaningless. The specific risk of errors in the Company's accounting treatment of leases, inventory, ADS Mexicana, long-lived assets, and income taxes had materialized, and Defendants were duty bound, but failed, to disclose them to investors.

62. In a section of the July 24, 2014 Registration Statement, beginning on page 49, entitled "Selected Historical Consolidated Financial Data," the Company presented selected historical consolidated financial data, derived from the Company's audited consolidated financial statements, for the fiscal years ended March 31, 2010,[9] 2011, 2012, 2013, and 2014.

***Fiscal Year Ended March 31, 2011***

63. For the fiscal year ended March 31, 2011, the Company reported the cost of goods sold as $692,164,000 and gross profits of $170,974,000. The Company also reported income from operations of $38,929,000, other miscellaneous expenses (net) in the amount of ($847,000), and income before income taxes of $12,655,000. In addition, the Company reported net income of $9,338,000, net income attributable to the Company of $5,996,000, and net income per diluted share of $0.03.

64. The foregoing statements in the July 24, 2014 Registration Statement with respect to the Company's income data for the fiscal year ended March 31, 2011 were false and misleading. Defendants knew or were reckless in not knowing that, for the fiscal year ended March 31, 2011, they understated the cost of goods sold by $20,527,000 or 3%, and overstated gross profit by $20,419,000 or 13.6%. Defendants also knew or recklessly disregarded that they overstated income from operations by $9,236,000 or 31.1%, understated other miscellaneous expenses (net) by $522,000 or 38.1%, and overstated income before income taxes by $9,546,000 or 307%. In addition, Defendants knew or recklessly disregarded that they overstated net income by $11,404,000 or 552%, net income attributable to the Company by $14,961,000 or 390%, and income per diluted share by $0.20 or 667%.

[9] Although, in a press release issued on August 17, 2015, the Company announced that it would restate its previously filed Annual Report on Form 10-K for the fiscal year ended March 31, 2010, to date it has not done so.

65. For the fiscal year ended March 31, 2011, the Company reported working capital of $204,061,000. The Company also reported long-term capital lease obligations of $0, total liabilities of $618,351,000, and a stockholders' deficit of $245,227,000.

66. The foregoing statements in the July 24, 2014 Registration Statement with respect to the Company's consolidated balance sheet data for the fiscal year ended March 31, 2011 were false and misleading. Defendants knew or were reckless in not knowing that, for the fiscal year ended March 31, 2011, they overstated working capital by $6,042,000 or 3.1%. Defendants also knew or were reckless in not knowing that they understated long-term capital lease obligations by $10,179,000 or 100%, total liabilities by $34,761,000 or 5.3%, and stockholders' deficit by $1,303,000 or 0.5%.

***Fiscal Year Ended March 31, 2012***

67. For the fiscal year ended March 31, 2012, the Company reported the cost of goods sold as $818,398,000 and gross profits of $195,358,000. The Company also reported income from operations of $95,053,000 and income before income taxes of $70,791,000. In addition, the Company reported net income of $44,431,000, net income attributable to the Company of $43,260,000, and net income per diluted share of $0.62.

68. The foregoing statements in the July 24, 2014 Registration Statement with respect to the Company's income data for the fiscal year ended March 31, 2012 were false and misleading. Defendants knew or were reckless in not knowing that, for the fiscal year ended March 31, 2012, they understated the cost of goods by $21,239,000 or 2.5%, and overstated gross profit by $19,328,000 or 11%. Defendants also knew or were reckless in not knowing that they overstated income from operations by $9,453,000 or 11%, and income before income taxes by $9,672,000 or 15.8%. In addition, Defendants knew or were reckless in not knowing that they overstated net

income by $8,865,000 or 24.9%, net income attributable to the Company by $8,662,000 or 25%, and net income per diluted share by $0.17 or 37.8%.

69. For the fiscal year ended March 31, 2012, the Company reported working capital of $208,268,000. The Company also reported long-term capital lease obligations of $0, total liabilities of $615,314,000, and a stockholders' deficit of $267,849,000.

70. The foregoing statements in the July 24, 2014 Registration Statement with respect to the Company's consolidated balance sheet data for the fiscal year ended March 31, 2012 were false and misleading. Defendants knew or were reckless in not knowing that, for the fiscal year ended March 31, 2012, they overstated working capital by $10,550,000 or 5.3%. Defendants also knew or were reckless in not knowing that they understated long-term capital lease obligations by $23,529,000 or 100%, total liabilities by $41,639,000 or 6.3%, and stockholders' deficit by $7,836,000 or 2.8%.

***Fiscal Year Ended March 31, 2013***

71. For the fiscal year ended March 31, 2013, the Company reported the cost of goods sold as $807,730,000 and gross profits of $209,311,000. The Company also reported income from operations of $63,063,000 and income before income taxes of $46,685,000. In addition, the Company reported net income of $30,178,000, net income attributable to noncontrolling interest of $2,019,000, net income attributable to the Company of $28,159,000, and net income per diluted share of $0.41.

72. The foregoing statements in the July 24, 2014 Registration Statement with respect to the Company's income data for the fiscal year ended March 31, 2013 were false and misleading. Defendants knew or were reckless in not knowing that, for the fiscal year ended March 31, 2013, they understated the cost of goods sold by $21,411,000 or 2.9%, and overstated gross profit by

$21,350,000 or 11.4%. Defendants also knew or were reckless in not knowing that they overstated income from operations by $5,585,000 or 9.7%, and income before income taxes by $7,836,000 or 20.2%. In addition, knew or were reckless in not knowing that they overstated net income by $6,998,000 or 30.2%, understated net income attributable to noncontrolling interest by $501,000 or 19.9%, overstated net income attributable to the Company by $7,499,000 or 36.3%, and overstated net income per diluted share by $0.14 or 51.9%.

73. For the fiscal year ended March 31, 2013, the Company reported working capital of $220,276,000, property, plant and equipment, net of $294,901,000. The Company also reported long-term capital lease obligations of $0, total liabilities of $585,115,000, and a stockholders' deficit of $285,722,000.

74. The foregoing statements in the July 24, 2014 Registration Statement with respect to the Company's consolidated balance sheet data for the fiscal year ended March 31, 2013 were false and misleading. Defendants knew or were reckless in not knowing that, for the fiscal year ended March 31, 2013, they overstated working capital by $16,242,000 or 8%. Defendants also knew or were reckless in not knowing that they understated long-term capital lease obligations by $28,851,000 or 100%, total liabilities by $57,227,000 or 8.9%, and stockholders' deficit by $14,201,000 or 4.7%.

***Fiscal Year Ended March 31, 2014***

75. For the fiscal year ended March 31, 2014, the Company reported the cost of goods sold as $856,118,000 and gross profits of $212,891,000. The Company also reported income from operations of $53,315,000 and income before income taxes of $37,041,000. In addition, the Company reported net income of $12,874,000, net income attributable to noncontrolling interest

of $1,750,000, net income attributable to the Company of $11,124,000, and net loss per diluted share of $0.07.

76. The foregoing statements in the July 24, 2014 Registration Statement with respect to the Company's income data for the fiscal year ended March 31, 2014 were false and misleading. Defendants knew or were reckless in not knowing that, for the fiscal year ended March 31, 2014, they understated the cost of goods sold by $17,692,000 or 2%, and overstated gross profit by $18,921,000 or 9.8%. Defendants also knew or were reckless in not knowing that they overstated income from operations by $430,000 or 0.8%, and income before income taxes by $17,860,000 or 5.1%. In addition, Defendants knew or were reckless in not knowing that they overstated net income by $654,000 or 5.4%, understated net income attributable to noncontrolling interest by $1,843,000 or 51.3%, overstated net income attributable to the Company by $2,497,000 or 28.9%, and understated net loss per diluted share by $0.05 or 41.7%.

77. For the fiscal year ended March 31, 2014, the Company reported working capital of $263,907,000. The Company also reported long-term capital lease obligations of $0, total liabilities of $691,980,000, and stockholders' deficit of $397,336,000.

78. The foregoing statements in the July 24, 2014 Registration Statement with respect to the Company's consolidated balance sheet data for the fiscal year ended March 31, 2014 were false and misleading. Defendants knew or were reckless in not knowing that, for the fiscal year ended March 31, 2014, they overstated working capital by $22,903,000 or 9.5%. Defendants also knew or were reckless in not knowing that they understated long-term capital lease obligations by $34,366,000 or 100%, total liabilities by $69,338,000 or 9.1%, and stockholders' deficit by $17,366,000 or 4.2%.

***July 28, 2014 Prospectus***

79. On July 28, 2014, the Company filed a Prospectus on Form 424B4 with the SEC in connection with its initial public offering.

80. In a section of the July 28, 2014 Prospectus, beginning on page 15, entitled "Summary Consolidated Financial Data," the Company presented summary consolidated financial data for the fiscal years ended March 31, 2012, 2013, and 2014.

81. The foregoing statements in the July 28, 2014 Prospectus with respect to the Company's summary consolidated financial data for the fiscal years ended March 31, 2012, 2013, and 2014 were false and misleading for the same reasons as stated above in ¶¶ 68, 70, 72, 74, 76, 78.

82. In a section of the July 28, 2014 Prospectus, beginning on page 19, entitled "Risk Factors," the Company details the "Risks Relating to Our Business." The Company's discussion of the risks related to its business contained statements identical to the ones quoted above in ¶ 58.[10]

83. The foregoing statements in the July 28, 2014 Prospectus concerning risks relating to the Company's business, results of operations, and financial condition were false and misleading for the same reasons as stated above in ¶ 61.

84. In a section of the July 28, 2014 Prospectus, beginning on page 49, entitled "Selected Historical Consolidated Financial Data," the Company presented selected historical consolidated financial data for the fiscal years ended March 31, 2011, 2012, 2013, and 2014.

85. The foregoing statements in the July 28, 2014 Prospectus with respect to the Company's selected historical consolidated financial data for the fiscal years ended March 31,

---

[10] July 28, 2014 Prospectus at 31.

2011, 2012, 2013, and 2014 were false and misleading for the same reasons as stated above in ¶¶ 64, 66, 68, 70, 72, 74, 76, 78.

***The September 3, 2014 Press Release and September 5, 2014 Form 10-Q***

86. On September 3, 2014, the Company filed a Current Report on Form 8-K ("September 3, 2014 Form 8-K") with the SEC,[11] attaching a press release issued that same day (the "September 3, 2014 Press Release"), at 7:30 a.m., announcing ADS's financial results for the first fiscal quarter ended June 30, 2014.

87. On September 5, 2014, the Company filed with the SEC a Quarterly Report on Form 10-Q for the first fiscal quarter ended June 30, 2014 (the "September 5, 2014 Form 10-Q").[12] In a section of the September 5, 2014 Form 10-Q, beginning on page 2, entitled "Financial Information," the Company presented condensed consolidated financial data for the three-month periods ended June 30, 2013 and 2014.

88. For the first fiscal quarter ended June 30, 2014, the Company reported the cost of goods sold as $256,264,000 and gross profits of $72,033,000. The Company also reported income from operations of $29,614,000 and income before income taxes of $24,985,000. In addition, the Company reported net income of $14,669,000, net income attributable to noncontrolling interest of $428,000, net income attributable to the Company of $14,241,000, and net loss per diluted share of $0.09.

89. The foregoing statements in the September 3, 2014 Press Release and September 5, 2014 Form 10-Q with respect to the Company's income data for the first fiscal quarter ended June 30, 2014 were false and misleading. Defendants knew or were reckless in not knowing that,

---

[11] Defendant Sturgeon signed the September 3, 2014 Form 8-K.

[12] Defendants Chlapaty and Sturgeon signed the September 5, 2014 Form 10-Q.

for the first fiscal quarter ended June 30, 2014, they understated the cost of goods sold by $9,312,000 or 3.5%, and overstated gross profit by $11,175,000 or 18.4%. Defendants also knew or were reckless in not knowing that they overstated income from operations by $6,783,000 or 29.7%, and income before income taxes by $6,989,000 or 38.8%. In addition, Defendants knew or were reckless in not knowing that they overstated net income by $5,228,000 or 55.4%, understated net income attributable to noncontrolling interest by $447,000 or 51.1%, overstated net income attributable to the Company by $5,675,000 or 66.3%, and understated net loss per diluted share by $0.12 or 57.1%.

90. For the first fiscal quarter ended June 30, 2014, the Company reported inventories of $260,971,000, intangible assets, net of $63,264,000, and other assets of $71,277,000. The Company also reported long-term capital lease obligations of $0, total liabilities of $747,474,000, and noncontrolling interest in subsidiaries of $22,558,000.

91. The foregoing statements in the September 3, 2014 Press Release and September 5, 2014 Form 10-Q with respect to the Company's consolidated balance sheet data for the first fiscal quarter ended June 30, 2014 were false and misleading. Defendants knew or were reckless in not knowing that, for the first fiscal quarter ended June 30, 2014, they overstated inventories by $7,282,000 or 2.9%, intangible assets, net by $6,562,000 or 11.6%, and other assets by $209,000 or 0.3%. Defendants also knew or were reckless in not knowing that they understated long-term capital lease obligations by $42,995,000 or 100%, total liabilities by $76,440,000 or 9.3%, and noncontrolling interest in subsidiaries by $3,754,000 or 20%.

92. In a section of the September 5, 2014 Form 10-Q, beginning on page 39, entitled "Other Information," the Company discussed, among other things, in Item 1A the "Risk Factors" related to its common stock. The Company stated, in pertinent part, as follows: "We discussed in

the Company's Registration Statement on Form S-1 (File No. 333-194980), as amended (the 'Registration Statement'), and our other filings with the SEC various risks that may materially affect our business. There have been no material changes to the risk factors disclosed in our Registration Statement."[13]

93. The foregoing statements in the September 5, 2014 Form 10-Q with respect to the risks to its common stock were false and misleading for the same reasons as stated above in ¶ 61.

