UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                           :
CHRISTOPHER WYCHE, *individually and*    :
*on behalf of all others similarly situated*,    :
                                           :
                      Plaintiff,    :
                                           :
               v.                              :         15 Civ. 5955 (KPF)
                                           :
ADVANCED DRAINAGE SYSTEMS, INC.,    :     <u>OPINION AND ORDER</u>
JOSEPH A. CHLAPATY, and MARK B.    :
STURGEON,    :
                                           :
                     Defendants. :
                                           :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>March 10, 2017</u>

KATHERINE POLK FAILLA, District Judge:

       Lead Plaintiff Christopher Wyche ("Plaintiff") brings this class action

lawsuit on behalf of purchasers (the "Class") of securities issued by Advanced

Drainage Systems, Inc. ("ADS" or the "Company") during the period from

July 25, 2014, through March 29, 2016, inclusive (the "Class Period"). Plaintiff

alleges that ADS, Joseph A. Chlapaty ("Chlapaty"), and Mark B. Sturgeon

("Sturgeon," with Chlapaty, the "Individual Defendants," and with Chlapaty and

ADS, "Defendants") violated Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and

Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, in financial

statements issued in conjunction with the Company's Initial Public Offering

("IPO") and during the months thereafter. Defendants have moved to dismiss

Plaintiff's Amended Complaint (the "Complaint") pursuant to Federal Rules of

Civil Procedure 9(b) and 12(b)(6) for failure to state a claim.

There is no shortage of statements identified in the Complaint as to which Plaintiff cries fraud.  There is, however, a noticeable shortage of well-pleaded allegations of scienter, and likely also loss causation.  Accordingly, and for the reasons outlined below, Defendants' motion to dismiss is granted.

## BACKGROUND[1]

### A.    Factual Background

Plaintiff alleges that Defendants perpetrated a fraud in connection with ADS's July 24, 2014 IPO in order to inflate artificially the price of ADS's common stock.  Before explaining why these allegations fail, the Court situates them in context.

---

[1]    This Opinion draws on facts from Plaintiff's Amended Complaint ("Compl." (Dkt. #42)), taking all well-pleaded allegations to be true, as the Court must at this stage.  *See, e.g.*, *Peralta* v. *St. Luke's Roosevelt Hosp.*, No. 14 Civ. 2609 (KPF), 2015 WL 3947641, at *1 n.1 (S.D.N.Y. June 26, 2015).  The Court has also reviewed the briefing submitted by the parties and will refer to it as follows:  Defendants' Joint Memorandum of Law in Support of their Motion to Dismiss the Amended Class Action Complaint For Violations of the Federal Securities Laws (Dkt. #60) will be referred to as "Def. Br.," Plaintiff's Memorandum of Law in Opposition to Defendants' Motion (Dkt. #62) as "Pl. Opp.," and Defendants' Memorandum in Reply (Dkt. #63) as "Def. Reply."

The Complaint refers to various forms that are required to be filed with the Securities and Exchange Commission (the "SEC") pursuant to Sections 13 and 15(d) of the Exchange Act, *see* 15 U.S.C. §§ 78m, 78o(d), and the Court will summarize several of them here for ease of reference.  A Form 10-K is an annual report that is intended to detail the financial condition and performance of a particular company for an annual period in a comprehensive manner.  *See id.*; *see also* 17 C.F.R. §§ 240.15d-1, 249.310.  On a quarterly basis, by contrast, the company would file a Form 10-Q, a report that provides a continuing view of the company's financial position during the year and generally includes unaudited financial statements.  *See* 15 U.S.C. §§ 78m, 78o(d); *see also* 17 C.F.R. §§ 240.13a-13, 249.308a.  And where there are material corporate events that should be known by the shareholders, a company would file a Form 8-K to announce these events.  *See* 15 U.S.C. §§ 78m, 78o(d); s*ee also* 17 C.F.R. §§ 240.13a-11, 249.308.  *See generally* EDGAR Filer Manual (Volume II) dated January 2017.

1.      **The Parties**

Plaintiff is an individual who purchased eight shares of ADS common stock on March 23, 2015, for a price of $28.96 per share.  (Compl., Ex. A, Dkt. #43).

ADS is a "leading manufacturer of high performance thermoplastic corrugated pipe, providing a comprehensive suite of water management products and superior drainage solutions for use in the construction and infrastructure marketplace."  (Compl. ¶ 22).[2]  Its "product line includes corrugated high density polyethylene (or HDPE) pipe, polypropylene (or PP) pipe[,] and related water management products."  (*Id.*).  ADS is a Delaware corporation that maintains its principal executive offices in Hilliard, Ohio; its common stock trades on the New York Stock Exchange under the ticker symbol "WMS."  (*Id.* at ¶ 17).

Chlapaty served as the Company's President and Chief Executive Officer throughout the Class Period.  (Compl. ¶ 18).  He first joined ADS in 1980, and rose to serve "as Chairman of the ADS board of directors since 2008, a director since 1988, President since 1994[,] and Chief Executive Officer since 2004."  (*Id.*).  Sturgeon was the Company's Executive Vice President, Chief Financial Officer, Secretary[,] and Treasurer.  (*Id.* at ¶ 19).  He joined ADS in 1981 to serve as a Corporate Cost and Budget Manager and Market Planning Manager;

---

[2]      The Court notes that this quotation appears in the Complaint as a quotation, but without attribution.  There are many such quotations in the Complaint; the Court has not been able to attribute each to its source because the Complaint does not do so.  To minimize confusion, the Court has omitted internal quotation marks when quoting from unattributed quotations in the Complaint.

by 1994, he had been elevated to the position of Executive Vice President and Chief Financial Officer. (*Id.*). Each Individual Defendant "signed all relevant filings with the [SEC], certifying the Company's post-IPO financial statements and the material accuracy of its financial condition and results of operations as ADS's principal executive officer." (*Id.* at ¶¶ 18-19).

### 2.   The Initial Public Offering

"Prior to July 24, 2014, ADS was a private company with equity ownership divided among management (24.17%), and several investors including ASP ADS Investco, LLC ('ASP') (57.42%) and the University of Notre Dame du Lac ('Notre Dame') (10.10%)." (Compl. ¶ 26).[3] On July 24, 2014, "[b]y means of a Registration Statement on Form S-1 and a Prospectus ([the] 'Offering Documents'), [which] Defendant ADS filed with the Securities Exchange Commission ... ADS issued stock in its initial public offering ([the] 'IPO') for the first time." (*Id.* at ¶ 3). "In the IPO, ASP sold 7,894,737 shares while Notre Dame sold 1,315,789 shares and the Company sold 5,289,474 shares for proceeds of $118,105,266[;] $19,684,203[;] and $79,130,531 respectively, after underwriting discounts and commissions." (*Id.* at ¶ 26).[4]

---

[3]   "ASP, a Delaware limited liability company, is 99% owned by American Securities Partners V, L.P., a $2.3 billion fund raised and sponsored by American Securities, a private equity investment firm. American Securities ... purports to focus on partnership with great companies and their existing management teams, using conservative capital structures to enable stability, growth[,] and flexibility." (Compl. ¶ 27).

[4]   As a corollary to the IPO, ADS and ASP entered into an amended and restated stockholders agreement that permitted ASP to select four of ADS's eleven directors. (Compl. ¶ 30). ASP selected "David L. Horing ('Horing'), managing director of American Securities[;] Mark A. Lovett ('Lovett'), a vice president of American Securities[;] and Scott M. Wolff ('[Wolff]'), another managing director of American Securities." (*Id.* at ¶ 28). On December 4, 2014, ADS issued a secondary offering, which allowed "ASP, and ASP

A primary purpose of the IPO was to generate proceeds with which the Company could repay its debt. (Compl. ¶ 38).  In connection with the IPO, the Company disclosed that its debt obligations included

> a credit agreement with PNC bank that consisted of a $325 million revolving credit facility and bank term loans in an aggregate original principal amount of $100 million.  In addition[,] the Company had issued Senior Notes through a private shelf offering with Prudential Investment Management, Inc., enabling the Company to issue to Prudential notes in the aggregate principal amount of $100 million[,]

all of which had been issued as of the IPO. (*Id.* at ¶ 35).  These debts were subject to certain restrictive covenants. (*Id.* at ¶ 37).  The Company indicated that its intention with regard to the IPO proceeds was to repay at least $72.8 million of its indebtedness under the revolving portion of its credit facility. (*Id.* at ¶ 38).