94. Attached as Exhibits 31.1 and 31.2 to the September 5, 2014 Form 10-Q were the Certifications of Defendant Chlapaty and Defendant Sturgeon, respectively, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 (the "SOX 302 Certifications"). In the SOX 302 Certifications, Defendants Chlapaty and Sturgeon each certified that:

> 1. I have reviewed this Quarterly Report on Form 10-Q (this "Report") of the registrant, Advanced Drainage Systems, Inc.;
>
> 2. Based on my knowledge, this Report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this Report fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this Report;
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:
>
> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to

[13] September 5, 2014 Form 10-Q at 39.

> us by others within those entities, particularly during the period in which this Report is being prepared;
>
> b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this Report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this Report based on such evaluation; and
>
> c. Disclosed in this Report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.[14]

95. The foregoing statements in the SOX 302 Certifications of Defendants Chlapaty and Sturgeon, attached to the September 5, 2014 Form 10-Q, were false and misleading for the same reasons as stated above in ¶¶ 72, 74, 76, 78. In addition, the foregoing statements were false and misleading because Defendants failed to disclose the existence of certain material weaknesses in our internal control over financial reporting in the areas of (a) Company control environment, (b) accounting for leases, (c) accounting for inventory, (d) journal entry and account reconciliation,

[14] September 5, 2014 Form 10-Q, Exs. 31.1, 31.2.

(e) ADS Mexicana control environment, and (f) ADS Mexicana revenue recognition cut-off practices. Defendants Chlapaty and Sturgeon knew or were reckless in not knowing that they had created and/or maintained an ineffective control environment in which the risk of errors in the accounting treatment of these areas had materialized, as evidence by: (i) an insufficient number of personnel appropriately qualified to perform control design, execution, and monitoring activities, (ii) an insufficient number of personnel with an appropriate level of GAAP knowledge, experience, and ongoing training in the application of GAAP commensurate with our external financial reporting requirements, which resulted in erroneous judgments regarding the proper application of GAAP, (iii) insufficient documentation or basis to support account balances and accounting estimates, (iv) the lack of appropriate independent review and approval over certain key accounting personnel who had the ability to both prepare and post manual journal entries, and (v) the failure to communicate effectively management's expectations regarding the level of documentation necessary to support account balances, journal entries, accrual calculations and cutoff processes and management estimates.

***The November 5, 2014 Press Release and November 10, 2014 Form 10-Q***

96. On November 5, 2014, the Company filed a Current Report on Form 8-K ("November 5, 2014 Form 8-K") with the SEC,[15] attaching a press release issued that same day (the "November 5, 2014 Press Release"), at 7:30 a.m., announcing ADS's financial results for the second fiscal quarter ended September 30, 2014.

97. On November 10, 2014, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended September 30, 2014 (the "November 10, 2014 Form 10-Q").[16] In

[15] Defendant Sturgeon signed the November 5, 2014 Form 8-K.

[16] Defendants Chlapaty and Sturgeon signed the November 10, 2014 Form 10-Q.

a section of the November 10, 2014 Form 10-Q, beginning on page 2, entitled "Financial Information," the Company presented condensed consolidated financial data for the three- and six-month periods ended September 30, 2013 and 2014.

98. For the second fiscal quarter ended September 30, 2014, the Company reported the cost of goods sold as $282,282,000 and gross profits of $82,442,000. The Company also reported income from operations of $41,163,000 and income before income taxes of $36,832,000. In addition, the Company reported net income of $22,768,000, net income attributable to noncontrolling interest of $378,000, net income attributable to the Company of $22,390,000, and net income per diluted share of $0.51.

99. The foregoing statements in the November 5, 2014 Press Release and November 10, 2014 Form 10-Q with respect to the Company's income data for the second fiscal quarter ended September 30, 2014 were false and misleading. Defendants knew or were reckless in not knowing that, for the second fiscal quarter ended September 30, 2014, they understated the cost of goods sold by $14,669,000 or 4.9%, and overstated gross profit by $12,679,000 or 18.2%. Defendants also knew or were reckless in not knowing that they overstated income from operations by $8,374,000 or 25.5%, and income before income taxes by $8,847,000 or 31.6%. In addition, Defendants knew or were reckless in not knowing that they overstated net income by $3,771,000 or 19.9%, understated net income attributable to noncontrolling interest by $1,775,000 or 82.4%, overstated net income attributable to the Company by $5,546,000 or 32.9%, and understated net income per diluted share by $0.10 or 24.4%.

100. For the second fiscal quarter ended September 30, 2014, the Company reported inventories of $247,368,000, intangible assets, net of $60,266,000, and other assets of

$68,591,000. The Company also reported long-term capital lease obligations of $0, total liabilities of $655,642,000, and noncontrolling interest in subsidiaries of $21,886,000.

101. The foregoing statements in the November 5, 2014 Press Release and November 10, 2014 Form 10-Q with respect to the Company's consolidated balance sheet data for the second fiscal quarter ended September 30, 2014 were false and misleading. Defendants knew or were reckless in not knowing that, for the second fiscal quarter ended September 30, 2014, they overstated inventories by $15,106,000 or 6.5%, intangible assets, net by $6,134,000 or 11.3%, and other assets by $931,000 or 1.4%. Defendants also knew or were reckless in not knowing that they understated long-term capital lease obligations by $49,237,000 or 100%, total liabilities by $76,777,000 or 10.5%, and noncontrolling interest in subsidiaries by $2,188,000 or 11.1%.

102. In a section of the November 10, 2014 Form 10-Q, beginning on page 49, entitled "Other Information," the Company discussed, among other things, in Item 1A the "Risk Factors" related to its common stock. The Company stated, in pertinent part, as follows: "We discussed in the Company's Registration Statement on Form S-1 (File No. 333-194980), as amended (the 'Registration Statement'), and our other filings with the SEC various risks that may materially affect our business. There have been no material changes to the risk factors disclosed in our Registration Statement."[17]

103. The foregoing statements in the November 10, 2014 Form 10-Q with respect to the risks to its common stock were false and misleading for the same reasons as stated above in ¶ 61.

104. Attached as Exhibits 31.1 and 31.2 to the November 10, 2014 Form 10-Q were the SOX 302 Certifications of Defendants Chlapaty and Sturgeon, respectively.[18]

---

[17] November 10, 2014 Form 10-Q at 49.

[18] November 10, 2014 Form 10-Q, Exs. 31.1, 31.2.

105. The foregoing statements in the SOX 302 Certifications of Defendants Chlapaty and Sturgeon, attached to the November 10, 2014 Form 10-Q, were false and misleading for the same reasons as stated above in ¶ 95.

***The December 3, 2014 Registration Statement***

106. On November 17, 2014, ADS filed a Registration Statement on Form S-1 with the SEC in connection with its secondary public offering. The Company amended the November 17, 2014 Registration Statement on Form S-1/A with the SEC on December 1, 2014.[19] On December 3, 2014, the SEC declared the Company's Registration Statement, as amended (the "December 3, 2014 Registration Statement"), effective.

107. In a section of the December 3, 2014 Registration Statement, beginning on page 15, entitled "Summary Consolidated Financial Data," the Company presented summary consolidated financial data for the fiscal years ended March 31, 2012, 2013, and 2014.

108. The foregoing statements in the December 3, 2014 Registration Statement with respect to the Company's summary consolidated financial data for the fiscal years ended March 31, 2012, 2013, and 2014 were false and misleading for the same reasons as stated above in ¶¶ 68, 70, 72, 74, 76, 78.

109. In the same section of the December 3, 2014 Registration Statement, the Company presented summary consolidated financial data for the six-month period ended September 30, 2014.

110. For the six-month period ended September 30, 2014, the Company reported the cost of goods sold as $538,546,000 and gross profits of $154,475,000. The Company also reported income from operations of $70,777,000 and income before income taxes of $61,817,000. In

[19] Defendants Chlapaty and Sturgeon signed the December 3, 2014 Registration Statement.

addition, the Company reported net income of $37,437,000, net income attributable to non-controlling interest of $806,000, net income attributable to the Company of $36,631,000, and net loss per diluted share of $0.60.

111. The foregoing statements in the December 3, 2014 Registration Statement with respect to the Company's income data for the six-month period ended September 30, 2014 were false and misleading. Defendants knew or were reckless in not knowing that, for the six-month period ended September 30, 2014, they understated the cost of goods sold by $23,981,000 or 4.3%, and overstated gross profit by $23,854,000 or 18.3%. Defendants also knew or were reckless in not knowing that they overstated income from operations by $15,157,000 or 27.3%, and income before income taxes by $15,836,000 or 34.4%. In addition, Defendants knew or were reckless in not knowing that they overstated net income by $8,999,000 or 31.6%, understated net income attributable to noncontrolling interest by $2,222,000 or 73.4%, overstated net income attributable to the Company by $11,221,000 or 44.2%, and overstated net income per diluted share by $0.35 or 140%.

112. For the six-month period ended September 30, 2014, the Company reported total liabilities of $655,642,000 and stockholders' equity of $253,305,000.

113. The foregoing statements in the December 3, 2014 Registration Statement with respect to the Company's consolidated balance sheet data for the six-month period ended September 30, 2014 were false and misleading. Defendants knew or were reckless in not knowing that, for the six-month period ended September 30, 2014, they understated total liabilities by $76,777,000 or 10.5%, and overstated stockholders' equity by $48,861,000 or 23.9%.

114. In a section of the December 3, 2014 Registration Statement, beginning on page 20, entitled "Risk Factors," the Company details the "Risks Relating to Our Business." The Company's discussion of the risks related to its business includes the following statements:

> ***Our failure to maintain effective disclosure controls and internal control over financial reporting could adversely affect our business, financial position and results of operations.***
>
> We are required to evaluate the effectiveness of our disclosure controls and internal control over financial reporting on a periodic basis and publicly disclose the results of these evaluations and related matters, in accordance with the requirements of Section 404 of the Sarbanes-Oxley Act of 2002. These reporting and other obligations place significant additional demands on our management and administrative and operational resources, including our accounting resources, which could adversely affect our operations among other things. To comply with these requirements, we have upgraded and are continuing to upgrade our systems, including information technology, implemented additional financial and management controls, reporting systems and procedures. We cannot be certain that we will be successful in maintaining adequate control over our financial reporting and financial processes. Furthermore, as we grow our business, our disclosure controls and internal controls will become more complex, and we may require significantly more resources to ensure that these controls remain effective. If we are unable to continue upgrading our financial and management controls, reporting systems, information technology and procedures in a timely and effective fashion, additional management and other resources may need to be devoted to assist in compliance with the disclosure and financial reporting requirements and other rules that apply to reporting companies, which could adversely affect our business, financial position and results of operations.
>
> We have not been required to have and have not had our independent registered public accounting firm perform an evaluation of our internal control over financial reporting as of the end of our last fiscal year in accordance with the provisions of the Sarbanes-Oxley Act of 2002. Had our independent registered public accounting firm performed an evaluation of our internal control over financial reporting in accordance with the provisions of the Sarbanes-Oxley Act of 2002, additional control deficiencies may have been identified by our independent registered public accounting firm and

> those control deficiencies could have also represented one or more material weaknesses.[20]

115. The foregoing statements in the December 3, 2014 Registration Statement concerning risks relating to the Company's business, results of operations, and financial condition were false and misleading for the same reasons as stated above in ¶ 61.

116. In a section of the December 3, 2014 Registration Statement, beginning on page 48, entitled "Selected Historical Consolidated Financial Data," the Company presented selected historical consolidated financial data for the fiscal years ended March 31, 2011, 2012, 2013, and 2014.

117. The foregoing statements in the December 3, 2014 Registration Statement with respect to the Company's selected historical consolidated financial data for the fiscal years ended March 31, 2011, 2012, 2013, and 2014 were false and misleading for the same reasons as stated above in ¶¶ 64, 66, 68, 70, 72, 74, 76, 78.

118. In the same section of the December 3, 2014 Registration Statement, the Company presented selected historical consolidated financial data for the six-month period ended September 30, 2014.

119. For the six-month period ended September 30, 2014, the Company reported the cost of goods sold as $538,546,000 and gross profits of $154,475,000. The Company also reported income from operations of $70,777,000 and income before income taxes of $61,817,000. In addition, the Company reported net income of $37,437,000, net income attributable to non-controlling interest of $806,000, net income attributable to the Company of $36,631,000, and net income per diluted share of $0.45.

[20] December 3, 2014 Registration Statement at 32-33.

120. The foregoing statements in the December 3, 2014 Registration Statement with respect to the Company's income data for the six-month period ended September 30, 2014 were false and misleading. Defendants knew or were reckless in not knowing that, for the six-month period ended September 30, 2014, they understated the cost of goods sold by $23,981,000 or 4.3%, and overstated gross profit by $23,854,000 or 18.3%. Defendants also knew or were reckless in not knowing that they overstated income from operations by $15,157,000 or 27.3%, and income before income taxes by $15,836,000 or 34.4%. In addition, Defendants knew or were reckless in not knowing that they overstated net income by $8,999,000 or 31.6%, understated net income attributable to non-controlling interest by $2,222,000 or 73.4%, overstated net income attributable to the Company by $11,221,000 or 44.2%, and understated net loss per diluted share by $0.35 or 140%.

121. For the six-month period ended September 30, 2014, the Company reported inventories of $247,368,000, intangible assets, net of $60,266,000, and other assets of $68,591,000. The Company also reported long-term capital lease obligations of $0, total liabilities of $655,642,000, and non-controlling interest in subsidiaries of $21,886,000.