### 3.    The Revelation of the Accounting Errors

On June 30, 2015, ADS filed a Form 12b-25 with the SEC to notify its investors that it would be unable to file its Form 10-K for the fiscal year that ended March 31, 2015, within the prescribed time period. (Compl. ¶¶ 153, 166).  The Company indicated that it was "finalizing its inventory costing analysis," and that the Audit Committee of the Company's Board of Directors was engaged in an ongoing "review of the Company's journal entry control processes." (*Id.*).  The Company estimated its filing delay would be no more than 15 days. (*Id.*).

---

alone, to sell ten (10) million more shares at $20.35 per share for proceeds of $203,468,750." (*Id.* at ¶ 34).

However, on July 15, 2015, in a Form 8-K and accompanying press release, the Company announced that its internal review had expanded, and would take longer than previously disclosed.  (Compl. ¶¶ 156, 167).  In particular, the Company indicated that its review of "year-end inventory costing analysis and the related impact on the Company's fiscal year 2015 financial statements" was still ongoing, but that the internal review had been broadened to include a review of the Company's "accounting treatment for its transportation and equipment leasing program."  (*Id.*).  This broadened review was anticipated to result in "a reduction of year-end inventory values for fiscal year 2015 as compared to previously reported amounts, and a related increase in cost of sales," counterbalanced in part by "a positive impact on cost of sales in fiscal year 2016."  (*Id.*).

On August 12, 2015, the SEC's Division of Enforcement notified the Company that it would be conducting an informal inquiry into the Company and requesting the Company's production of documents.  (Compl. ¶ 158).  Shortly thereafter, on August 17, 2015, the Company released a second Form 8-K and press release in which it advised investors that "its previously issued financial statements and other financial data, including its May 12, 2015 earnings release, should no longer be relied upon, and that it would restate prior period financial statements and related financial information as filed with the SEC ... as soon as practicable."  (*Id.* at ¶¶ 159-60, 169).  The restated financial information was expected to include "the annual periods ended March 31, 2010, 2011, 2012, 2013[,] and 2014 as set forth in the

Company's Registration Statements on Form S-1, as well as the quarterly periods ended June 30, September 30, and December 31, 2013 and 2014, as set forth in the Company's Quarterly Reports on Form 10-Q." (*Id.* at ¶ 160). The majority of adjustments to be made in the restatements was expected to "fall within three areas: lease adjustments, inventory adjustments, and other adjustments." (*Id.*).

In the midst of these announcements, it was also announced on November 9, 2015, that Sturgeon, the Company's CFO, "had notified the Company of his intent to retire." (Compl. ¶ 171). He was replaced by Scott A. Cottril. (*Id.*).

By February 2, 2016, the Company still had not filed its Form 10-K for the 2015 fiscal year. (Compl. ¶ 173). Again, it announced a delay, which it explained was "due in part to certain accounting errors that management recently identified with respect to the Company's Mexican joint venture affiliate that extend beyond the scope of the inventory and leasing errors previously disclosed." (*Id.*). The Company hoped to file the report by the end of that month, though it admitted that there could "be no assurance that the process will be completed by that time." (*Id.*). And indeed, it was not. February came and went, and only on March 28, 2016, did the Company announce it would finish its restatement and file the outstanding reports after the market closed the following day. (*Id.* at ¶ 175).

The 2015 Form 10-K was filed on March 29, 2016. (Compl. ¶ 177). "The Company restated its financial results for the years 2011 through 2014 and for

the first three quarters of fiscal 2015 as well as providing actual audited financial statements for fiscal 2015." (*Id*.).  The Company further disclosed that its self-investigation had begun in June 2015, when "the Audit Committee of the ADS's Board of Directors authorized two investigative reviews by its independent counsel and a third-party forensic consulting firm." (*Id.* at ¶ 178). The Audit Committee believed this was necessary because "certain members of the Company's finance staff responded affirmatively to questions presented to them by the independent registered public accounting firm in accordance with Public Company Accounting Oversight Board Interim Auditing Standard AU 316, Consideration of Fraud in a Financial Statement Audit (commonly referred to as [the] 'SAS 99')." (*Id*.).  And "[w]hile the investigation found no evidence of fraud, [the Audit Committee] determined that the concerns reflected in the responses to the SAS 99 questions were well founded and resulted in restatement of prior period financial statements." (*Id*.).  The self-investigation did not conclude until March 2016.  (*Id*.).  The 2015 Form 10-K detailed the Company's findings at length, describing the material weaknesses the Company had identified.  (*Id*.).

## B.    Procedural Background

This lawsuit was brought originally on July 29, 2015.  (Dkt. #1, 9).  On September 28, 2015, then-Class Member Wyche moved the Court for an order appointing him as Lead Plaintiff in this case and approving his selected counsel as Lead Counsel.  (Dkt. #17-18).  This motion was granted on January 11, 2016. (Dkt. #25).

On April 28, 2016, Plaintiff filed the Complaint.  (Dkt. #42).  Defendants requested leave to file a motion to dismiss the Complaint, which request Plaintiff opposed.  (Dkt. #49-50).  The Court discussed the contemplated motion with the parties at a Pre-Motion Conference on June 9, 2016, and Plaintiff was afforded an opportunity to amend his Complaint.  (Dkt. #56).  Plaintiff declined, electing to stand on the Complaint, and the Court set a briefing schedule.  (Dkt. #52, 56).

Defendants filed their joint Motion to Dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws on August 8, 2016.  (Dkt. #59-61).  Plaintiff filed his Opposition to Defendants' Motion on September 22, 2016 (Dkt. #62), and Defendants filed their Reply on October 24, 2016 (Dkt. #63).

## DISCUSSION

### A.    Applicable Law

#### 1.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Rule 12(b)(6), a court should "draw all reasonable inferences in [the plaintiff's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  In this regard, a complaint is deemed to include

any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.  *See, e.g.*, *Hart* v. *FCI Lender Servs., Inc.*, 797 F.3d 219, 221 (2d Cir. 2015) (citing Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion.  A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.")).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to '[nudge a plaintiff's] claims across the line from conceivable to plausible.'"  *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).  Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

### 2.    The Relevant Securities Laws

Under Section 10(b) of the Exchange Act, it is

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ... [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or

> contrivance in contravention of such rules and
> regulations as the Commission may prescribe as
> necessary or appropriate in the public interest or for the
> protection of investors.

15 U.S.C. § 78j.  Rule 10b-5, promulgated by the SEC under Section 10(b),

further provides that a person may not

> employ any device, scheme, or artifice to defraud[;] …
> make any untrue statement of a material fact or … omit
> to state a material fact necessary in order to make the
> statements made, in the light of the circumstances
> under which they were made, not misleading[;] or …
> engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon any
> person[;] in connection with the purchase or sale of any
> security.

17 C.F.R. § 240.10b-5.  "Although Section 10(b) does not expressly provide for

a private right of action, courts have long recognized an implied private right of

action under Section 10(b) and Rule 10b-5."  *In re Longtop Fin. Techs. Ltd. Sec.*

*Litig.*, 939 F. Supp. 2d 360, 376 (S.D.N.Y. 2013) (citing *Superintendent of Ins. of*

*State of N.Y.* v. *Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971) ("It is now

established that a private right of action is implied under [Section] 10(b).")).

 To succeed on a Section 10(b) and Rule 10b-5 claim, a plaintiff must

prove "[i] a material misrepresentation or omission by the defendant;

[ii] scienter; [iii] a connection between the misrepresentation or omission and

the purchase or sale of a security; [iv] reliance upon the misrepresentation or

omission; [v] economic loss; and [vi] loss causation.'"  *GAMCO Inv'rs, Inc.* v.

*Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton*

*Co.* v. *Erica P. John Fund, Inc.*, — U.S. —, 134 S. Ct. 2398, 2407 (2014)).

Section 20(a) establishes that "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its implementing regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable."  15 U.S.C. § 78t(a).  To state a Section 20(a) claim, a plaintiff must show [i] "a primary violation by the controlled person"; [ii] "control of the primary violator by the defendant"; and [iii] that the controlling person "was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

### 3. Heightened Pleading of Fraud Claims Under Federal Rule of Civil Procedure 9(b)

Plaintiff's securities fraud claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b).  *See, e.g.*, *ATSI Commc'ns*, 493 F.3d at 99 (affirming that securities fraud claims must satisfy the heightened pleading standards of both Rule 9(b) and the PSLRA); *Arco Capital Corp.* v. *Deutsche Bank AG*, 949 F. Supp. 2d 532, 539 (S.D.N.Y. 2013) (same).  The Court will discuss the PSLRA in more detail below, primarily as it pertains to Plaintiff's pleading of the element of scienter.

Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting [a] fraud."  Fed. R. Civ. P. 9(b).  This, in turn, requires that a plaintiff's complaint: "[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when

the statements were made, and [iv] explain why the statements were fraudulent." *Rombach* v. *Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Mills* v. *Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  In contrast, "intent, knowledge, and other conditions of mind may be averred generally." *Kalnit* v. *Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting Fed. R. Civ. P. 9(b)).

## B.    Analysis

Plaintiff alleges that Defendants violated Sections 10(a) and 20(a) and Rule 10b-5 when they made a host of statements in connection with ADS's IPO and throughout the Class Period thereafter.  In particular, Plaintiff contends that Defendants failed to utilize Generally Accepted Accounting Principles ("GAAP") in ADS's accounting and thereby (i) misstated and understated the Company's costs, costs of goods sold, long-term lease obligations, total liabilities, and non-controlling interest in subsidiaries; and (ii) misstated and overstated the Company's net income, income from operations, income before taxes, working capital, gross profit, inventories, intangible assets and other assets, and shareholders' equity throughout the Class Period.  (*See generally* Compl.).  According to Plaintiff, Defendants failed to disclose both "that they had created and/or maintained an ineffective control environment" (*id.* at ¶¶ 61, 83, 93, 103, 115, 129, 144), and "the full scope of the errors in the Company's accounting treatment of transportation and equipment leases, inventory, long-lived assets, ADS Mexicana, and income taxes, requiring that restatement of the Company's financial statements for the fiscal years ended

13

March 31, 2010, 2011, 2012, 2013, and 2014, as well as the quarterly periods
for the first three fiscal quarters of the fiscal year ended March 31, 2015 and
for all of the quarterly periods in the fiscal year ended March 31, 2014" (*id.* at
¶¶ 154, 157, 164).

Because Section 20(a) liability can only arise if there is a primary
violation by a controlled person, the Court considers first the antecedent issue
of whether Plaintiff has pleaded adequately that any Defendant violated Section
10(b) and Rule 10b-5. *See SRM*, 829 F.3d at 177 (quoting *ECA & Local 134
IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.* (hereinafter, "*ECA*"), 553
F.3d 187, 207 (2d Cir. 2009)). The Court concludes that Plaintiff has not, and
thus dismisses all of Plaintiff's remaining claims.

### 1. Plaintiff Has Not Stated a Claim Under Section 10(b) and Rule 10b-5

Plaintiff's claim fails because he fails to plead adequately scienter. The
Court therefore focuses its analysis on this element, though it briefly notes
flaws in Plaintiff's pleading of loss causation as well.

### a. The Alleged Material Misrepresentations and Omissions

Plaintiff has identified numerous statements that may be actionable
because they were untrue outright or misleading in what they omitted to
disclose. *See In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016);
*see also S.E.C.* v. *Espuelas*, 579 F. Supp. 2d 461, 472 (S.D.N.Y. 2008) ("A
complaint pleads false or misleading statements with sufficient particularity if
it alleges that there was a restatement correcting earlier corporate filings and
identifies the restated financials. This is largely because GAAP requires

14

restatement only when there were accounting errors in previously issued financials." (internal citations omitted)).  The Court does not analyze the sufficiency of Plaintiff's identification in this regard, but merely enumerates his allegations for the sake of its later analysis.

In the Complaint, Plaintiff identifies and takes issue with a multitude of allegedly false and misleading statements and omissions.  Generally speaking, they include any reference by ADS during the Class Period to its business risks, its financial information, or its accounting controls.  They are summarized here according to the report or communication in which they were made:

- With regard to the Company's July 24, 2014 Form S-1/A, signed by Chlapaty and Sturgeon (Compl. ¶ 57 & n.7), Plaintiff challenges the statements: (i) of the risks relating to the Company's business (*id.* at ¶¶ 58, 61); (ii) "disclosing risk of fraud at foreign operations" (*id.* at ¶¶ 60-61); (iii) "with respect to the Company's income data for the fiscal year[s]" that ended on March 31 of 2011, 2012, 2013, 2014 (*id.* at ¶¶ 64, 68, 72, 76); and (iv) "with respect to the Company's consolidated balance sheet data for the fiscal year[s]" that ended March 31 of 2011, 2012, 2013, and 2014 (*id.* at ¶¶ 66, 70, 74, 78). (*See also id.* at ¶ 41 (quoting July 24, 2014 Registration Statement)).

- With regard to the Company's July 28, 2014 Prospectus, Plaintiff challenges the statements (i) presenting the Company's "summary consolidated financial data for the fiscal years ended March 31, 2012, 2013, and 2014" (Compl. ¶¶ 80-81); (ii) describing the risks relating to the Company's business (*id.* at ¶¶ 82-83); and (iii) presenting historical consolidated financial data for the fiscal years ended March 31, 2011, 2012, 2013, and 2014 (*id.* at ¶¶ 84-85).

15

- With regard to the September 3, 2014 Form 8-K signed by Sturgeon (Compl. ¶ 86 & n.11), and its accompanying press release, Plaintiff challenges the statements (i) "with respect to the Company's income data for the first fiscal quarter ended June 30, 2014" (*id.* at ¶ 89); and (ii) "with respect to the Company's consolidated balance sheet data for the first fiscal quarter ended June 30, 2014" (*id.* at ¶ 91).

- With regard to the September 5, 2014 Form 10-Q for the first fiscal quarter ending June 30, 2014, which was signed by Chlapaty and Sturgeon (Compl. ¶ 87 & n.12), Plaintiff challenges the statements (i) "with respect to the Company's income data for the first fiscal quarter ended June 30, 2014" (*id.* at ¶ 89); (ii) "with respect to the Company's consolidated balance sheet data for the first fiscal quarter ended June 30, 2014" (*id.* at ¶ 91); (iii) denying "material changes to the risk factors disclosed in [the Company's] Registration Statement" (*id.* at ¶¶ 92-93); and (iv) in the Sarbanes-Oxley 302 Certifications of Chlapaty and Sturgeon that "failed to disclose the existence of certain material weaknesses in [the Company's] internal control over financial reporting (*id.* at ¶¶ 94-95).[5]

- With regard to the November 5, 2014 Form 8-K signed by Sturgeon, and its attached press release (Compl. ¶ 96 & n.15), Plaintiff challenges the statements (i) "with respect to the Company's income data for the second fiscal quarter ended September 30, 2014" (*id.* at ¶¶ 98-99); and (ii) "with respect to the Company's consolidated balance sheet data for the second fiscal quarter ended September 30, 2014" (*id.* at ¶¶ 100-01).

---

[5]    Section 302 of the Sarbanes-Oxley Act of 2002 requires a company's CEO and CFO to sign financial reports and certify that (i) they have reviewed the report; (ii) the report does not contain any material untrue statements or material omission that could be considered misleading; (iii) the financial statements and related information fairly present the financial condition and the results in all material respects; (iv) the signing parties are responsible for internal controls and have evaluated these internal controls within the previous 90 days and have reported on their findings; (v) they have listed all deficiencies in the internal controls and information on any fraud that involves employees who are involved with internal activities; and (vi) they have listed any significant changes in internal controls or related factors that could have a negative impact on the internal controls.  *See* 15 U.S.C. § 7241(a).

16

- With regard to the November 10, 2014 Form 10-Q for the period ending September 30, 2014 signed by Chlapaty and Sturgeon (Compl. ¶ 97 & n.16), Plaintiff challenges the statements (i) "with respect to the Company's income data for the second fiscal quarter ended September 30, 2014" (*id.* at ¶¶ 98-99); (ii) "with respect to the Company's consolidated balance sheet data for the second fiscal quarter ended September 30, 2014" (*id.* at ¶¶ 100-01); (iii) denying "material changes to the risk factors disclosed in [the Company's] Registration Statement" (*id.* at ¶¶ 102-03); and (iv) in the Sarbanes-Oxley 302 Certifications of Chlapaty and Sturgeon (*id.* at ¶¶ 104-05).