122. The foregoing statements in the December 3, 2014 Registration Statement with respect to the Company's consolidated balance sheet data for the six-month period ended September 30, 2014 were false and misleading. Defendants knew or were reckless in not knowing that, for the six-month period ended September 30, 2014, they overstated inventories by $15,106,000 or 6.5%, intangible assets, net by $6,134,000 or 11.3%, and other assets by $931,000 or 1.4%. Defendants also knew or were reckless in not knowing that they understated long-term capital lease obligations by $49,237,000 or 100%, total liabilities by $76,777,000 or 10.5%, and non-controlling interest in subsidiaries by $2,188,000 or 11.1%.

***The December 4, 2014 Prospectus***

123. On December 4, 2014, the Company filed a Prospectus on Form 424B4 with the SEC in connection with its secondary public offering.

124. In a section of the December 4, 2014 Prospectus, beginning on page 15, entitled "Summary Consolidated Financial Data," the Company presented summary consolidated financial data for the fiscal years ended March 31, 2012, 2013, and 2014.

125. The foregoing statements in the December 4, 2014 Prospectus with respect to the Company's summary consolidated financial data for the fiscal years ended March 31, 2012, 2013, and 2014 were false and misleading for the same reasons as stated above in ¶¶ 68, 70, 72, 74, 76, 78.

126. In the same section of the December 4, 2014 Prospectus, the Company presented summary consolidated financial data for the six-month period ended September 30, 2014.

127. The foregoing statements in the December 4, 2014 Prospectus with respect to the Company's summary consolidated financial data for the six-month period ended September 30, 2014 were false and misleading for the same reasons as stated above in ¶¶ 120, 122.

128. In a section of the December 4, 2014 Prospectus, beginning on page 20, entitled "Risk Factors," the Company details the "Risks Relating to Our Business." The Company's discussion of the risks related to its business includes statements identical to those quoted above in ¶ 58.[21]

129. The foregoing statements in the December 4, 2014 Prospectus concerning risks relating to the Company's business, results of operations, and financial condition were false and misleading for the same reasons as stated above in ¶ 61.

---

[21] December 4, 2014 Prospectus at 32-33.

130. In a section of the December 4, 2014 Prospectus, beginning on page 48, entitled "Selected Historical Consolidated Financial Data," the Company presented selected historical consolidated income data for the fiscal years ended March 31, 2011, 2012, 2013, and 2014.

131. The foregoing statements in the December 4, 2014 Prospectus with respect to the Company's selected historical consolidated income data for the fiscal years ended March 31, 2011, 2012, 2013, and 2014 were false and misleading for the same reasons as stated above in ¶¶ 64, 66, 68, 70, 72, 74, 76, 78.

132. In the same section of the December 4, 2014 Prospectus, the Company presented selected historical consolidated balance sheet data for the six-month period ended September 30, 2014.

133. The foregoing statements in the December 4, 2014 Prospectus with respect to the Company's selected historical consolidated balance sheet data for the six-month period ended September 30, 2014 were false and misleading for the same reasons as stated above in ¶¶ 122.

***The February 5, 2015 Press Release & Earnings Call and February 9, 2015 Form 10-Q***

134. On February 5, 2015, the Company filed a Current Report on Form 8-K ("February 5, 2015 Form 8-K") with the SEC,[22] attaching a press release issued that same day (the "February 5, 2015 Press Release"), at 7:30 a.m., announcing ADS's financial results for the third fiscal quarter ended December 31, 2014.

135. On February 5, 2015, at 10:00 a.m., the Company held an earnings conference call with investors to discuss its financial results for the third fiscal quarter ended December 31, 2014 (the "February 5, 2015 Call"). Defendants Chlapaty and Sturgeon participated in the February 5, 2015 Call.

[22] Defendant Sturgeon signed the February 5, 2015 Form 8-K.

136. During the February 5, 2015 Call, Defendant Sturgeon provided detailed financial results for the third fiscal quarter ended December 31, 2014. Defendant Sturgeon stated, among other things, that "[g]ross profit increased 0.6% to $50 million for the third quarter of fiscal 2015," and that "net loss attributable to ADS for the third quarter of fiscal 2015 was a loss of $367,000 compared to a net loss of just over $10 million for the third quarter of fiscal 2014." Defendant Sturgeon also stated that "[n]et loss per diluted share for the third quarter of fiscal 2015 totaled $0.01 per share based on average weighted shares of 53 million shares of common."

137. The foregoing statements made by Defendant Sturgeon in the February 5, 2015 Call were false and misleading. Defendant Sturgeon knew or was reckless in not knowing that, for the third fiscal quarter ended December 31, 2014, he overstated gross profit by $939,000 or 1.9%, understated net income attributable to the Company by $2,958,000 or 90%, and understated net loss per diluted share by $0.06 or 85.7%.

138. On February 9, 2015, the Company filed with the SEC a Quarterly Report on Form 10-Q for the period ended December 31, 2014.[23] In a section of the February 9, 2015 Form 10-Q, beginning on page 2, entitled "Financial Information," the Company presented condensed consolidated financial data for the three-month periods ended December 31, 2013 and 2014.

139. For the third fiscal quarter ended December 31, 2014, the Company reported the cost of goods sold as $228,059,000 and gross profits of $50,117,000. In addition, the Company reported net income of $499,000, net income attributable to noncontrolling interest of $866,000, net loss attributable to the Company of $367,000, and net loss per diluted share of $0.01.

140. The foregoing statements in the February 5, 2015 Press Release and February 9, 2015 Form 10-Q with respect to the Company's income data for the third fiscal quarter ended

[23] Defendants Chlapaty and Sturgeon signed the November 10, 2014 Form 10-Q.

December 31, 2014 were false and misleading. Defendants knew or were reckless in not knowing that, for the third fiscal quarter ended December 31, 2014, they understated the cost of goods sold by $2,634,000 or 1.1%, and overstated gross profit by $939,000 or 1.9%. In addition, Defendants knew or were reckless in not knowing that they overstated net income by $2,452,000 or 125.6%, understated net income attributable to noncontrolling interest by $506,000 or 36.9%, understated net income attributable to the Company by $2,958,000 or 90%, and understated net loss per diluted share by $0.06 or 85.7%.

141. For the third fiscal quarter ended December 31, 2014, the Company reported inventories of $230,949,000, intangible assets, net of $57,580,000, and other assets of $66,556,000. The Company also reported long-term capital lease obligations of $0, total liabilities of $551,076,000, and noncontrolling interest in subsidiaries of $20,488,000.

142. The foregoing statements in the February 5, 2015 Press Release and February 9, 2015 Form 10-Q with respect to the Company's consolidated balance sheet data for the third fiscal quarter ended December 31, 2014 were false and misleading. Defendants knew or were reckless in not knowing that, for the third fiscal quarter ended December 31, 2014, they overstated inventories by $11,199,000 or 5.1%, intangible assets, net by $5,706,000 or 11%, and other assets by $2,164,000 or 3.4%. Defendants also knew or were reckless in not knowing that they understated long-term capital lease obligations by $47,831,000 or 100%, total liabilities by $81,508,000 or 12.9%, and non-controlling interest in subsidiaries by $2,043,000 or 11.1%.

143. In a section of the February 9, 2015 Form 10-Q, beginning on page 52, entitled "Other Information," the Company discussed, among other things, in Item 1A the "Risk Factors" related to its common stock. The Company stated, in pertinent part, as follows: "We discussed in the Company's Registration Statement on Form S-1 (File No. 333-194980), as amended (the

'Registration Statement'), and our other filings with the SEC various risks that may materially affect our business. There have been no material changes to the risk factors disclosed in our Registration Statement."[24]

144. The foregoing statements in the February 9, 2015 Form 10-Q with respect to the risks to its common stock were false and misleading for the same reasons as stated above in ¶ 61.

145. Attached as Exhibits 31.1 and 31.2 to the February 9, 2015 Form 10-Q were the SOX 302 Certifications of Defendants Chlapaty and Sturgeon, respectively.

146. The foregoing statements in the SOX 302 Certifications of Defendants Chlapaty and Sturgeon, attached to the February 9, 2015 Form 10-Q, were false and misleading for the same reasons as stated above in ¶ 95.

***The May 12, 2015 Press Release***

147. On May 12, 2015, the Company filed a Current Report on Form 8-K (the "May 12, 2015 Form 8-K") with the SEC,[25] attaching a press release issued that same day (the "May 12, 2015 Press Release"), at 7:30 a.m., announcing the Company's financial results for the fourth fiscal quarter ended March 31, 2015 and the fiscal year ended March 31, 2015.

148. In the May 12, 2015 Press Release, the Company presented consolidated financial data for the fiscal years ended March 31, 2014 and 2015.

149. For the fiscal year ended March 15, 2015, the Company reported the cost of goods sold as $935,483,000 and gross profits of $242,338,000. The Company also reported income from operations of $75,889,000 and income before income taxes of $46,497,000. In addition, the Company reported net income of $29,054,000, net income attributable to noncontrolling interest

---

[24] February 9, 2015 Form 10-Q at 52.

[25] Defendant Sturgeon signed the May 12, 2015 Form 8-K.

of $2,754,000, net income attributable to the Company of $26,300,000, and net income per diluted share of $0.26.

150. The foregoing statements in the May 12, 2015 Press Release with respect to the Company's income data for the fiscal year ended March 31, 2015 were false and misleading. Defendants knew or were reckless in not knowing that, for the fiscal year ended March 31, 2015, they understated the cost of goods sold by $38,477,000 or 4%, and overstated gross profit by $36,225,000 or 17.6%. Defendants also knew or were reckless in not knowing that they overstated income from operations by $17,622,000 or 30.2%, and income before income taxes by $21,968,000 or 89.6%. In addition, Defendants knew or were reckless in not knowing that they overstated net income by $16,303,000 or 127.9%, understated net income attributable to noncontrolling interest by $1,377,000 or 33.3%, overstated net income attributable to the Company by $17,680,000 or 205.1%, and overstated net income per diluted share by $0.32 or 533.3%.

151. For the fiscal year ended March 31, 2015, the Company reported inventories of $291,791,000, intangible assets, net of $63,029,000, and other assets of $65,567,000. The Company also reported total liabilities of $653,607,000 and stockholders' equity of $247,796,000.

152. The foregoing statements in the May 12, 2015 Press Release with respect to the Company's consolidated balance sheet data for the fiscal year ended March 31, 2015 were false and misleading. Defendants knew or were reckless in not knowing that, for the fiscal year ended March 31, 2015, they overstated inventories by $21,949,000 or 8.1%, intangible assets, net by $4,974,000 or 8.6%, and other assets by $4,400,000 or 7.2%. Defendants also knew or were reckless in not knowing that they understated total liabilities by $73,495,000 or 10.1%, and overstated shareholders' equity by $41,220,000 or 20%.

***The June 30, 2015 Form 12b-25***

153. On June 30, 2015, the Company filed a Form 12b-25 (the "June 30, 2015 Form 12b-25") with the SEC,[26] notifying investors that ADS was "unable to file the Annual Report on Form 10-K for the fiscal year ended March 31, 2015 (the 'Annual Report') within the prescribed time period without unreasonable effort or expense because additional time is required to complete the preparation of the Company's financial statements (and the required audit thereof)." The Company stated that it was "in the process of finalizing its inventory costing analysis, which will require additional time to complete," and that "the Audit Committee of the Company's Board of Directors has undertaken a review of the Company's journal entry control processes, which review is ongoing and will require additional time to complete." The Company advised in the June 30, 2015 Form 12b-25 that it "anticipates that it will be able to do so [file the Annual Report] within the extension period of 15 calendar days provided under Rule 12b-25."

154. The foregoing statements in the June 30, 2015 Form 12b-25 were false and misleading at the time they were made because Defendants failed to disclose the full scope of the errors in the Company's accounting treatment of transportation and equipment leases, inventory, long-lived assets, ADS Mexicana, and income taxes, requiring that restatement of the Company's financial statements for the fiscal years ended March 31, 2010, 2011, 2012, 2013, and 2014, as well as the quarterly periods for the first three fiscal quarters of the fiscal year ended March 31, 2015 and for all of the quarterly periods in the fiscal year ended March 31, 2014. Defendants knew or were reckless in not knowing of the existence of errors in the Company's accounting treatment of all of these areas. Indeed, in the Annual Report on Form 10-K filed with the SEC on March 29, 2016, Defendants later admitted that "certain errors related to the Company's accounting treatment

[26] Defendant Chlapaty signed the June 30, 2015 Form 12b-25.

for its transportation and equipment leases and inventory methodology were identified" "[i]n June of 2015."[27] Having disclosed the existence of certain issues with its "inventory costing analysis" and "journal control entry processes," Defendants were duty bound, but failed, to disclose fully to investors the nature and extent of the various errors in the Company's accounting treatment and the impact such errors would have upon its previously issued financial statements filed with the SEC.

***The July 15, 2015 Press Release***

155. On July 15, 2015, the Company filed a Current Report on Form 8-K (the "July 15, 2015 Form 8-K") with the SEC,[28] attaching a press release issued that same day (the "July 15, 2015 Press Release"), at 8:30 a.m., providing an update with respect to the Company's expected timeline for filing its Annual Report on Form 10-K for the fiscal year ended March 31, 2015.

156. In the July 15, 2015 Press Release, the Company made the following statements:

> As previously disclosed by the Company in its Form 12b-25 filed with the Securities and Exchange Commission on June 30, 2015, the Company is reviewing methodologies utilized in its year-end inventory costing analysis and the related impact on the Company's fiscal year 2015 financial statements. This review is ongoing, and is primarily due to the need to assess the impact of highly volatile raw material costs during the Company's fiscal 2015 fourth quarter. Although the Company's independent public accounting firm is performing audit testing procedures for such items, the Company anticipates that the effect of this review will be a reduction of year-end inventory values for fiscal year 2015 as compared to previously reported amounts, and a related increase in cost of sales. The Company anticipates these adjustments will have a positive impact on cost of sales in fiscal year 2016. The Company intends to make any necessary adjustments to its previously issued earnings release for the fourth-quarter and full fiscal year 2015 in light of the above concurrent with the filing of its Form 10-K.