- With regard to the December 3, 2014 Form S-1 filed in connection with ADS's secondary public offering and signed by Chlapaty and Sturgeon (Compl. ¶ 106 & n.19), Plaintiff challenges the statements: (i) presenting "summary consolidated financial data for the fiscal years ended March 31, 2012, 2013, and 2014" (*id.* at ¶¶ 107-08); (ii) presenting "summary consolidated financial data for the six-month period ended September 30, 2014" (*id.* at ¶¶ 109-11); (iii) reporting "the Company's consolidated balance sheet data for the six-month period ended September 30, 2014" (*id.* at ¶¶ 112-13); (iv) "concerning risks relating to the Company's business, results of operations, and financial condition" (*id.* at ¶¶ 114-15); (v) presenting "selected historical consolidated financial data for the fiscal years ended March 31, 2011, 2012, 2013" (*id.* at ¶¶ 116-17); (vi) with regard "to the Company's income data for the six-month period ended September 30, 2014" (*id.* at ¶¶ 118-20); and (v) "with respect to the Company's consolidated balance sheet data for the six-month period ended September 30, 2014" (*id.* at ¶¶ 121-22).

- With regard to the December 4, 2014 Prospectus that the Company filed with the SEC in connection with its secondary public offering (Compl. ¶ 123), Plaintiff challenges the statements: (i) with respect to the Company's summary consolidated financial data for the fiscal years ended March 31, 2012, 2013, and 2014" (*id.* at ¶¶ 124-25); (ii) presenting "summary consolidated financial data for the six-month period ended

September 30, 2014" (*id.* at ¶¶ 126-27); (iii) discussing the "risks relating to the Company's business, results of operations, and financial condition" (*id.* at ¶ 129); (iv) presenting "historical consolidated income data for the fiscal years ended March 31, 2011, 2012, 2013, and 2014" (*id.* at ¶¶ 130-31); and (v) with respect to the Company's selected historical consolidated balance sheet data for the six-month period ended September 30, 2014" (*id.* at ¶¶ 132-33).

- With regard to the February 5, 2015 "earnings conference call with investors to discuss [the Company's] financial results for the third fiscal quarter ended December 31, 2014," in which Chlapaty and Sturgeon participated (Compl. ¶ 135), Plaintiff challenges Sturgeon's statements regarding the Company's gross profit and net loss in the third quarter of fiscal year 2015 (*id.* at ¶¶ 136-37).

- With regard to the February 5, 2015 Form 8-K signed by Sturgeon, and its attached press release (Compl. ¶ 134 & n.22), Plaintiff challenges the statements: (i) "with respect to the Company's income data for the third fiscal quarter ended December 31, 2014" (*id.* at ¶ 140); and (ii) "with respect to the Company's consolidated balance sheet data for the third fiscal quarter ended December 31, 2014" (*id.* at ¶¶ 141-42).

- With regard to the February 9, 2015 Form 10-Q signed by Sturgeon and Chlapaty (Compl. ¶ 138 & n.23), Plaintiff challenges the statements: (i) "with respect to the Company's income data for the third fiscal quarter ended December 31, 2014" (*id.* at ¶ 140); (ii) "with respect to the Company's consolidated balance sheet data for the third fiscal quarter ended December 31, 2014" (*id.* at ¶¶ 141-42); (iii) "with respect to the risks to [the Company's] common stock" (*id.* at ¶¶ 143-44); and (iv) in the Sarbanes-Oxley 302 Certifications of Chlapaty and Sturgeon (*id.* at ¶¶ 145-46).

- With regard to the May 12, 2015 Form 8-K signed by Sturgeon, and its attached press release (Compl. ¶ 147 & n.25), Plaintiff challenges the statements: (i) "with respect to the Company's income data for the fiscal year ended March 31, 2015" (*id.* at ¶¶ 148-50); and (ii) "with

respect to the Company's consolidated balance sheet data for the fiscal year ended March 31, 2015" (*id.* at ¶¶ 151-52).

- With regard to the June 30, 2015 Form 12b-25 that the Company filed "notifying investors that ADS was unable to file [its] Annual Report on Form 10-K for the fiscal year ended March 31, 2015 (the 'Annual Report') within the prescribed time period," and which Chlapaty signed, Plaintiff challenges the statements indicating that the Company "was in the process of finalizing its inventory costing analysis, which [would] require additional time to complete, and that the Audit Committee of the Company's Board of Directors [had] undertaken a review of the Company's journal entry control processes, which review is ongoing and will require additional time to complete." (Compl. ¶ 153 & n.26).

- With regard to the July 15, 2015 Form 8-K signed by Chlapaty, and its attached press release (Compl. ¶ 155 & n.28), Plaintiff challenges statements regarding (i) the Company's ongoing review of the "methodologies utilized in its year-end inventory costing analysis and the related impact on the Company's fiscal year 2015 financial statements";  (ii) the Company's anticipated effects of this review on year-end inventory values and the cost of sales; and (iii) the inclusion in this review of the Company's "accounting treatment for its transportation and equipment leasing program" and its "journal entry control processes as previously disclosed" (*id.* at ¶ 156).

- With regard to the August 17, 2015 Form 8-K signed by Chlapaty and the press release attached to it (Compl. ¶ 159 & n.29), Plaintiff challenges the statements (i) advising that the Company's previously issued financial statements and data should no longer be relied upon and would be restated (*id.* at ¶ 159); (ii) indicating that the restated financial information would "include the annual periods ended March 31, 2010, 2011, 2012, 2013 and 2014 as set forth in the Company's Registration Statements on Form S-1, as well as the quarterly periods ended June 30, September 30, and December 31, 2013 and 2014, as set forth in the Company's Quarterly Reports on Form 10-Q" and would

19

primarily derive from accounting adjustments to the Company's lease and inventory accounting (*id.* at ¶ 160); (iii) providing the Company's historical classification of "Fleet Leases as operating leases" as an example of an error that was identified "based upon a re-examination of the Company's historic assumptions, estimates and judgments with respect to lease accounting" and describing how that error would be rectified (*id.* at ¶ 161); (iv) indicating that the Company's review was ongoing, prompted by the Company's "need to assess the impact of highly volatile raw material costs during the fiscal 2015 fourth quarter on the Company's lower of cost or market assessment" and would "result in a reduction of year-end inventory balances as of March 31, 2013, 2014 and 2015 and a related increase in cost of goods sold for the same periods" (*id.* at ¶ 162); and (v) disclosing that the Company had identified "other accounting errors in connection with the completion of the fiscal year 2015 audit" that it previously had considered immaterial but which would be remedied in the Company's restated financial statements and data (*id.* at ¶¶ 163-64). (*See also id.* at ¶ 169 (quoting August 17, 2015 press release)).

### b. Scienter

With regard to each of these statements, the Court must consider whether Plaintiff has pleaded with sufficient particularity the element of scienter. As detailed in the remainder of this section, the specificity with which Plaintiff has identified putative misrepresentations and omissions does not extend to his allegations of scienter. Accordingly, Plaintiff fails to state a claim under Section 10(b) and Rule 10b-5.

### i. The Law Regarding Scienter

As discussed above, Plaintiff's securities-fraud claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, 15 U.S.C. § 78u-4(b). *See, e.g., ATSI Commc'ns*, 493

F.3d at 99 (affirming that securities fraud claims must satisfy the heightened pleading standards of both Rule 9(b) and the PSLRA); *Arco Capital Corp.*, 949 F. Supp. 2d at 539 (same).

The PSLRA "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 193 & n.12 (1976)) (citing 15 U.S.C. § 78u-4(b)(1), (2)).  To satisfy the scienter requirement, a complaint must give "rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  A "strong inference" that a defendant acted with scienter is not an irrefutable inference, though it "must be more than merely plausible or reasonable[.]"  *Tellabs*, 551 U.S. at 314.  It cannot be identified "in a vacuum," as "[t]he inquiry is inherently comparative[.]"  *Id.* at 323.  A "strong inference" is an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.

To evaluate whether the PSLRA's scienter standard has been met, courts consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Tellabs, Inc.*, 551 U.S. at 323 (emphasis in original); *see also id.* at 326 ("[The court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. ... [A] court must ask:  When the allegations are accepted as true and taken collectively,

would a reasonable person deem the inference of scienter at least as strong as any opposing inference?").  And "[w]hen the defendant is a corporate entity, ... the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

The facts pled must either show "that the defendants had the motive and opportunity to commit fraud" or constitute "strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198.  "In order to raise a strong inference of scienter through 'motive and opportunity' to defraud, [a plaintiff] must allege that [defendants] 'benefitted in some concrete and personal way from the purported fraud.'"  *Id.* (emphasis added) (quoting *Novak*, 216 F.3d at 307-08).  It is not enough for a plaintiff to show "[m]otives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation[.]"  *Id.*; *accord, e.g.*, *Chill* v. *Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[A] generalized motive ... which could be imputed to any publicly owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter.").