---

[27] March 29, 2016 Form 10-K, at F-19.

[28] Defendant Chlapaty signed the July 15, 2015 Form 8-K.

> As part of the review process, the Company is now also conducting a review of its accounting treatment for its transportation and equipment leasing program. The Company's transportation and equipment leases have historically been recorded as operating leases and the Company is now in the process of re-evaluating whether it is necessary to record such leases as capital leases.
>
> The Company is working diligently to conclude its review and analysis of the items described above as well as the Company's journal entry control processes as previously disclosed, and will announce its anticipated timing via press release once known.

157. The foregoing statements in the July 15, 2015 Press Release were false and misleading because Defendants failed to disclose the full scope of the errors in the Company's accounting treatment of transportation and equipment leases, inventory, long-lived assets, ADS Mexicana, and income taxes, requiring that restatement of the Company's financial statements for the fiscal years ended March 31, 2010, 2011, 2012, 2013, and 2014, as well as the quarterly periods for the first three fiscal quarters of the fiscal year ended March 31, 2015 and for all of the quarterly periods in the fiscal year ended March 31, 2014. Defendants knew or were reckless in not knowing of the existence of errors in the Company's accounting treatment of all of these areas. Having disclosed the existence of an "ongoing" "review" of the Company's "accounting treatment for its transportation and equipment leasing program," and having acknowledged that errors in the Company's accounting treatment of inventory would result in "a reduction of year-end inventory values for fiscal year 2015 as compared to previously reported amounts," Defendants were duty bound, but failed, to disclose fully to investors the nature and extent of the various errors in the Company's accounting treatment and the impact such errors would have upon its previously issued financial statements filed with the SEC.

***The August 17, 2015 Press Release***

158. On August 12, 2015, according to the Company, "the SEC Division of Enforcement [] informed the Company that it was conducting an informal inquiry with respect to the Company."

The SEC sought voluntary production of documents from ADS, "generally related to the Company's accounting practices." In its 2015 10-K, the Company disclosed that subsequently, the SEC served a document subpoena on ADS, "pursuant to a formal order of investigation," acknowledging the possibility that the SEC's "investigation ultimately could be resolved unfavorably to the Company, [but that] the Company is currently unable to estimate the range of possible losses, but they could be material."

159. On August 17, 2015, the Company filed a Current Report on Form 8-K (the "August 17, 2015 Form 8-K") with the SEC,[29] attaching a press release issued that same day (the "August 17, 2015 Press Release"), at 4:40 p.m., announcing that "its previously issued financial statements and other financial data, including its May 12, 2015 earnings release, should no longer be relied upon, and that it would restate prior period financial statements and related financial information as filed" with the SEC.

160. In the August 17, 2015 Press Release, the Company stated that:

> The restated financial information will include the annual periods ended March 31, 2010, 2011, 2012, 2013 and 2014 as set forth in the Company's Registration Statements on Form S-1, as well as the quarterly periods ended June 30, September 30, and December 31, 2013 and 2014, as set forth in the Company's Quarterly Reports on Form 10-Q. The Company intends to file the restated financial information as soon as practicable.
>
> The Company believes the majority of accounting adjustments generally fall within three areas: lease adjustments, inventory adjustments, and other adjustments.

161. With respect to the lease adjustments, the Company stated in the August 17, 2015 Press Release that:

> The Company has historically classified its Fleet Leases as operating leases. However, based upon a re-examination of the Company's historic assumptions, estimates and judgments with

[29] Defendant Chlapaty signed the August 17, 2015 Form 8-K.

> respect to lease accounting, the Company has determined that a substantial portion of the leases comprising the Fleet Leases should instead be classified as capital leases. The change in lease accounting treatment does not impact the economic terms or substance of the Fleet Leases, but will require that for substantially all of the Company's leased assets, at lease inception, the present value of the minimum lease payments will be recognized on the Company's balance sheet as property, plant and equipment, and lease financing obligations. The assets will be depreciated over the term of the Fleet Leases, and the rental payments will be allocated to principal and interest payments on the lease financing obligations.

162. With respect to the inventory adjustments, the Company stated in the August 17, 2015 Press Release that:

> This review [of the Company's accounting treatment for inventory] was due to the need to assess the impact of highly volatile raw material costs during the fiscal 2015 fourth quarter on the Company's lower of cost or market assessment. This review has resulted in certain adjustments being required to inventory accounting. Other areas of inventory accounting were also identified as requiring prior period adjustments, which primarily relate to the capitalization of certain general and administrative overhead costs. Based upon this review, which is ongoing, the net effect of the inventory adjustments identified to date will result in a reduction of year-end inventory balances as of March 31, 2013, 2014 and 2015 and a related increase in cost of goods sold for the same periods.

163. With respect to the "other" adjustments, the Company stated that it "has also identified certain other accounting errors in connection with the completion of the fiscal year 2015 audit. These errors and any other prior period errors that were previously considered immaterial will be reflected in the restated financial statements and other financial data for the Non-reliance Periods."

164. The foregoing statements in the August 17, 2015 Press Release were false and misleading because Defendants failed to disclose the full scope of the errors in the Company's accounting treatment of transportation and equipment leases, inventory, long-lived assets, ADS Mexicana, and income taxes, requiring that restatement of the Company's financial statements for

the fiscal years ended March 31, 2010, 2011, 2012, 2013, and 2014, as well as the quarterly periods for the first three fiscal quarters of the fiscal year ended March 31, 2015 and for all of the quarterly periods in the fiscal year ended March 31, 2014. Defendants knew or were reckless in not knowing of the existence of errors in the Company's accounting treatment of all of these areas. Having disclosed the existence of errors in the Company's accounting treatment of leases and inventory, Defendants were duty bound, but failed, to disclose fully to investors the nature and extent of the various errors in the Company's accounting treatment and the impact such errors would have upon its previously issued financial statements filed with the SEC.

165. In addition the August 17, 2015 press release failed to disclose that the SEC had commenced an informal inquiry and sought voluntary production of documents from the Company. The Company failed to disclose this information and the subsequent SEC formal order of investigation until it filed its 2015 10-K with the SEC on March 30, 2016.

## THE TRUTH EMERGES

166. On June 30, 2015, at 4:06pm EST, the Company filed with the SEC a Form 12b-25, informing the market that it would not file its Annual Report on Form 10-K for the year ended March 31, 2015 ("2015 10-K"). The Form 12b-15 states in relevant part:

> Advanced Drainage Systems, Inc. (the "Company") is unable to file the Annual Report on Form 10-K for the fiscal year ended March 31, 2015 (the "Annual Report") within the prescribed time period without unreasonable effort or expense because additional time is required to complete the preparation of the Company's financial statements (and the required audit thereof). The factors that have caused the delay are as follows:
>
> 1. The Company is in the process of finalizing its inventory costing analysis, which will require additional time to complete.
>
> 2. The Audit Committee of the Company's Board of Directors has undertaken a review of the Company's journal

> entry control processes, which review is ongoing and will require additional time to complete.
>
> The Company intends to conclude the review and analysis of the items described above as quickly as possible in order to complete the preparation of the Company's financial statements (and the required audit thereof), and will thereafter file the Annual Report as soon as practicable. The Company anticipates that it will be able to do so within the extension period of 15 calendar days provided under Rule 12b-25 of the Securities Exchange Act, as amended; however, there can be no assurance that the Company will be able to file the Annual Report within such 15-day period.

167. On July 15, 2015, the Company issued a press release announcing the delay in the filing of the 2015 10-K beyond the July 14, 2015 deadline and the need to adjust its previously issued earnings release for the fourth quarter and full fiscal year 2015. The Company stated in relevant part:

> HILLIARD, Ohio--(BUSINESS WIRE)--Advanced Drainage Systems, Inc. (NYSE:WMS) (the "Company"), the leading manufacturer of high performance thermoplastic corrugated pipe and related products, announced today that it has delayed the filing of its Annual Report on Form 10-K for the fiscal year ended March 31, 2015 beyond the July 14, 2015 extended filing date.
>
> As previously disclosed by the Company in its Form 12b-25 filed with the Securities and Exchange Commission on June 30, 2015, the Company is reviewing methodologies utilized in its year-end inventory costing analysis and the related impact on the Company's fiscal year 2015 financial statements. This review is ongoing, and is primarily due to the need to assess the impact of highly volatile raw material costs during the Company's fiscal 2015 fourth quarter. ***Although the Company's independent public accounting firm is performing audit testing procedures for such items, the Company anticipates that the effect of this review will be a reduction of year-end inventory values for fiscal year 2015 as compared to previously reported amounts, and a related increase in cost of sales.*** The Company anticipates these adjustments will have a positive impact on cost of sales in fiscal year 2016. ***The Company intends to make any necessary adjustments to its previously issued earnings release for the fourth-quarter and full fiscal year 2015 in light of the above concurrent with the filing of its Form 10-K.***

> ***As part of the review process, the Company is now also conducting a review of its accounting treatment for its transportation and equipment leasing program. The Company's transportation and equipment leases have historically been recorded as operating leases and the Company is now in the process of re-evaluating whether it is necessary to record such leases as capital leases.***
>
> The Company is working diligently to conclude its review and analysis of the items described above as well as the Company's journal entry control processes as previously disclosed, and will announce its anticipated timing via press release once known.

(Emphasis added).

168. As a result of this news, shares of Advanced Drainage Systems fell $0.56 per share to close at $28.69 per share on July 15, 2015.

169. On August 17, 2015 at 4:40pm EST,

> HILLIARD, Ohio – (August 17, 2015) – Advanced Drainage Systems, Inc. (NYSE: WMS) ("ADS" or the "Company"), a leading global manufacturer of water management products and solutions for commercial, residential, infrastructure and agricultural applications, today announced that its previously issued financial statements and other financial data, including its May 12, 2015 earnings release, should no longer be relied upon, and that it will restate prior period financial statements and related financial information as filed with the Securities and Exchange Commission ("SEC"). The restated financial information will include the annual periods ended March 31, 2010, 2011, 2012, 2013 and 2014 as set forth in the Company's Registration Statements on Form S-1, as well as the quarterly periods ended June 30, September 30, and December 31, 2013 and 2014, as set forth in the Company's Quarterly Reports on Form 10-Q. The Company intends to file the restated financial information as soon as practicable.
> The Company believes the majority of accounting adjustments generally fall within three areas: lease adjustments, inventory adjustments, and other adjustments.
>
> The Company previously disclosed in its Current Report on Form 8-K filed on July 15, 2015 that it was evaluating the accounting treatment for its transportation and equipment leasing program (the "Fleet Leases"). The Company has historically classified its Fleet Leases as operating leases. However, based upon a re-examination of the Company's historic assumptions, estimates and judgments

with respect to lease accounting, the Company has determined that a substantial portion of the leases comprising the Fleet Leases should instead be classified as capital leases. The change in lease accounting treatment does not impact the economic terms or substance of the Fleet Leases, but will require that for substantially all of the Company's leased assets, at lease inception, the present value of the minimum lease payments will be recognized on the Company's balance sheet as property, plant and equipment, and lease financing obligations. The assets will be depreciated over the term of the Fleet Leases, and the rental payments will be allocated to principal and interest payments on the lease financing obligations. The Company anticipates that this change in accounting treatment will have a positive impact on Adjusted EBITDA in fiscal year 2016.

As previously disclosed, the Company has also been in the process of reviewing its methodologies for inventory costing and the related impact on the Company's financial statements. This review was due to the need to assess the impact of highly volatile raw material costs during the fiscal 2015 fourth quarter on the Company's lower of cost or market assessment. This review has resulted in certain adjustments being required to inventory accounting. Other areas of inventory accounting were also identified as requiring prior period adjustments, which primarily relate to the capitalization of certain general and administrative overhead costs. Based upon this review, which is ongoing, the net effect of the inventory adjustments identified to date will result in a reduction of year-end inventory balances as of March 31, 2013, 2014 and 2015 and a related increase in cost of goods sold for the same periods.
The Company anticipates that these adjustments will have a positive impact on cost of goods sold in fiscal year 2016.

The Company has also identified certain other accounting errors in connection with the completion of the fiscal year 2015 audit. These errors and any other prior period errors that were previously considered immaterial will be reflected in the restated financial statements and other financial data for the Non-reliance Periods.

The Company's review of its prior period accounting is ongoing and the adjustments identified below are preliminary amounts and are subject to change as management finalizes its accounting review in connection with the fiscal year 2015 audit and the related restatements.

| *(in thousands, adjustments shown are preliminary and subject to change)* | Fiscal Year Ended, | | |
|---|---|---|---|
| | **March 31, 2013** | **March 31, 2014** | **March 31, 2015** |
| | | **(unaudited)** | |
| **As originally reported** | | | |
| Net sales | $1,017,041 | $1,069,009 | $1,177,821 |
| Income before income taxes | $ 46,685 | $ 37,041 | $ 46,497 |
| Adjusted EBITDA | $ 129,759 | $ 147,009 | $ 153,610 |
| **Adjustments identified to date – increase (decrease)** | | | |
| Net sales | $ (856) | $ 130 | $ 1,105 |
| Income before income taxes | $ (5,239) | $ (4,683) | $ (17,285) |
| Adjusted EBITDA | $ 5,686 | $ 6,845 | $ (4,980) |

The information set forth above includes Adjusted EBITDA, a non-GAAP financial measure. The Company's management uses non-GAAP financial measures in its analysis of the Company's performance. See "Reconciliation of Non-GAAP Financial Measures" below.