In the absence of a showing of motive, "it is still possible to plead scienter by identifying circumstances" indicative of conscious misbehavior or recklessness on the part of the defendant, "though the strength of the circumstantial allegations must be correspondingly greater."  *Kalnit*, 264 F.3d

at 142 (quoting *Beck* v. *Mfrs. Hanover Tr. Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).

Conscious recklessness is a "state of mind approximating actual intent, and

not merely a heightened form of negligence." *S. Cherry St., LLC* v. *Hennessee*

*Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (quotation mark and emphasis

omitted) (quoting *Novak*, 216 F.3d at 312). To plead adequately conscious

recklessness, a plaintiff must allege facts showing "conduct which is highly

unreasonable and which represents an extreme departure from the standards

of ordinary care to the extent that the danger was either known to the

defendants or so obvious that the defendant must have been aware of it." *In re*

*Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000); *accord Rothman*

v. *Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (quoting *Rolf* v. *Blyth, Eastman Dillon*

*& Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). A plaintiff may allege that a defendant

"engaged in deliberately illegal behavior, knew facts or had access to

information suggesting his public statements were not accurate, or failed to

check information that he had a duty to monitor." *Nathel* v. *Siegal*, 592 F.

Supp. 2d 452, 464 (S.D.N.Y. 2008) (citing *Novak*, 216 F.3d at 311).

### ii. Plaintiff Has Not Pleaded Scienter on the Basis of Defendants' Motive and Opportunity to Commit Fraud

In attempting to comply with Rule 9(b), Plaintiff has specified the

statements that are alleged to be fraudulent. He has identified the speaker of

each, attributing these statements to Defendants.[6] He has also described the

---

[6]     Plaintiff has identified Sturgeon as the author of the challenged statements made within
the February 5, 2015 earnings conference call. (Compl. ¶¶ 135-37). The Individual
Defendants are alleged to be the collective authors of the statements made in the

circumstances in which the statements were made, and explained his belief as to why they were fraudulent.  Rule 9(b)'s requirements would therefore appear to be satisfied.

With regard to the PSLRA's pleading requirements regarding scienter, Plaintiff has argued both that Defendants had "the motive and opportunity to commit fraud" and that there is "strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198.  Considering the first of these scienter arguments, the Court focuses on Plaintiff's demonstration of motive; there can, after all, be little dispute that Defendants had the opportunity to commit fraud.  *See, e.g.*, *In re PXRE Grp. LTD, Sec. Litig.* (hereinafter "*PXRE*"), 600 F. Supp. 2d at 529-30, *aff'd sub nom. Condra* v. *PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) (summary order); *Pension Comm. of Univ. of Montreal Pension Plan* v. *Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 181 (S.D.N.Y. 2006) (citing *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269

---

Company's SEC filings.  *See Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 173 (2d Cir. 2015) ("Where a plural author is implied by the nature of the representations — for instance, where, as here, [i] the alleged fraud is based on statements made in the offering materials and [ii] the complaint gives grounds for attributing the statements to the group — group pleading may satisfy the source identification required by Rule 9(b).").  The Court is skeptical of this attribution with regard to the Company's press releases, but does not need to resolve this issue, since Plaintiff's claims in that regard fail on other grounds.

The Court notes, however, that courts in this Circuit have held that "scienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading."  *C.D.T.S.* v. *UBS AG*, No. 12 Civ. 4924 (KBF), 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom. Westchester Teamsters Pension Fund* v. *UBS AG*, 604 F. App'x 5 (2d Cir. 2015) (summary order); *see also S.E.C.* v. *Espuelas*, 579 F. Supp. 2d 461, 482 n.10 (S.D.N.Y. 2008) ("[T]he group pleading doctrine can only be invoked to attribute fraudulent statements to defendants, remaining wholly insufficient to plead scienter.").  Other courts have noted aptly that "Individual Defendants' signatures on SEC filings contribute, at most, a weak inference of scienter."  *Christine Asia Co.* v. *Alibaba Grp. Holding Ltd.*, 192 F. Supp. 3d 456, 482 (S.D.N.Y. 2016).

(2d Cir. 1993)) ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired.").

Plaintiff's motive argument has three prongs, none of which succeeds. First, Plaintiff argues that Defendants were motivated to engage in improper accounting so that ADS would not be "in default of its affirmative and negative financial covenants with its lenders." (Compl. ¶¶ 226-28). But this allegation is purely speculative, and thus insufficient as a matter of law. Plaintiff explains that "[o]n August 1, 2015, the Company entered into amended agreements related to the Bank Term Loans and Senior Notes in connection with the Company's determination that a substantial portion of its transportation and equipment leases should be treated as capital leases rather than as operating leases." (*Id.* at ¶ 39 (internal quotation mark omitted) (quoting ADS 2015 Form 10-K)). These amended agreements modified the Company's financial covenants, "including the negative covenant on indebtedness, to accommodate the Company's treatment of its transportation and equipment leases as capital leases rather than operating leases[.]" (*Id.*). "The amendments also waive[d] any potential event of default that [might have] exist[ed] under any of the respective agreements as a result of the Company's change in lease accounting treatment[.]" (*Id.*). Plaintiff contends that the execution of these amendments implies their necessity, which in turn implies a motive to avoid default. But the facts in his Complaint do not support these inferential leaps. No facts indicate that default was imminent or inevitable.

25

Nor may the Court infer from the Company's general intent to use the IPO proceeds to pay down ADS's debt that the Individual Defendants were consequently motivated to inflate improperly ADS's stock price.

To the extent Defendants *were* concerned with ADS's debt, and motivated to address it by raising as much money as possible in connection with the IPO, this motive is exactly the kind of generalized motive that courts in this Circuit have found insufficient to support an allegation of scienter.  *See, e.g.*, *In re MELA Scis., Inc. Sec. Litig.*, No. 10 Civ. 8774 (VB), 2012 WL 4466604, at *5 (S.D.N.Y. Sept. 19, 2012) (citing *In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 265 (S.D.N.Y. 2004) ("[T]he alleged desires to raise additional capital in a private placement or to maintain compliance with the financial covenants of a company loan agreement are similarly inadequate to support an allegation of intent to commit fraud.")); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 443 (S.D.N.Y. 2006) ("[C]ourts in this Circuit have consistently held that allegations that a defendant was motivated to commit securities fraud by a desire to reduce its debt burden, or otherwise reduce borrowing costs, are insufficient to raise a scienter inference.").  Indeed, Plaintiff could not have alleged motive on this basis even if ADS were in worse financial condition than the Complaint alleges.  *See Russo* v. *Bruce*, 777 F. Supp. 2d 505, 519-20 (S.D.N.Y. 2011) ("The theory that defendants engaged in fraud 'to protect the very survival of the company' is 'far too generalized (and generalizable) to allege the proper concrete and personal benefit required by the Second Circuit.'" (quoting *PXRE*, 600 F. Supp. 2d at 532)).

Plaintiff's second motive theory is that the Individual Defendants were motivated to overinflate stock prices to procure bonuses that were tied to "the Company's preliminary financial performance." (Compl. ¶ 237). But again, this is a general motive that any corporate officer would have, and insufficient as a matter of law. *See Kalnit*, 264 F.3d at 139 (citing *Novak*, 216 F.3d at 307 (collecting cases and identifying as an example of insufficient motive "the desire to maintain a high stock price in order to increase officer compensation")).

Third, Plaintiff argues that Defendants' motive can be inferred from the fact that "ADS insiders and majority stockholders sold over $247 million of their stock during the Class Period at suspicious times." (Compl. ¶ 231). This allegation has the greatest potential, inasmuch as the Second Circuit has recognized that motive may be "sufficiently pleaded where [a] plaintiff alleged that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares." *Kalnit*, 264 F.3d at 139 (citing *Novak*, 216 F.3d at 307-08 (collecting cases)). But this allegation, too, fails, because the Circuit also requires that a defendant's stock sales be "unusual" to support an allegation of motive, and the sales at issue here were not. *See Acito* v. *IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (citing *In re Apple Comput. Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989)).

"Factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir.