**Reconciliation of Non-GAAP Financial Measures**

This press release includes references to Adjusted EBITDA, a non-GAAP financial measure. This non-GAAP financial measure is used in addition to and in conjunction with results presented in accordance with GAAP. This measure is not intended to be a substitute for those reported in accordance with GAAP. Adjusted EBITDA may be different from non-GAAP financial measures used by other companies, even when similar terms are used to identify such measure.

Adjusted EBITDA is a non-GAAP financial measure that comprises net income attributable to the Company before interest, income taxes, depreciation and amortization, stock-based compensation, non-cash charges and certain other expenses. The Company's definition of Adjusted EBITDA may differ from similar measures used by other companies, even when similar terms are used to identify such measures. Adjusted EBITDA is a key metric used by management and the Company's board of directors to assess financial performance and evaluate the effectiveness of the Company's business strategies. Accordingly, management believes that Adjusted EBITDA provides useful information to investors and others in understanding and evaluating our operating results in the same manner as the Company's management and board of directors. In order to provide investors with a meaningful reconciliation, the Company has provided below a reconciliation of net income

> attributable to the Company with Adjusted EBITDA as originally reported, and the impact of the restatement adjustments identified to date on Adjusted EBITDA. Historically the Company has reconciled net income attributable to the Company with Adjusted EBITDA, as net income attributable to the Company is typically the GAAP measure most directly comparable to Adjusted EBITDA. However, because the Company is still finalizing the impact that the accounting errors and adjustments described in Item 4.02 above will have on the Company's income tax expense, specific quantifications of the amounts that would be required to fully reconcile net income attributable to the Company to Adjusted EBITDA are not currently available. Once the accounting review has been completed, a full reconciliation of its fiscal years 2013, 2014 and 2015 Adjusted EBITDA to net income attributable to the Company will be provided in the Company's Form 10-K for the fiscal year ended March 31, 2015.

170. In response to this announcement, the price of ADS common stock fell from a close of $29.42 on August 17, 2015 to close at $28.28 on August 18, 2015 even as, on August 17, 2015 at 5:00pm EST, ADS announced a quarterly cash dividend of $0.05 per share.

171. On November 9, 2015 at 6:30am EST, the Company issued a press release, stating:

> HILLIARD, Ohio--(BUSINESS WIRE)--Advanced Drainage Systems, Inc. (NYSE:WMS) ("ADS" or the "Company"), a leading global manufacturer of water management products and solutions for commercial, residential, infrastructure and agricultural applications, today announced that Mark Sturgeon, the Company's Chief Financial Officer, has notified the Company of his intent to retire on March 31, 2016 after a highly successful 33-year career with the Company. Mr. Sturgeon will remain with the Company as an Executive Vice President to ensure a seamless transition from now until March 31, 2016. As part of the transition process, the Board has appointed Scott A. Cottrill as the Company's Chief Financial Officer, effective immediately.

172. On the news of Defendant Sturgeon's imminent departure, ADS stock fell from a November 6, 2015 close of $31.66 to a November 9, 2015 close of $29.82.

173. On February 2, 2016 at 6:45am EST, ADS issued a press release, stating:

> HILLIARD, Ohio--(BUSINESS WIRE)--Advanced Drainage Systems, Inc. (NYSE:WMS) ("ADS" or the "Company"), a leading

global manufacturer of water management products and solutions for commercial, residential, infrastructure and agricultural applications, today provided an update on the timing by when it anticipates completing the restatement of historical interim and annual financial statements and filing of its Annual Report on Form 10-K for the fiscal year ended March 31, 2015 (the "Fiscal 2015 10-K") and amended Quarterly Reports on Form 10-Q for the quarterly periods in the fiscal year ended March 31, 2015 (the "Amended Quarterly Reports").

The Company will not complete the restatement and file its Fiscal 2015 10-K or Amended Quarterly Reports on or about February 1, 2016 as previously anticipated. The Company now expects to complete the restatement and file its Fiscal 2015 10-K and amended fiscal year 2015 quarterly reports by the end of February 2016, although there can be no assurance that the process will be completed by that time.

This delay is due in part to certain accounting errors that management recently identified with respect to the Company's Mexican joint venture affiliate that extend beyond the scope of the inventory and leasing errors previously disclosed. The Company will continue to work diligently to restate its historical financial statements and file its Fiscal 2015 10-K and Amended Quarterly Reports as soon as practicable. Based on the Company's current assessment of the remaining work to be completed, management believes the end of February is a reasonable date to expect. However, the Company intends to provide an update on this expected timeline on or about February 15, 2016.

Upon filing the Fiscal 2015 10-K and Amended Quarterly Reports, the Company currently anticipates being in a position to soon thereafter issue preliminary, unaudited financial results for the nine months ended December 31, 2015 as well as provide updated fiscal year 2016 guidance. The company also intends to conduct an annual stockholders' meeting following the filing of the Fiscal 2015 10-K and will provide an update on or about February 15, 2016 regarding the timing for such annual stockholders' meeting.

In addition, the New York Stock Exchange (the "NYSE") has agreed to provide the Company with up to a three-month additional trading period through April 15, 2016, subject to reassessment by the NYSE on an ongoing basis, to become current in all of its periodic public filings, including the Company's Quarterly Reports for the fiscal year 2016 quarterly periods ended June 30, September 30 and December 31, 2015. The Company currently expects to

> timely file its Annual Report on Form 10-K for the fiscal year ending March 31, 2016.

174. On this news, ADS shares traded down from a February 1, 2016 close of $22.85 to a February 2, 2016 close of $20.09.

175. On March 28, 2016, at 5:00pm EST, ADS issued a press release, stating:

> HILLIARD, Ohio--(BUSINESS WIRE)--Advanced Drainage Systems, Inc. (NYSE: WMS) ("ADS" or the "Company"), a leading global manufacturer of water management products and solutions for commercial, residential, infrastructure and agricultural applications, today announced that it anticipates completing the restatement of historical interim and annual financial statements and filing its Annual Report on Form 10-K for the fiscal year ended March 31, 2015 and amended Quarterly Reports on Form 10-Q for quarterly periods in the fiscal year ended March 31, 2015 after market close on March 29, 2016.
>
> The Company intends to provide an updated outlook for fiscal year 2016 before the market opens on Wednesday, March 30, 2016. Chairman and Chief Executive Officer, Joe Chlapaty, and Chief Financial Officer, Scott Cottrill will host a conference call and webcast that day at 10:00 a.m. ET to discuss the impact of the restatement and expectations for the fiscal year ending March 31, 2016.

176. On this news, the stock of ADS rose from a March 28, 2016 close of $20.69 to a March 29, 2016 close of $22.36.

177. On March 29, 2016, at 4:10pm EST, ADS filed with the SEC its 2015 10-K and amended Forms 10-Q for the quarters ending June 30, 2014, September 30, 2014, and December 31, 2014. The Company restated its financial results for the years 2011 through 2014 and for the first three quarters of fiscal 2015 as well as providing actual audited financial statements for fiscal 2015.

178. In the 2015 10-K, explaining the issues it confronted, but had failed to disclose to investors, ADS stated:

In June 2015, the Audit Committee of the ADS's Board of Directors authorized two investigative reviews by its independent counsel and a third-party forensic consulting firm In addition to the foregoing, beginning in June 2015, the Audit Committee of the Company's Board of Directors (the "Audit Committee") authorized two investigative reviews by its independent counsel and a third-party forensic consulting firm acting at the direction of independent counsel. The need for these investigations arose from allegations brought to the attention of management and the Audit Committee. The investigations related to potential override of the Company's journal entry and account reconciliation controls, intra company reconciliations involving the Company's South American joint venture affiliate and certain accounting misstatements and control deficiencies involving the Company's Mexican joint venture affiliate. These investigations and the related findings are further described in this Item 9A under "Evaluation of Disclosure Controls and Procedures — Audit Committee Oversight." The errors and misstatements identified as part of these investigations were corrected, as appropriate, in the Company's prior period financial statements.

The Audit Committee determined on August 14, 2015 that the Company's previously reported audited financial statements for the fiscal years ended March 31, 2014, 2013, 2012, 2011 and 2010 (and related reports of the Company's independent registered public accounting firm on the consolidated financial statements as of March 31, 2014 and 2013, and for each of the three years in the period ended March 31, 2014) and quarterly unaudited interim financial statements for the first three quarters of the fiscal year ended March 31, 2015, as well as each of the quarterly periods for the fiscal years ended March 31, 2014 and 2013, should no longer be relied upon.

Based on the evaluation of our disclosure controls and procedures, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were not effective as of March 31, 2015 because of the material weaknesses in our internal control over financial reporting as further described below.

*Review of Potential Override of Journal Entry and Account Reconciliation Controls*

In June 2015, certain members of the Company's finance staff responded affirmatively to questions presented to them by the independent registered public accounting firm in accordance with Public Company Accounting Oversight Board Interim Auditing

Standard AU 316, Consideration of Fraud in a Financial Statement Audit (commonly referred to as "SAS 99"). The SAS 99 questions asked members of the finance staff (i) whether they or anyone known to them had ever been asked to record a journal entry or other adjustment without proper authorization or support, (ii) whether they or anyone known to them had ever been asked or coerced to record a journal entry or other adjustment with which they were uncomfortable, or (iii) were they aware of any inappropriate journal entry or other adjustment in the entity's financial records. As a result of the responses provided to the SAS 99 questions, the Audit Committee engaged independent counsel and authorized such independent counsel to conduct an investigative review.

While the investigation found no evidence of fraud, it determined that the concerns reflected in the responses to the SAS 99 questions were well founded and resulted in restatement of prior period financial statements.

The Audit Committee's investigation also identified deficiencies in the Company's process for reconciling certain intra-company transactions with the Company's unconsolidated South American joint venture, Tuberías Tigre-ADS Limitada (the "South American Joint Venture"). Specifically, requests by our independent registered public accounting firm for confirmation on certain trade receivables balances between the Company and the South American Joint Venture lacked sufficient documentation when signed and were, in certain instances, completed and signed by the South American Joint Venture at the direction of a former Company employee without reconciling the differences in account balances between the Company and the South American Joint Venture.

Following further investigation, the Audit Committee's independent counsel found that the Company's intra-company reconciliation process lacked sufficient support.

*Review of Certain ADS Mexicana Transactions*

The Audit Committee in November of 2015 authorized independent counsel and its forensic consulting firm to conduct an independent investigation.

Upon concluding the investigation, it was determined by management, upon consultation with the Audit Committee's advisors, that the various lease and services arrangements described above, as well as certain additional services arrangements with related parties identified during the course of the investigation,

lacked commercial and economic substance or proper supporting documentation as to the services performed, and therefore were not appropriately reflected in the Company's consolidated financial statements and that certain of those transactions should be re-characterized by ADS Mexicana as dividends as opposed to expenses. As a result of re-characterizing the related party transactions, the Company will cause ADS Mexicana to amend its tax returns filed in Mexico for the open tax periods affected as soon as practicable in order to reflect the appropriate tax treatment for the transactions as re-characterized.

Management also identified potential accounting errors related to ADS Mexicana's revenue recognition cut-off practices which were reported by management to the Audit Committee and also investigated by the Audit Committee's advisors. Specifically, the Company identified instances where ADS Mexicana would recognize revenue prior to the date of shipment or transfer of title/ownership, which is not in accordance with accounting principles generally accepted in the United States ("GAAP"). The investigation also found that the timing for when such errors occurred was irregular and in certain instances attributable to requests from ADS Mexicana customers that were not properly accounted for, resulting in timing differences between invoicing date and shipment date. It was determined that these errors with respect to revenue recognition occurred due to ineffective controls and not due to an intent to commit fraud.

Management has concluded that the control deficiencies noted above related to the ADS Mexicana control environment, as well as the ADS Mexicana revenue recognition cut-off practices, each constituted a material weakness. Although such matters have resulted in a determination of material weakness,

*Internal Control Material Weaknesses*

A material weakness in internal controls is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. Because of its inherent limitations, even appropriate internal control over financial reporting may not prevent or detect misstatements.

We have identified certain material weaknesses in our internal control over financial reporting in the areas of (i) Company control environment, (ii) accounting for leases, (iii) accounting for

inventory, (iv) journal entry and account reconciliation, (v) ADS Mexicana control environment and (vi) ADS Mexicana revenue recognition cut-off practices, as further described below. Management determined these material weaknesses and other control deficiencies were primarily the result of an ineffective control environment. As a result, the Company lacked effective control activities necessary to prepare accurate financial statements and ensure compliance with regulatory filing requirements applicable to public companies. The lack of a sufficient number of finance personnel with an appropriate level of knowledge, experience and training as well as the Company's approach to accounting assumptions, estimates and judgments, including documentation and support therefor, were contributing factors to each of these material weaknesses and other control deficiencies described below.

*Control Environment*

We did not maintain an effective control environment, which is the foundation for the discipline and structure necessary for effective internal control over financial reporting, as evidenced by: (i) an insufficient number of personnel appropriately qualified to perform control design, execution and monitoring activities, (ii) an insufficient number of personnel with an appropriate level of GAAP knowledge and experience and ongoing training in the application of GAAP commensurate with our external financial reporting requirements, which resulted in erroneous judgments regarding the proper application of GAAP, and (iii) in certain instances, insufficient documentation or basis to support account balances and accounting estimates.

A contributing factor to the material weakness in the control environment was certain aspects of the Company's "tone at the top" set by senior management, which is the atmosphere and culture created by the Company's leadership and establishes the environment within which the Company's financial reporting process occurs. The following areas related to tone at the top were identified as contributing factors to the weaknesses described in the control environment that require remediation:

• channels for raising and communicating concerns were not effective to provide for the escalation and resolution of questions or issues known by Company finance staff or management in a timely or appropriate manner;

• Company positions with respect to certain accounting policies, estimates and judgments were not sufficiently established and documented, resulting in enhanced risk tolerance for the application of certain accounting principles;

• management expectations regarding the level of documentation necessary to support account balances, journal entries, accrual calculations and cutoff processes and management estimates were not adequate;

• management's understanding of its responsibility for the Company's financial statements (as opposed to the Company's independent registered public accounting firm) in connection with completing the Company's fiscal year 2015 audit was not adequate;

• management's style and temperament created a pressurized environment for finance personnel that was not conducive towards the expression and appropriate resolution of differing viewpoints regarding the Company's accounting practices; and

• inappropriate emphasis by senior management on meeting aggressive timelines for financial reporting and establishing reasonable timelines, in light of the resources available to the Company's finance staff.