2001)); *accord Stevelman* v. *Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999). The timing of the sales is also critical. *See Stevelman*, 174 F.3d at 85; *cf. id.* at 86 ("Some of the sales occurred after the representations were made, several officers made large sales, and a motive for inflation of the stock price can be inferred from these sales.").

Here, Plaintiff has claimed that the sales of "Company insiders"[7] were "unusual" for multiple reasons:

> First, on May 14, 2015, ADS's stock price reached its highest point since the Company went public in July 2014. The [multiple] insiders' sales, which began on May 14, were thus perfectly timed. Second, insiders understood that ADS's false and misleading financial statements could be discovered at any time given that the independent auditor was at work on the fiscal 2015 financial statements audit.

(Compl. ¶ 233). And third, the sales were the first that the "insiders" made on the open market after the July 2014 IPO. (*Id.* at ¶¶ 232, 234-36).[8]

---

[7]   This section of the Complaint describes the stock sales of Defendant Sturgeon and "Defendant Fussner." (Compl. ¶¶ 231-36). But there is no "Defendant Fussner" in this case. The Complaint makes mention of a "Tom Fussner," who served as ADS's Vice President of Operations during the Class Period (*id.* at ¶ 52), and the Court therefore construes the Complaint's reference to the alleged "suspicious" stock sales of "Defendant Fussner" as a reference to alleged suspicious stock sales made by Tom Fussner. The other alleged "insiders" are Sturgeon and ASP. (*Id.* at ¶¶ 234-36).

The allegations in this section also erroneously refer to the beginning of the Class Period as September 5, 2014, and September 14, 2015, when the Class Period began on July 25, 2014. (*Compare* Compl. ¶ 1, *with id.* at ¶¶ 234-36).

[8]   Defendants attempt to rebut this allegation with a factual argument, claiming that the timing of the sales was not unusual because Sturgeon and other ADS executives had an agreement not to sell any of their shares for the first 180 days following the IPO, and citing exhibits attached to their motion that support this contention. (Def. Br. 12; Def. Reply 3). However, the Court may not and will not consider at this stage the extrinsic evidence that Defendants attempt to introduce in connection with their motion to dismiss. Shorn of any factual support, Defendants' argument fails.

But these allegations are inadequate to plead motive-based scienter as a matter of law.  The Court's analysis here focuses on Sturgeon, because no "suspicious" sales are attributed to Chlapaty; Plaintiff therefore has not alleged that Chlapaty was motivated "to inflate stock prices while [he] sold [his] own shares." *Kalnit*, 264 F.3d at 139.  With regard to Sturgeon, Plaintiff alleges that

> on May 18 and 26, 2015, after the price of ADS shares had reached its highest point since the Company went public in July 2014, [he] sold 50,000 shares of ADS common stock, approximately 10.1% of his total shares held at the time, at prices of $29.95 and $29.22, respectively, for total proceeds of $1,479,347.50, or approximately 7 times his annual salary.

(Compl. ¶ 234).  But these facts do not show that this sale was "unusual." Courts in this Circuit have held that a defendant's sale of shares comparable to 10.1% of his total holdings is not "unusual."  *See, e.g.*, *Acito*, 47 F.3d at 54 (holding sale of 11% of defendant's holdings was not unusual); *In re Corning*, No. 01 Civ. 6580 (CJS), 2004 WL 1056063, at *28 (W.D.N.Y. April 9, 2004) ("A sale of less than 15% of one officer's stock holdings in the company does not raise a strong inference of scienter on the part of either the officer or the company to defraud investors."); *In re Glenayre Techs., Inc. Sec. Litig.*, No. 96 Civ. 8252 (HB), 1998 WL 915907, at *4 (S.D.N.Y. Dec. 30, 1998) (finding no inference of scienter where sales represented 5% of cumulative stock holdings). Nor are the insider sales of a single defendant typically found adequate, even when these sales are referenced together with sales of other non-parties.  *See Russo*, 777 F. Supp. 2d at 517 ("Courts routinely hold, however, that insider

sales by a single defendant are insufficient to give rise to a strong inference of scienter where, as here, the remaining individual defendants did not sell any shares" (citing *San Leandro Emergency Med. Grp. Profit Sharing Plan* v. *Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996); *Acito*, 47 F.3d at 54)); *see also id.* at 518-19 ("[A]s to the sales by officers and directors not named as defendants, the Complaint gives no indication as to why the Individual Defendants would have been motivated to defraud investors in order to enrich others, not themselves."). It is not unusual for an executive to sell stock for profits that exceed his compensation; it is in fact typical for executives to be paid in this way. *See Acito*, 47 F.3d at 54 (noting that if scienter could be pleaded on the basis of incentive compensation, "virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions"). Nor is it unusual for an executive to make such a sale when he can maximize its value; that is how any rational economic actor would behave.

Plaintiff's facts support far more plausibly an innocent inference. The facts that Chlapaty sold no stock and Sturgeon sold only 10% of his stock are inconsistent with an allegation that the two "understood that ADS's false and misleading financial statements could be discovered at any time given that the independent auditor was at work on the fiscal 2015 financial statements audit." (Compl. ¶ 233). If the jig were truly up, as Plaintiff alleges, "[i]t is hard to see what benefits accrue from a short respite from an inevitable day of reckoning*." In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 463 (S.D.N.Y.

2000) (quoting *Shields* v. *Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)).  Likewise inconsistent is the timing of the "suspicious sales":  Though Plaintiff claims actionable misstatements occurring prior to the December 2014 and May 2015 sales of Sturgeon, Fussner, and APS, the facts in the Complaint indicate that the Company did not become aware of potential accounting errors until June 2015.  (*See id.* at ¶ 178 (quoting ADS March 29, 2016 Form 10-K indicating that an independent investigative review was undertaken in June 2015 in response to finance staff allegations made that same month, which review notably "found no evidence of fraud")).  These facts instead support an inference the Court finds more compelling than Plaintiff's:  The stock sales were executed in the ordinary course, because Defendants were unaware that their accounting methods were insufficient and/or violative of GAAP, and did not expect any revelation of the methods' insufficiency to have a significant impact on the Company's business.  For all of these reasons, the Court finds that Plaintiff has not pleaded scienter on the basis of Defendants' motive and opportunity to commit fraud.

       **iii.**       **Plaintiff Has Not Pleaded Scienter on the Basis of Defendants' Conscious Misbehavior or Recklessness**

The Court next considers the circumstantial evidence of Defendants' conscious misbehavior or recklessness with regard to each of the alleged material misstatements or omissions.  Plaintiff alleges that Defendants knew that "material internal control weaknesses existed throughout the Class Period," which weaknesses rendered ADS "unable to perform the necessary

levels of monitoring and oversight and ... unable to resolve complex accounting issues." (Compl. ¶¶ 192-93; *see also, e.g.*, *id.* at ¶ 61). He also contends that Defendants knew or recklessly disregarded the Company's GAAP and Sarbanes-Oxley noncompliance, and knew or were reckless in not knowing that their financial statements were materially false on the basis of this noncompliance. (*E.g.*, *id.* at ¶¶ 56, 157, 217-20).

But Plaintiff has not alleged facts to support a strong inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.*" Teamsters Local 445 Freight Div. Pension Fund*, 531 F.3d at 196 (alteration omitted) (citing *Novak*, 216 F.3d at 309). Therefore, to the extent that Plaintiff is alleging Defendants had access to facts indicating that their representation of the Company's finances was false, his allegation fails. Plaintiff has not identified contemporaneous facts, reports, or statements to which Defendants had access and which contained information contrary to the information Defendants conveyed to the public.

Instead, Plaintiff speculates that Defendants *must have* had this information, because "senior ADS executives had access to inventory reports through the Oracle software at all times and certainly could have run the reports themselves." (Compl. ¶ 54). To this, Plaintiff adds allegations that Defendants "were responsible for establishing and maintaining disclosure

controls and procedures for ADS"; "acknowledged that they designed or supervised the design of disclosure controls and procedures"; "evaluated the effectiveness of [ADS]'s disclosure controls and procedures"; and acknowledged their responsibility to disclose "in the Forms 10-Q" changes to ADS's internal controls over financial reporting that had "materially affected" or were "reasonably likely to materially affect," ADS's internal control over financial reporting.  (*Id.* at ¶ 43 (alteration in original)).  But the facts alleged do not support Plaintiff's claims.  *See City of Austin Police Ret. Sys.* v. *Kinross Gold Corp.*, 957 F. Supp. 2d 277, 299 (S.D.N.Y. 2013) ("[Plaintiff] merely argues that because defendants were aware of the extent of the diligence, they were also aware that the diligence was inadequate.  However, the facts alleged do not bear that out.").  The Court will consider Plaintiff's circumstantial evidence piece by piece, and then together as a whole.