*Accounting for Leases*

We did not design and maintain effective control over the accounting for leases, resulting in a material weakness. The Company's control over the application of the proper accounting treatment for leases related to fleet tractors, trailers, forklifts, automobiles, aircraft, and buildings was not effective, as the historical accounting analysis failed to consider all criteria necessary for purposes of the assessment of whether the leases should be classified as operating leases or capital leases. We have also re-examined our historic assumptions, estimates and judgments with respect to the accounting for real estate, equipment and aircraft leases that were previously classified as operating leases. We have now determined that a significant number of such leases should instead be classified as capital leases and included in property, plant and equipment.

*Accounting for Inventory*

We did not design and maintain effective control over the accounting for inventory, resulting in a material weakness. The

errors primarily related to the Company's incorrect historical calculation of inventory cost based on the first-in-first-out ("FIFO") method, the excess capitalization of certain inter-plant freight expense and other overhead costs, as well as the misclassification of certain overhead costs between general and administrative expense and cost of goods sold.

With respect to inventory costing adjustments related to the application of the FIFO method, the Company had historically utilized a simplified method of calculating inventory cost based on an overall average price near period end for all products, particularly with respect to the resin material cost component of inventory. However, this simplified method for establishing inventory cost became less precise over time as a result of the significant increase in the number of products sold by the Company. The imprecision in this simplified method became even greater during periods of volatile raw material pricing, which occurred during the fourth quarter of fiscal year 2015. Multiple contributing factors were identified related to the misclassification of certain overhead costs. First, the Company historically applied a simplified method of capitalizing general and administrative overhead costs to inventory by using a consistent capitalization rate across all general and administrative functions, such as the purchasing, human resources and information technology functions, regardless of the actual percentage of each function's efforts that were related to the inventory procurement and production process. Additionally, certain capitalized overhead costs were determined to be overstated as the result of either the inclusion of certain types of costs that were unrelated to the inventory production process or the use of estimates that did not accurately reflect actual costs.

*Journal Entry and Account Reconciliation*

We did not design and maintain effective control over access within our information technology ("IT") systems to control the ability of key accounting personnel to initiate, modify and record transactions in our financial systems. Specifically, it was determined that certain key accounting personnel had the ability to both prepare and post manual journal entries without appropriate independent review and approval. As these key accounting personnel are also reviewers of certain account reconciliations, we also did not maintain appropriate segregation of duties. Also, management expectations regarding the level of documentation necessary to support account balances, journal entries, accrual calculations and cutoff processes and management estimates were not adequate. Accordingly, we

> concluded that these journal entry and account reconciliation control deficiencies constitute a material weakness.
>
> *ADS Mexicana Control Environment*
>
> We did not maintain an effective control environment with respect to certain aspects of the financial reporting of our consolidated joint venture affiliate, ADS Mexicana, resulting in certain mischaracterized transactions. These transactions were the subject of the investigation authorized by the Audit Committee and conducted by its independent advisors as described above.
>
> Based upon the errors identified with respect to ADS Mexicana and the findings of the investigation conducted by the Audit Committee's independent advisors, management concluded that such deficiencies resulted in a material weakness in ADS Mexicana's control environment.
>
> *ADS Mexicana Revenue Recognition Cut-Off Practices*
>
> We did not design and maintain effective control with respect to ADS Mexicana's revenue recognition cut-off practices. Specifically, the Company identified instances where ADS Mexicana would recognize revenue, prior to the date of shipment or transfer of title/ownership, which is not in accordance with GAAP. Based upon the errors identified and the findings of the investigation conducted by the Audit Committee's independent advisors, management concluded that such revenue recognition cut-off practices resulted in a material weakness.

179. On the disclosure of the Company's restated fiscal 2011-2014 results, its restated quarterly results for fiscal 2015 and its actual annual results for 2015, the price of ADS common stock fell from a March 29, 2016 close of $22.36 to a March 30, 2016 close of $20.86 a fall of $1.50 or 6%.

## DEFENDANTS VIOLATED GAAP

***Defendants Knew of Material Weaknesses in Internal Controls throughout the Class Period***

180. ADS was required by the SEC but failed to maintain books and records in sufficient detail to reflect the transactions of the Company and prepare financial statements in accordance with generally accepted accounting principles ("GAAP").[30] Section 13(b) 2 of the Exchange Act entitled *Periodical and Other Reports* states the following with respect to books and records and internal controls:

> Every issuer which has a class of securities registered pursuant to section 12 and every issuer which is required to file reports pursuant to section 15(d) shall:
>
> A. Make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> B. devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –
>
> i. transactions are executed in accordance with management's general or specific authorization;
>
> ii. transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (II) to maintain accountability for assets;
>
> iii. access to assets is permitted only in accordance with management's general or specific authorization; and

[30] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

iv. the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

181. A good system of internal controls helps management achieve its objectives related to the effectiveness and efficiency of its operations, the reliability of its financial reporting, and compliance with applicable laws and regulations. It is management's responsibility to develop and implement internal controls necessary to ensure that it maintains adequate books and records. This is made clear in SEC regulations and in a report prepared by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), Internal Control – Integrated Framework (the "COSO Report").[31]

182. The COSO Report defines internal control as a process that is "designed to provide reasonable assurance regarding the achievement of objectives" related to the effectiveness and efficiency of operations, the reliability of financial reporting, and compliance with applicable laws and regulations. More broadly, however, a system of internal control encompasses more than the policies governing the objectives related to operations, financial reporting, and compliance; namely, it includes the actions taken by a company's board of directors, management at all levels, and employees in running the business.

183. The COSO Report requires that financial statements prepared for external purposes be fairly presented in conformity with GAAP and regulatory requirements. Borrowing from generally accepted auditing standards, the COSO Report defines fair presentation as the following:

- the accounting principles selected and applied have general acceptance;

[31] Generally accepted auditing standards codified in AU §319, Consideration of Internal Control in a Financial Statement Audit, is based on the internal control framework described in the COSO Report. The COSO report was issued in September 1992 as a four-volume set. Additional modifications and updates of the framework have been issued with the most recent Integrated Framework being issued in 2013 as a three-volume set.

- the accounting principles are appropriate in the circumstances;

- the financial statements are informative of matters that may affect their use, understanding and interpretation; and

- the financial statements reflect the underlying transactions and events in a manner that presents the financial position, results of operations and cash flows stated within a range of acceptable limits, that is, limits that are reasonable and practical to attain in financial statements.[32]

184. The COSO Report describes internal control within a certain framework that consists of five separate components. It requires that financial statements prepared for external use are fairly presented in conformity with generally accepted accounting principles and regulatory requirements. The COSO Report defines five components of an internal control framework that are needed to enable a business to achieve its objectives: (1) the control environment, (2) risk assessment, (3) control activities, (4) information and communications and (5) monitoring.

185. Everyone in an organization has responsibility for internal control. The CEO, however, sets the "tone at the top" that affects integrity, ethics, and other factors of a positive control environment. "In any organization, 'the buck stops' with the chief executive. He or she has ultimate ownership responsibility for the internal control system. The influence of the CEO on an entire organization cannot be overstated."[33] The chief executive fulfills this duty by providing leadership and direction to senior managers and reviewing the way they are controlling the business. The Addendum to the COSO Report makes it clear that the Chief Accounting Officer,

[32] *See* COSO Report, Chapter 3; see also Statement on Auditing Standards No. 69, The Meaning of "Present Fairly in Conformity With Generally Accepted Accounting Principles" in the Independent Auditor's Report (New York: AICPA, 1992).

[33] COSO Report, Chapter 8, p. 84.

who in the case of ADS was defendant Sturgeon, plays a critical role with respect to the internal control system.

186. Specifically, the CEO, Defendant Chlapaty and the CFO, Defendant Sturgeon failed to comply with SEC regulations and the requirements of COSO. As described herein there were material weaknesses in internal control at ADS that were necessary to prepare accurate financial statements and unsure compliance with regulatory filing requirements applicable to public companies.[34]. A material weakness is defined by the SEC as "a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis."[35] ADS's internal control system failed to live up to the standards as set forth in the five elements of an internal control framework described above. Defendants Chlapaty and Sturgeon failed to maintain a proper tone and control awareness that focused on achieving consistent application of accounting policies and procedures and strict adherence to GAAP.

187. In its prior public filings Defendants Chlapaty and Sturgeon had concluded that disclosure controls and procedures were effective as of September 30, 2014.[36] Moreover, in its Form 10-Q for the period ended December 31, 2014, Chlapaty and Sturgeon in addition to

---

[34] 2015 10-K, Item 9A.

[35] The Public Company Accounting Oversight Board's ("PCAOB") definition is identical, except is replaces the word "registrant's" with "company's" and notes that "There is a reasonable possibility of an event, as used in this standard, when the likelihood of the event is either 'reasonably possible' or 'probable,' as those terms are used in Financial Accounting Standards Board Statement No. 5, Accounting for Contingencies ('FAS 5')." AS 5 ¶A7.

[36] ADS Form 10-Q for the period ended September 30, 2014, filed November 10, 2014, Item 4.

determining that that disclosure controls and procedures were effective as of December 31, 2014, Chlapaty and Sturgeon stated that there was no change in internal controls over financial reporting that has materially affected or is reasonably likely to materially affect the internal controls over financial reporting.[37] These representations when made were false given the disclosure made on March 30, 2016 and the subsequent revision to it Form 10-Qs for the periods ended March 31, 2014, June 30, 2014 and December 31, 2015.

188. The existence of these material weaknesses enabled the Defendants to circumvent the Company's accounting policies caused a misstatement and understatement of costs and resulted in an overstatement of net income throughout the class period.

189. In connection with ADS's filing of various Form 10-Qs, Chlapaty and Sturgeon provided certifications which were false.

190. Ultimately ADS restated its false financial statements but prior to ADS's restatement of the financials investors during the class period had unreliable internal controls as described above by reference to the 2015 10-K.

191. As of March 30, 2016 ADS still had much work to do in order to have a proper internal control process. ADS disclosed remediation efforts which were underway, including among others:

- Implementation of the finance organization structure, roles and responsibility recommendations;
- Change in finance personnel, including adding additional positions that were required to ensure proper controls and financial reporting;
- Continued use of third party consultants to assist company personnel in the finance organization and to remediate identified deficiencies;

[37] ADS Quarterly Report on Form 10-Q for the period ended December 31, 2014, filed February 9, 2015, Item 4.

- Continued enhancement to journal entry controls and account reconciliations;
- Implementation of process level controls;
- Increased training regarding ethics, compliance and anti-corruption matters;
- Enhancement of ADS Mexicana Control Environment.

192. As a result of the material internal control weaknesses described above, ADS failed to comply with SEC regulation and the requirements of COSO. ADS had a poor tone at the top, they were unable to perform the necessary levels of monitoring and oversight and were unable to resolve complex accounting issues. This was all the more important given that ADS had an insufficient number of personnel with the appropriate levels of experience.

193. Thus, defendants knew that these material internal control weaknesses existed throughout the Class Period.

***Defendants Violated GAAP by Reporting Materially False Financial Statements for the Company***

194. The Company represented its financial results and statements in a manner which materially violated GAAP, including the following fundamental accounting principles:

> (a) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);
>
> (b) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);
>
> (c) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that

> management offers securities of the enterprise to the public, it voluntarily accepts wider responsibility for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);
>
> (d) The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);
>
> (e) The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);
>
> (f) The principle of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions, was violated (FASB Statement of Concepts No. 2, ¶79); and
>
> (g) The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2 ¶¶95, 97).

195. ADS's financial statements were not in compliance with GAAP in several areas including, accounting for leases, accounting for inventory, accounting for long-lived assets, accounting for ADS Mexicana, and various other items. In its March 31, 2015 Form 10-K, filed March 30, 2016, ADS admitted that its previously filed financial statements were not in compliance with GAAP. Through its restatement, ADS acknowledged that its annual financial statements for 2010-2014 and for the first three quarters of 2015 were materially false when issued as follows.

196. First, with respect to ADS's lease accounting adjustments, ASC Topic 840 governed its lease accounting and that GAAP is prescriptive. That is for all intents and purposes ASC Topic 840 requires application of specific rules and no application of judgment as ADS should have – as it acknowledged – applied it.

197. With respect to lease accounting, the Company stated in the 2015 10-K:

> The Company leases real estate and equipment under various lease agreements. Historically, assets leased under the Company's transportation and equipment leasing program ("Fleet Leases") have been classified as operating leases. However, based upon a reexamination of the Company's historic assumptions, estimates and judgments with respect to lease accounting, as further described below, the Company has determined that a substantial portion of the Fleet Leases should instead be classified as capital leases.
>
> As part of the Company's recent review of its Fleet Leases, the Company reexamined the minimum lease payment classification test (the "MLP Test") set forth in ASC Topic 840, which is one of four criteria used to determine lease classification. The MLP Test requires a lease to be capitalized when the present value of the minimum lease payments is greater than or equal to 90% of the fair market value of leased property at lease inception. The Company had historically included in the minimum lease payments used for purposes of the MLP Test only those payments related to the noncancellable period identified in the lease agreement.