First, Plaintiff offers the testimony of five former ADS employees to bolster his contention of fraud.  These employees are: Former Employee 1, "a plant accountant at ADS's Ennis, Texas plant from April, 2009 through January, 2014" (Compl. ¶ 46 n.2); Former Employee 2, "the fleet manager at ADS's Olympia, Washington plant from 2006 through December 31, 2013" (*id.* at ¶ 46 n.3); Former Employee 3, "the Plant Manager for ADS's Brazil, Indiana plant from April, 2014 through June, 2015" (*id.* at ¶ 50 n.4); Former Employee 4, "the Production Manager at ADS's Brazil, Indiana plant from 2007 through June, 2015" (*id.* at ¶ 53 n.5); and Former Employee 5, "a Plant Manager at

ADS's Ennis, Texas plant from April, 2014 through January, 2015" (*id.* at ¶ 53 n.6).

The statements Plaintiff offers from these employees fall into two buckets: they either (i) identify internal accounting issues or (ii) describe the Company's efforts to become Sarbanes-Oxley compliant.  (*See* Compl. ¶¶ 46-56).  Regarding the Company's accounting, Former Employee 1, who handled some accounting for truck leases, reported an expectation on the part of "corporate accounting" that "as many expenses as possible [be classified] as operating expenses, notwithstanding that many were obviously capital expenses."  (*Id.* at ¶¶ 46-47).  Former Employee 1 "believe[d] that Defendants Sturgeon and Chlapaty were aware of these instructions," because he "interacted with Chlapaty" and recalled Chlapaty to be "fairly involved in accounting treatment and financial statements."  (*Id.* at ¶ 47).  Such ruminations are, of course, far too attenuated to support scienter.

Additionally, Former Employee 1 reported accounting weaknesses to his "superiors in ADS's corporate accounting function," but "found the corporate accounting staff to be unaccepting of comments or criticism about appropriate accounting treatment," instead joking "that ADS did not follow GAAP, but rather 'SAAP,' or 'Sturgeon approved accounting principles.'"  (Compl. ¶ 48). And Former Employee 3 reported that employees were incentivized (though not instructed) to misstate monthly accounting reports to meet production goals, and that "ADS lacked any means of ensuring accuracy of financial statements." (*Id.* at ¶ 50).  The "[F]ormer [E]mployees agree that with respect to the cost of

34

raw materials in inventory, the ADS corporate accounting function — and not the individual plants —input the cost to the accounting software," and confirm that the software to calculate inventory values from the raw material inventory inputs of plant personnel was Oracle software programmed by the "corporate accounting function."  (*Id.* at ¶¶ 53-56).   According to Former Employee 2, "senior ADS executives had access to inventory reports through the Oracle software at all times and certainly could have run the reports themselves."  (*Id.* at ¶ 54).

Regarding the Company's Sarbanes-Oxley compliance, both Former Employee 1 and Former Employee 3 report that the Company was aware of its noncompliance and undertook efforts to become Sarbanes-Oxley compliant. (Compl. ¶¶ 49-50, 56).  Former Employee 1 knew that "Defendants Chlapaty and Sturgeon were well-aware of the [Sarbanes Oxley] compliance efforts" because they "prais[ed] accounting personnel directly when they made progress."  (*Id.* at ¶ 49).  And Former Employee 3 indicated that the Company's compliance efforts were significantly ramped up in January 2015, when new requirements were instituted to spur the Company toward compliance.  (*Id.* at ¶¶ 51-52).

These former employee statements, taken individually and together, cannot support a strong inference of scienter.  Not one of these former employees indicates that he or she communicated his or her concerns to "an Individual Defendant, let alone that they persuaded the defendants (or notified them of facts demonstrating) that the [accounting] was inadequate."  *City of*

35

*Austin Police Ret. Sys.*, 957 F. Supp. 2d at 299.  Nor did any Individual

Defendant, or anyone acting at the direction of an Individual Defendant,

request that any of the former employees engage in fraudulent conduct on the

Company's behalf.  At most, these former employee statements indicate that

the Individual Defendants and a handful of their employees disagreed about

the adequacy of the Company's accounting.  "However, differences of opinion,

even stark differences, between employees do not reveal scienter.  That is

particularly so where, as here, no pleading specifically alleges that the contrary

views were communicated to the company or its officers." *Id.* (citing *In re Flag*

*Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 270 (S.D.N.Y. 2004)

("[T]he mere fact that the Planning Manager 'anticipated' a delay in March 2000

does not establish that Flag or the individual defendants had similar

foresight.")); *see also, e.g.*, *PXRE*, 600 F. Supp. 2d at 538-39 ("Plaintiff points to

no case in which a court in this District has inferred a 'top executive's' 'access'

to contrary facts based on the expression of 'concerns' from one employee to

another[.]"); *Steinberg* v. *Ericsson LM Tel. Co.*, No. 07 Civ. 9615 (RPP), 2008 WL

5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (finding that plaintiff failed to allege

with sufficient particularity defendants' knowledge or access to contradictory

facts, because "[c]omplaint fail[ed] to identify any reports [d]efendants ... saw,

or any conversations in which they were provided information, that was

inconsistent in any way with their public statements").[9]

---

[9]     The Court notes that in this Circuit, "[i]t is possible to plead scienter against a
        corporation 'without being able to name the individuals who concocted and
        disseminated the fraud.'"  *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 303

Plaintiff argues in the alternative that Defendants were reckless not to know of the extent of the Company's accounting improprieties because the Company's utilization of GAAP required an "application of specific rules and no application of judgment," such that its accounting failures should have been obvious.  (Compl. ¶ 196).  Indeed, courts have found scienter in such cases. *See Espuelas*, 579 F. Supp. 2d at 478 (holding that even where defendants are "not accounting professionals, a strong inference of recklessness might be drawn from allegations that the accounting rules are straightforward and the company's accounting treatment was obviously wrong").

However, it is also "well-settled" in this Circuit that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."  *Espuelas*, 579 F. Supp. 2d at 474 (internal quotation marks omitted) (quoting *Novak*, 216 F.3d at 309).  "[W]hile there is case law supporting a strong inference of fraudulent intent when large restatements are alleged, the complaints in [those] cases [also] … all contained additional supporting allegations" indicating that a defendant had possessed and ignored contrary facts or obvious red flags.  *Id.* at 474 (citing *Rothman* v. *Gregor*, 220

---

(S.D.N.Y. 2009) (quoting *Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)).  But to the extent Plaintiff seeks the Court to impute ADS's corporate scienter from the scienter of "the accounting function" or "supervisors" of the unnamed employees, the Court cannot do so; though there is no specific seniority formula for scienter, these employees are clearly not identified with the requisite particularity that would permit the Court to infer that their seniority is sufficient.  *Cf. In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants." (citing *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 442 (S.D.N.Y. 2005); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005)).

F.3d 81, 90, 92 (2d Cir. 2000) (holding that magnitude of restatement was sufficient to plead scienter when coupled with allegations that despite repeatedly receiving reports that advanced royalties were overcapitalized, defendants continued their accounting without correction); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488-92, 496 (S.D.N.Y. 2004) (holding large restatement was enough for strong inference of fraudulent intent when coupled with allegations that defendants knew that idleness and declining demand meant that airplanes owned by the company were worth far less than they were accounted for); *S.E.C.* v. *DCI Telecomms., Inc.*, 122 F. Supp. 2d 495, 497, 500 (S.D.N.Y. 2000) (holding that scienter sufficiently pleaded when defendants were alleged to have overstated their assets and revenues by as much as 1408% in ten major GAAP violations and were "lifelong accounting professionals").

Here, Plaintiff argues that "ADS's financial statements were not in compliance with GAAP" in areas including "accounting for leases, accounting for inventory, accounting for long-lived assets, accounting for ADS Mexicana, and various other items." (Compl. ¶ 195). Similarly, Plaintiff contends that the application of the relevant Accounting Standards Codification ("ASC") Topics required "no application of judgment, but rather application of specific rules" such that Defendants *must have* been aware of the Company's noncompliance with them. (*Id.* at ¶ 198). The Court disagrees.

38

In general,

> GAAP is not the lucid or encyclopedic set of pre-existing rules that [it might be perceived] to be.  Far from a single-source accounting rulebook, GAAP encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time.  GAAP changes and, even at any one point, is often indeterminate.