198. ASC Topic 840 at 840-10-25-4 defines what constitutes minimum lease payments ("MLP") under the minimum lease payment criterion. It is clear that proper application of GAAP requires more than just consideration of payments related to the non-cancellable period identified in the minimum lease payment test. ASC Topic at 840-10-25-5 and ASC Topic at 840-10-25-6 describe what constitutes a minimum lease payment for a Lessee like ADS. According to those sections which follow there is no application of judgment, but rather application of specific rules. Based upon the application of the specific rules, ADS was minimally reckless in its historical application of GAAP with respect to lease accounting.

199. According to ASC Topic 840-10-25-5, for a lessee, minimum lease payments comprise the payments that the lessee is obligated to make or can be required to make in connection with the leased property, excluding both of the following:

> a. Contingent rentals
>
> b. Any guarantee by the lessee of the lessor's debt and the lessee's obligation to pay (apart from the rental payments) executory costs such as insurance, maintenance, and taxes in connection with the leased property.

200. Further, according to ASC Topic 840-10-25-6, if the lease contains a bargain purchase option, only the minimum rental payments over the lease term and the payment called for by the bargain purchase option shall be included in the minimum lease payments. Otherwise, minimum lease payments include all of the following:

> a. The minimum rental payments called for by the lease over the lease term.
>
> b. Any guarantee by the lessee (including by a third party related to the lessee) of the residual value at the expiration of the lease term, whether or not payment of the guarantee constitutes a purchase of the leased property. If the lessor has the right to require the lessee to purchase the property at termination of the lease for a certain or determinable amount, that amount shall be considered a lessee guarantee of the residual value. If the lessee agrees to make up any deficiency below a stated amount in the lessor's realization of the residual value, the residual value guarantee to be included in the minimum lease payments shall be the stated amount, rather than an estimate of the deficiency to be made up.
>
> c. Any payment that the lessee must make or can be required to make upon failure to renew or extend the lease at the expiration of the lease term, whether or not the payment would constitute a purchase of the leased property. Note that the definition of lease term includes all periods, if any, for which failure to renew the lease imposes a penalty on the lessee in an amount such that renewal appears, at lease inception, to be reasonably assured. If the lease term has been extended because of that provision, the related penalty shall not be included in minimum lease payments.

d. Payments made before the beginning of the lease term. Such payments shall be considered as part of minimum lease payments and included in the 90 percent test, as specified in paragraph 840-10-25-1(d), at their future value at the beginning of the lease term—that is, to give effect to the time value of money, the future value at the beginning of the lease term of the lease payments would be calculated just as payments during the lease term are discounted back to the beginning of the lease term for purposes of applying the 90 percent test in that paragraph. The lessee shall use the same interest rate to accrete payments to be made before the beginning of the lease term that it uses to discount lease payments to be made during the lease term.

e. Fees that are paid by the lessee to the owners of the special-purpose entity for structuring the lease transaction. Such fees shall be included as part of minimum lease payments (but shall not be included in the fair value of the leased property) for purposes of applying the 90 percent test in paragraph 840-10-25-1(d).

201. By only including payments related to the noncancellable period, ADS chose to ignore the many subsections of ASC Topic 940-10-25, 4 through 6, that detail specifics as to what GAAP required ADS to include in the determination of the MLP. ADS's actions are not one based upon judgment since under GAAP there is a specific list of what it was bound to include. As a result the error described herein is not a change in historic assumption, estimate or judgment and can only be based upon a deliberate act or a reckless disregard of GAAP in applying this prescriptive test as to whether a lease should be considered an operating or capital lease. Proper application of ASC 840 makes it clear that the company's historical application of GAAP was erroneous.

202. The Company continued with respect to lease accounting adjustments that it had "now determined that the minimum lease payments should also include payments related to certain reasonably assured renewal periods included in the lease agreement."

203. ASC Topic 840 at 840-10-20, however, makes it clear that the lease term includes not only the noncancelable lease term, but all periods covered by bargain renewal options, all period including ordinary renewal options if certain conditions are met, all periods covered by ordinary renewal options preceding the date of a bargain purchase option and all periods representing renewals or extensions of the lease at the lessor's option. As a result, the errors ADS identified with respect to its lease accounting do not reflect changes in historic assumptions, estimates or judgments, but rather either a deliberate action or at a minimum a reckless disregard of clear, applicable GAAP.

204. With respect to lease accounting adjustments, the Company further stated that:

> Under that revised analysis of significant lease arrangements, the Company has concluded that the present value of the minimum lease payments exceeded 90% of the fair market value for certain leased assets, requiring a modification of treatment from operating to capital leases.
>
> The Company has also reexamined its historic assumptions, estimates and judgments with respect to the accounting for real estate and aircraft leases that were previously classified as operating leases. In many cases, the Company has determined that the leases should instead be classified as capital leases due to the inclusion of contingent penalty amounts in the minimum lease payments used for purposes of the MLP Test.

205. ASC Topic 840 at 840-10-20, however, clearly defines what constitutes a penalty which is:

> Any requirement that is imposed or can be imposed on the lessee by the lease agreement or by factors outside the lease agreement to do any of the following:
>
> a. Disburse cash
>
> b. Incur or assume a liability
>
> c. Perform services

> d. Surrender or transfer an asset or rights to an asset or otherwise forego an economic benefit, or suffer an economic detriment. Factors to consider in determining whether an economic detriment may be incurred include, but are not limited to, all of the following:
>
> 1. The uniqueness of purpose or location of the property
>
> 2. The availability of a comparable replacement property
>
> 3. The relative importance or significance of the property to the continuation of the lessee's line of business or service to its customers
>
> 4. The existence of leasehold improvements or other assets whose value would be impaired by the lessee vacating or discontinuing use of the leased property
>
> 5. Adverse tax consequences
>
> 6. The ability or willingness of the lessee to bear the cost associated with relocation or replacement of the leased property at market rental rates or to tolerate other parties using the leased property.

206. More, ASC Topic 840-10-25-6 it is clear that penalties are included in the MLP test. Again, it is clear that the error identified herein is not a change in historic assumption, estimate or judgment, but rather either a deliberate action or at a minimum a reckless disregard of clear applicable GAAP.

207. With respect to lease accounting adjustments, the Company concluded with the appropriate treatment that should never have been in doubt:

> The errors in lease classification have been corrected in the restated consolidated financial statements, whereby at lease inception the Company has recorded a capital lease asset and lease financing obligation equal to the lesser of the present value of the minimum lease payments or the fair market value of the leased asset. The capital lease asset is recorded in Property, plant and equipment, net and amortized to its expected residual value at the end of the lease term using the straight-line method, and the lease financing

> obligation is amortized using the effective interest method over the lease term with the rental payments being allocated to principal and interest.

208. Second, with respect to inventory accounting adjustments, in the 2015 10-K, the Company stated:

> The Company identified and corrected certain errors related to its accounting for inventory. The errors primarily related to the Company's incorrect historical calculation of inventory costing based on the FIFO method, the inappropriate capitalization of certain inter-plant freight expense and other overhead costs, as well as the misclassification of certain overhead costs between general and administrative expense and cost of goods sold. The Company also identified and corrected certain errors related to ADS Mexicana's accounting for inventory.
>
> With respect to inventory costing errors related to the application of the FIFO method, the Company had historically utilized a simplified method of calculating inventory cost based on an overall average price near period end for all products, particularly with respect to the resin material cost component of inventory.

209. According to ASC Topic 330 at 330-10-30-9, however, cost for inventory purposes may be determined under any one of several assumptions as to the flow of cost factors, such as first-in first-out (FIFO), average, and last-in first-out (LIFO). The major objective in selecting a method should be to choose the one which, under the circumstances, most clearly reflects periodic income. As evidenced by the restatement, the Company's prior method did not properly reflect period income. In addition, the method was a combination of a FIFO assumption and an average assumption. GAAP does not provide for the combination of assumptions, but rather one of a several assumptions. As a result, the Company's previous practice was not GAAP, but rather some made up combination which was deliberate and which did not accurately reflect periodic income. In the alternative, the Company's application of its pricing methodology was a reckless disregard of applicable GAAP.

210. With respect to inventory accounting adjustments, the Company continued:

> However, this simplified method for stablishing inventory cost became less precise over time primarily as a result of the significant increase in the number of raw materials purchased by the Company. The imprecision in this simplified method became even greater during fiscal 2015 when raw material pricing became particularly volatile. In response, the Company has developed a more precise model to value the resin component of ending inventory on hand under the FIFO method.

211. GAAP requires a determination of FIFO based upon actual historical costs, subject to a lower of cost or market constraint. GAAP prohibits ADS's applying a simplified average method. As a result, the restatement was really a result in a change in method from one which was not GAAP to one which was GAAP. Based upon the clarity provided for in GAAP, either the Company engaged in a deliberate act or at a minimum a reckless disregard of clear applicable GAAP.

212. Again, with respect to inventory accounting adjustments, the Company continued:

> There were multiple contributing factors related to the errors in the capitalization of overhead costs. First, the Company historically applied a simplified method of capitalizing general and administrative overhead costs to inventory by using a consistent capitalization rate across all general and administrative functions, such as the purchasing, human resources and information technology functions, regardless of the actual amount of each function's efforts that were related to the inventory production process.

213. ASC Topic 330 at 330-10-30-8, however, makes it clear that under most circumstances general and administrative expenses shall be included in period costs, except for the portion of such expense that may be clearly related to production and thus constitute a part of inventory costs. ADS's previous policy was clearly not GAAP and resulted in period costs being inappropriately being capitalized and deferred resulting in an overstatement of net income being

reported to shareholders. As a result, either the Company engaged in a deliberate act or at a minimum a reckless disregard of clear applicable GAAP.

214. Last, with respect to inventory accounting adjustments, the Company stated that:

> In addition, certain amounts were capitalized from Cost of goods sold into inventory without a corresponding reclassification entry from general and administrative expenses. In response, the Company developed an appropriate allocation of general and administrative overhead costs to inventory based on the specific amount of each function's efforts that were related to the inventory production process.

215. ASC Topic 330 at 330-10-30-8, however, states that under most circumstances, general and administrative expenses shall be included as period charges, except for the portion of such expenses that may be clearly related to production and thus constitute a part of inventory costs (product charges). Selling expenses constitute no part of inventory costs. The exclusion of all overheads from inventory costs does not constitute an accepted accounting procedure. The exercise of judgment in an individual situation involves a consideration of the adequacy of the procedures of the cost accounting system in use, the soundness of the principles thereof, and their consistent application. General and administrative expenses ordinarily shall be charged to expense as incurred but may be accounted for as contract costs under the completed-contract method of accounting or, in some circumstances, as indirect contract costs by government contractors.

216. Also, under most circumstances, general and administrative expenses shall be included as period charges, except for the portion of such expenses that may be clearly related to production and thus constitute a part of inventory costs (product charges). Selling expenses constitute no part of inventory costs. The exclusion of all overheads from inventory costs does not constitute an accepted accounting procedure. The exercise of judgment in an individual situation involves a consideration of the adequacy of the procedures of the cost accounting system in use,

the soundness of the principles thereof, and their consistent application. General and administrative expenses ordinarily shall be charged to expense as incurred. While ASC 330-10-30-8 requires some judgment, the issues ADS faced here were basic, indicating that Defendants either purposefully or recklessly violated clear and applicable GAAP.

## ADDITIONAL SCIENTER ALLEGATIONS

217. Thus, with Defendants violations of prescriptive GAAP, requiring little of any judgment, Defendants knew or were reckless in not knowing that the financial results that the Company reported during the Class Period were false and misleading. Prior to their issuing their financial statements during the Class Period, Defendants knew or were reckless in not knowing of the likelihood of material misstatements as a direct result of weak internal controls over financial reporting and the Company's failure to apply GAAP to, among other accounts, its lease accounting and inventory accounting.

218. Defendants failed to take proper steps to ensure the adequacy of the internal control and reporting practices when it is clear that the financial reporting practices of a public company are significantly more stringent than that of a privately held company as evidenced by the remediation efforts underway at the company to correct its internal control weaknesses.

219. In addition, the Defendants knew or were reckless in not knowing that the application of GAAP by ADS was inappropriate. The errors discussed above were basic elements of GAAP, including what items should be included in the MCP test, pricing of inventory under FIFO at the lower of cost or market, period ending cutoff procedures, etc.

220. The improper application of controls over financial reporting enabled ADS to bypass GAAP which resulted in the systematic overstatement of net income that was used by investors in making an investment in ADS.

221. In connection with its public offering, ADS transitioned itself from a privately owned company to a publicly traded company. The objective of these two types of entities can differ, in that private entities tend to try to minimize reportable income so as to minimize taxes while public entities try to maximize reported income and operating results to increase shareholder value in the form of the price of their stock.

222. For example, generally the effect on financial statements from treating leases as operating leases compared to capital leases is that on an overall basis, cumulative earnings are lower since all amounts are expensed and no amounts are capitalized. Over the life of the lease, the difference equals itself out. As can be seen in ***Table 1*** below, the cumulative effects of the restatements on the balance sheets was an increase to retained earnings

**Table 1 – Effect on Equity from Lease Restatement**[38]

| Description | FYE 3-31-14 | FYE -3-31-13 | FYE 3-31-12 | FYE 3-31-11 |
|---|---|---|---|---|
| Retained Earnings Increase attributable to Lease Restatement | $15,460 | $17,882 | $21,024 | $24,229 |

223. More important to ADS's capital raising efforts was the fact that given the timing of ADS's IPO, historical earnings measures were able to be overstated by inappropriately reporting the leases as operating leases compared to capitalized leases in accordance with GAAP. ***Table 2*** provides a summary of these historical overstatements.

**Table 2 – Overstatement of Earnings Measures attributable to Lease Restatement**[39]

| Description | FYE 3-31-14 | FYE 3-31-13 | FYE 3-31-12 | FYE 3-31-11 |
|---|---|---|---|---|

[38] ADS 2015 10-K page 52, 53 and F-26.