*Shalala* v. *Guernsey Mem. Hosp.*, 514 U.S. 87, 101 (1995) (citation omitted).  And Plaintiff's allegations fall, premised as they are on this unsteady foundation.  What is more, ASC Topic 840, governing lease classification, requires a multifactor analysis, which this Court notes has been in flux in recent years.  (*See generally* Def. Reply 8).[10]  Presumably for this reason, the few courts to consider lease classification have not found it straightforward.  *See In re Hypercom Corp. Sec. Litig.*, No. CV-05-0455-PHX-NVW, 2006 WL 1836181, at *8 (D. Ariz. July 5, 2006) ("In addition, it requires a big inference to conclude that knowledge of a 'core' product includes knowledge of how that product is classified for accounting purposes."); *In re Hypercom Corp. Sec. Litig.*, No. CV-05-0455-PHX-NVW, 2006 WL 726791, at *5 (D. Ariz. Jan. 25, 2006) ("[Employee] is not an accountant, so it is unclear how he would know how to classify a lease pursuant to GAAP, and his conclusory claim alone does not establish the obviousness of the GAAP violation."); *Moskowitz* v. *Mitcham Indus.*, No. Civ.A. 98-1244, 1999 WL 33606197, at *15 (S.D. Tex. Sept. 29, 1999) (holding that the misclassification of equipment-operating leases as

---

[10]    The Court takes judicial notice of the fact that the Financial Accounting Standards Board (the "FASB") released Accounting Standards Update No. 2016-02, Leases (Topic 842) on February 25, 2016, having spent years developing it.

sales-type leases, a GAAP violation, does not establish scienter where plaintiff does not show defendant knew it was publishing materially false information or was reckless in publishing such information).  And Plaintiff concedes that the application of ACS 330 entails an even greater exercise of judgment.  (Compl. ¶ 216).

Even if the Court credited the alleged obviousness of the Company's GAAP violations, it would not support an inference of scienter because Plaintiff has not pleaded additional supporting allegations indicating that Defendants also possessed and ignored contrary facts or obvious "red flags".  To the contrary, Plaintiff has pleaded a "green light":  The Complaint indicates that the Company's independent auditor, Deloitte, found no issues when "performing [its] audits of ADS for 2014 through 2011."  (Compl. ¶ 229).  Plaintiff concludes that this is evidence that Deloitte itself failed to "properly adhere[] to applicable professional standards," but provides no facts to support this rather striking assertion.  (*Id.*).  More plausible an inference from any misstep by Deloitte is that the proper application of GAAP to the Company's finances was no easy task, even for a party with significant knowledge and expertise.

Finally, the Court does not find compelling Plaintiff's scienter argument predicated on the fact of Sturgeon's retirement.  Plaintiff notes that Sturgeon retired on March 31, 2016, after announcing his intent to do so on November 9, 2015.  (Compl. ¶ 171).  But "[w]ithout additional factual allegations linking [his] resignation ... to the alleged fraud, the Court finds these allegations insufficient to raise a strong inference of scienter."  *PXRE*, 600

F. Supp. 2d at 545 (collecting cases holding the same); *accord, e.g.*, *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446-447 (S.D.N.Y. 2005) ("Plaintiffs, however, have alleged no facts linking the resignation of [two individual defendants] to the accounting improprieties at BISYS.  In reality, there are any number of reasons that an executive might resign, most of which are not related to fraud.").

As Plaintiff's allegations of Defendants' conscious misbehavior or recklessness fail individually, so too do they fail as a whole.  Taken together, Plaintiff's allegations comprise a classic "fraud in hindsight" claim:  Because the Company's accounting eventually was found to be inadequate, and violative of GAAP, Plaintiff contends that Defendants must have known, or were reckless not to know, that the Company's accounting was inadequate *at the time* of their public statements.  But such claims are not cognizable.  *See Novak*, 216 F.3d at 309 ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."); *City of Austin Police Ret. Sys.*, 957 F. Supp. 2d at 304-05 (collecting cases).  And, indeed, the sum of Plaintiff's alleged facts better supports the contrary inference:  As of the Company's IPO, the Individual Defendants were unware of the extent of the Company's noncompliance with GAAP.  They warned investors that their efforts to identify the Company's accounting failings could have a detrimental impact on the Company's finances.  And as this contemplated risk materialized, Defendants took efforts to disclose its evolution to the public and to remedy it expeditiously.  These facts do not a securities fraud make.

41

Plaintiff fails to plead scienter, and so also a claim under Section 10(a) and Rule 10b-5.  The Court therefore does not need to reach the issue of loss causation.[11]

### 2.    Plaintiff Has Not Pleaded a Claim Under Section 20(a)

To state a Section 20(a) claim, a plaintiff must show [i] "a primary violation by the controlled person"; [ii] "control of the primary violator by the defendant"; and [iii] evidence that the controlling person "was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108.  This claim fails because Plaintiff has not stated a primary violation under Section 10(b) and Rule 10b-5.

### 3.    Plaintiff Has Not Sought Leave to Amend

"Plaintiff has not sought leave to amend his complaint … and, accordingly, the Court affords him no such opportunity."  *Schwartz* v. *HSBC Bank USA, N.A.*, No. 14 Civ. 9525 (KPF), 2017 WL 95118, at *8 (S.D.N.Y.

---

[11]    That said, the Court is skeptical that Plaintiff has pleaded adequately loss causation. Plaintiff alleges that Defendants concealed from the market the risk that the Company's accounting and internal control mechanisms were inadequate under GAAP and Sarbanes-Oxley, and that a proper accounting could have an adverse impact on its business.  But it seems to the Court that these risks were plainly disclosed in the Company's offering documents.  *See Lentell* v. *Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005); *Olkey* v. *Hyperion 1999 Term Tr., Inc.*, 98 F.3d 2, 5 (2d Cir. 1996) ("The plaintiffs seek to have all of the cautionary language disregarded as boilerplate, but it is too prominent and specific to be disregarded.  The prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed.").

"Where (as here) substantial indicia of the risk that materialized are unambiguously apparent on the face of the disclosures alleged to conceal the very same risk, a plaintiff must allege (i) facts sufficient to support an inference that it was defendant's fraud — rather than other salient factors — that proximately caused plaintiff's loss; or (ii) facts sufficient to apportion the losses between the disclosed and concealed portions of the risk that ultimately destroyed an investment."  *Lentell*, 396 F.3d at 177; *see also, e.g.*, *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 568 F. Supp. 2d 349, 361-62 (S.D.N.Y. 2008).  The Court is not convinced that Plaintiff has alleged facts sufficient in either regard.

Jan. 9, 2017) (citing *Shields*, 25 F.3d at 1132 ("Although federal courts are inclined to grant leave to amend following a dismissal order, we do not deem it an abuse of the district court's discretion to order a case closed when leave to amend has not been sought."); *Chen* v. *Antel Commc'ns, LLC*, 653 F. App'x 43, 44 (2d Cir. 2016) (summary order) (same)).   Rather than evincing any desire to amend, all of Plaintiff's conduct has manifested an intent to stand on the Complaint:  The Court gave Plaintiff an opportunity to amend his Complaint at the Pre-Motion Conference, and Plaintiff declined it.  (Dkt. #56).  And though Defendants in their opening brief moved the Court to dismiss the Complaint with prejudice, Plaintiff made no request for leave to amend in his opposition. *Cf. Cruz* v. *Zucker*, 116 F. Supp. 3d 334, 349 n.10 (S.D.N.Y. 2015) (finding arguments not raised in an opening brief are waived), *reconsideration denied*, 195 F. Supp. 3d 554 (S.D.N.Y. 2016), *on reconsideration*, No. 14 Civ. 4456 (JSR), 2016 WL 6882992 (S.D.N.Y. Nov. 14, 2016).  In the absence of evidence suggesting a desire to replead, much less an indication that any repleading would remedy the various deficiencies outlined in this Opinion, the Court will dismiss the matter with prejudice.

**CONCLUSION**

For the reasons outlined above, Defendants' motion to dismiss the

Complaint for failure to state a claim is GRANTED.  The Complaint is

DISMISSED.  The Clerk of Court is directed to terminate all pending motions,

adjourn all remaining dates, and close this case.

        SO ORDERED.

Dated:      March 10, 2017
            New York, New York

                                    _____
                                        KATHERINE POLK FAILLA
                                        United States District Judge