[39] ADS 201510-K pages 51, 52, F-23 and F-24.

| | | | | |
|---|---|---|---|---|
| Gross Profit | (1,233) | 1,522 | 2,284 | 85 |
| Income from Operations | (243) | 710 | 2,049 | 127 |
| Net Income | 2,423 | 3,141 | 3,206 | 959 |

224. Since the amount of capital raised can be directly related to a multiple of earnings measures, the historical overstatements presented in the financial statements presents ADS's financial results in a more favorable light which would have resulted in an overpayment by investors for the ADS stock.

225. ADS disclosed in its financial statements "The agreements and instruments governing our debt contain certain restrictions and limitations that could significantly impact our ability to operate our business and adversely affect the holder of our stock." as a result ADS was incentivized to stay in compliance with its debt instruments. Violating GAAP and recording its leases as operating leases enabled ADS to stay in compliance with its debt instruments.

226. As disclosed in the restated financial statements, had ADS properly followed GAAP with respect to leases, it would have been in default of its affirmative and negative financial covenants with its lenders as evidence by the fact the ADS was required to modify these definitions on a go forward basis and obtain a waiver of its historical defaults.

227. In addition, had ADS properly followed GAAP with respect to leases it would have resulted in ADS being unable to declare dividends absent a waiver from its lenders.

228. Similarly, the failure to apply GAAP for inventory resulted in historical overstatements of earnings measures (similar to the misstatement regarding leases) would have a direct effect on the amount investors paid for ADS stock, resulting in an overpayment on the part of investors. ***Table 3*** provides a summary of these historical overstatements.

**Table 3 – Overstatement of Earnings Measures attributable to Inventory Restatement**[40]

| Description | FYE 3-31-14 | FYE 3-31-13 | FYE 3-31-12 | FYE 3-31-11 |
|---|---|---|---|---|
| Gross Profit | 17,949 | 18,089 | 16,501 | 19,272 |
| Income from Operations | 1,483 | 3,141 | 2,613 | 6,042 |
| Net Income | 1,483 | 3,141 | 2,613 | 6,042 |

229. As demonstrated earlier, ADS's historical treatment of leases and inventory were either a deliberate action or at a minimum a reckless disregard of clear applicable GAAP Moreover, given the clear violation of GAAP and the material impact on the ADS financial statements, ADS's auditors, Deloitte, could not have properly adhered to applicable professional standards when performing their audits of ADS for 2014 through 2011, especially in light of the fact that in a company like ADS inventory would have been deemed a critical audit areas by its outside auditors.

230. As shown in the tables below, the restatement of gross profit, income from operations and net income were also material in percentage terms. Moreover the misstatements which we have determined were driven by a deliberate action to misapply basic prescriptive GAAP or a reckless disregard of GAAP were likewise material in percentage terms. ***Table 4*** shows these effects on 2014, ***Table 5*** shows these effect on 2013, ***Table 6*** shows these effect on 2012 and ***Table 7*** shows these effect on 2011.

**Table 4 – Analysis of 2014 restatement on Selected Items**[41]

| Description | As reported | As restated | Percentage Difference | Combined Effect of | Percentage of Restatement Related to |
|---|---|---|---|---|---|

[40] ADS Form 10-K pages 51, 52, F-23 and F-24.

[41] ADS 201510-K pages 51, 52, F-23 and F-24.

| | | | | | |
|---|---|---|---|---|---|
| | | | | Leases and Inventory | Leases and Inventory |
| Gross Profit | 212,891 | 193,970 | (8.89)% | (16,726) | 88.4% |
| Income from Operations | 53,315 | 52,885 | (0.81)% | (3,906) | 908.4% |
| Net Income | 12,874 | 12,220 | (5.08)% | (3,906) | 597.2% |

**Table 5 – Analysis of 2013 restatement on Selected Items**[42]

| Description | As reported | As restated | Percentage Difference | Combined Effect of Leases and Inventory | Percentage of Restatement Related to Leases and Inventory |
|---|---|---|---|---|---|
| Gross Profit | 209,311 | 187,961 | (10.2)% | (19,611) | 91.9% |
| Income from Operations | 63,063 | 57,478 | (8.86)% | (3,851) | 69.0% |
| Net Income | 30,178 | 23,180 | (23.19)% | (6,282) | 89.8% |

**Table 6 – Analysis of 2012 restatement on Selected Items**[43]

| Description | As reported | As restated | Percentage Difference | Combined Effect of Leases and Inventory | Percentage of Restatement Related to Leases and Inventory |
|---|---|---|---|---|---|
| Gross Profit | 195,658 | 176,030 | (10.03)% | (18,785) | 95.7% |
| Income from Operations | 95,053 | 85,600 | (9.94)% | (4,662) | 49.3% |
| Net Income | 44,431 | 35,566 | (19.95)% | (5,819) | 65.6% |

**Table 7 – Analysis of 2011 restatement on Selected Items**[44]

| Description | As reported | As restated | Percentage Difference | Combined Effect of Leases and Inventory | Percentage of Restatement Related to |
|---|---|---|---|---|---|

[42] ADS 201510-K pages 51, 52, F-23 and F-24.

[43] ADS 2015 10-K pages 51, 52, F-23 and F-24.

[44] ADS 2015 10-K pages 51, 52, F-23 and F-24.

| | | | | | Leases and Inventory |
|---|---|---|---|---|---|
| Gross Profit | 170,974 | 150,555 | (11.94)% | (19,357) | 94.8% |
| Income from Operations | 38,929 | 29,963 | (23.03)% | (6,169) | 68.8% |
| Net Income | 1,507 | (8,326) | (652.48)% | (7,001) | 71.2% |

***Insider Trading Suspiciously Timed***

231. ADS insiders and majority stockholders sold over $247 million of their stock during the Class Period at suspicious times.

232. The Company insiders did not sell the stock in question pursuant to pre-arranged Rule 10b5-1 trading plans, and none of the selling Defendants had previously sold ADS stock on the open market.

233. The Company insiders, including Defendant Sturgeon, engaged in such sales in part for two reasons. First, on May 14, 2015, ADS's stock price reached its highest point since the Company went public in July 2014. The insiders' sales, which began on May 14, were thus perfectly timed. Second, insiders understood that ADS's false and misleading financial statements could be discovered at any time given that the independent auditor was at work on the fiscal 2015 financial statements audit.

234. Defendant Sturgeon sold shares of ADS suspicious in timing and amount. From the Company's IPO in July 2014 until the beginning of the Class Period on September 5, 2014, Defendant Sturgeon sold no shares of ADS common stock on the open market. During the Class Period, however, on May 18 and 26, 2015, after the price of ADS shares had reached its highest point since the Company went public in July 2014, Defendant Sturgeon sold 50,000 shares of ADS common stock, approximately 10.1% of his total shares held at the time, at prices of $29.95 and $29.22, respectively, for total proceeds of $1,479,347.50, or approximately 7 times his annual salary.

235. Defendant Fussner sold shares of ADS suspicious in timing and amount. From the Company's IPO in July 2014 until the beginning of the Class Period on September 14, 2015, Defendant Fussner sold no shares of ADS common stock on the open market. During the Class Period, however, on May 14 and 15, 2015, after the price of ADS shares had reached its highest point since the Company went public in July 2014, Defendant Fussner sold 100,000 shares of ADS common stock, approximately 16% of his total shares held at the time, at prices of $30.11 and $29.68, respectively, for total proceeds of $2,982,783.65, or approximately 10 times his annual salary.

236. ASP sold shares of ADS suspicious in timing and amount. From the Company's IPO in July 2014 until the beginning of the Class Period on September 14, 2015, Defendant Fussner sold only 514,286 shares of ADS common stock on the open market. During the Class Period, however, on December 10 and 15, 2014, after the price of ADS shares had climbed to over $21 per share following its initial public offering price of $19 per share, ASP sold 11,500,000 shares of ADS common stock, approximately 58.8% of its total shares held at the time, at prices of $30.11 and $29.68, respectively, for total proceeds of nearly $234 million.

***Executive Bonuses Based on False Financial Statements***

237. In addition, Defendants received bonuses from ADS for the year ended March 31, 2015. For the fiscal year 2015, the Company's Compensation and Management Development Committee (the "Committee") recommended and approved, and the Board of Directors ratified and approved, incentive awards under the Cash Incentive Plan for each named executive officer ("NEO"), and the Company paid such incentive awards to the NEOs, based on the Company's preliminary financial performance, as follows:

> The Board and the Committee based their determinations on a review of previously established performance measures related to

> the Company's financial performance (15% weighted for net sales, 55% weighted for Adjusted EBITDA and 10% weighted for average quarterly debt balance), as well as individual performance measures based upon the performance of the NEO as compared to the NEO's annual performance objectives, weighted at 20%. The bonus amounts awarded were consistent with the performance measures and percentage weights established under the plan for fiscal year 2015. The amounts awarded for fiscal year 2015 are as follows: Joseph A. Chlapaty, $500,000, Mark B. Sturgeon $155,000, Thomas M. Fussner, $170,000, Ronald R. Vitarelli, $150,000, and Robert M. Klein, $125,000.

238. Based upon what the Company referred to as "subsequent uncertainty regarding the Company's financial performance for fiscal year 2015," however, the Company's management made a recommendation, which the Committee approved, to rescind the fiscal year 2015 awards and requested that the NEOs voluntarily return all previously-paid amounts, as described in the Company's Current Report on Form 8-K filed with the SEC on May 11, 2015.

239. On August 17, 2015, the Company's NEOs voluntarily agreed to return to the Company the previously-paid cash bonuses awarded under the annual cash incentive plan for fiscal year 2015.

***SEC Investigation***

240. In the 2015 10-K, ADS also disclosed that the SEC was investigating it, without describing the nature or the thrust of the investigation, but attributing it to "the restatement of our previously issued financial results." The Company stated:

> On August 12, 2015, the SEC Division of Enforcement ("Enforcement Division") informed the Company that it was conducting an informal inquiry with respect to the Company. As part of this inquiry, the Enforcement Division requested the voluntary production of certain documents generally related to the Company's accounting practices. Subsequent to the initial voluntary production request, the Company received document subpoenas from the Enforcement Division pursuant to a formal order of investigation. The Company has from the outset cooperated with the Enforcement Division's investigation and intends to continue to do

> so. While it is reasonably possible that this investigation ultimately could be resolved unfavorably to the Company, the Company is currently unable to estimate the range of possible losses, but they could be material.

## CLASS ACTION ALLEGATIONS

241. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased Advanced Drainage Systems securities during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

242. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Advanced Drainage Systems securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Advanced Drainage Systems shares were traded publicly during the Class Period on the NYSE. As of January 31, 2015, there were 73,335,999 shares of Advanced Drainage Systems common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Advanced Drainage Systems or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

243. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, which is complained of herein.

244. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

245. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of ADS;

c. Whether the price of ADS shares was artificially inflated during the Class Period; and

d. To what extent the members of the Class have sustained damages, and the proper measure of damages.

246. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

247. The market for ADS securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to

disclose, ADS securities traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of ADS securities and the market information relating to ADS, and have been damaged thereby.

248. During the Class Period, the artificial inflation of ADS stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about ADS's business, operations and financial prospects. These material misstatements and/or omissions created an unrealistically positive assessment of ADS and its business and financial condition, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Lea Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

249. At all relevant times, the market for ADS securities was an efficient market for the following reasons, among others:

e. ADS stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

f. As a regulated issuer, ADS Systems filed periodic public reports with the SEC and/on the NYSE;

g. ADS regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

h. ADS was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

250. As a result of the foregoing, the market for ADS securities promptly digested current information regarding ADS from all publicly available sources and reflected such information in ADS's stock price. Under these circumstances, all purchasers of ADS securities during the Class Period suffered similar injury through their purchase of ADS securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

251. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CAUSES OF ACTION

## COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants**

252. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

253. During the Class Period, the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase ADS securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Individual

254. Defendants, and each of them, took the actions set forth herein.

255. The Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ADS securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

256. The Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about ADS's business, operations and financial performance and prospects, as specified herein.

257. The Individual Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ADS's value and performance and continued substantial growth. These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about ADS and its business operations and financial prospects in light of the circumstances under which they were made, not misleading. As set forth more particularly herein, Defendants further engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

258. The Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Individual Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ADS's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Individual Defendants' misstatements and/or omissions concerning the Company's business, operations, financial well-being, and prospects throughout the Class Period, Individual Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

259. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of ADS

securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Individual Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Individual Defendants, but not disclosed in public statements by the Individual Defendants during the Class Period, Plaintiffs and the other members of the Class acquired ADS securities during the Class Period at artificially high prices and were damaged thereby.

260. At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known the truth regarding ADS and its business and prospects, which were not disclosed by Individual Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their ADS securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

261. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

262. As a direct and proximate result of Individual Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of the Exchange Act against the Individual Defendants

263. Lead Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

264. The Individual Defendants acted as controlling persons of ADS within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

265. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

266. As set forth above, ADS and the Individual Defendants violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' wrongful conduct, Lead

Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure with Lead Plaintiff serving as class representative;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

Dated: April 28, 2016

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ *Phillip Kim*

Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Avenue, 34th Floor
New York, NY 10016
T: 212-686-1060
F: 212-202-3827
Email: lrosen@rosenlegal.com
pkim@rosenlegal.com

and

Jacob A. Goldberg
Keith Lorenze
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
T: 215-600-2817
F: 212-202-3827
Email: jgoldberg@rosenlegal.com
klorenze@rosenlegal.com

***Lead Counsel for Lead Plaintiff Wyche and the Class***

# CERTIFICATE OF SERVICE

I hereby certify that on this, the 28th day of April, 2016, I caused a true and correct copy of the foregoing ***Amended Class Action Complaint for Violations of the Federal Securities Laws*** to be served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ *Phillip Kim*
Phillip Kim